WILLKIE FARR & GALLAGHER LLP
Attorneys for 360networks Corporation
Alan J. Lipkin, Esq.
Eilish M. Cahalan, Esq.
Adam S. Ross, Esq.
787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                :

In re                            :

                            :    Chapter 7

ASIA GLOBAL CROSSING LTD., *et al.,*  :    Case Nos. 02-15749

                            :    through 02-15750 (SMB)

            Debtors.     :    (Substantively Consolidated)

                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

360NETWORKS CORPORATION,    :

                            :

           Appellant,     :    08 Civ. 03148-RJH

v.                       :

ROBERT GELTZER, as Chapter 7 Trustee of :
the Estate of Asia Global Crossing, Ltd.,  :

                            :

           Appellee.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**BRIEF OF APPELLANT 360NETWORKS CORPORATION ON APPEAL
FROM BANKRUPTCY COURT'S ORDER EXPUNGING CLAIM NUMBER 5**

# TABLE OF CONTENTS

Page

STATEMENT OF ISSUES PRESENTED..............................................................................1

STANDARD OF REVIEW ...............................................................................................2

JURISDICTION…… ........................................................................................................2

PRELIMINARY STATEMENT ........................................................................................2

STATEMENT OF THE CASE............................................................................................3

    A.  Nature Of The Case.............................................................................................3

    B.  Course Of the Proceedings And Statements Of Facts .........................................4

        1.  The Parties And Other Relevant Entities ....................................................4

        2.  Summary Of Key Facts................................................................................5

            a.  The Master Agreement and AGC's Unconditional
               Guaranty Thereof................................................................................5

            b.  360networks Was Entitled To $100 Million Worth Of
               Asia Capacity At Market Prices At The Time Of Delivery...................6

            c.  The Ordering Process Under The Master Agreement............................6

            d.  360networks Had Enormous Flexibility To Order And Use
               Asia Capacity For 15 To 25 Years.......................................................7

            e.  360networks' Efforts To Market The Asia Capacity.............................7

            f.  The Global Crossing Entities' Bankruptcy Filings.................................9

            g.  AGC's Bankruptcy Filing And ANC Sale Motion...............................11

    C.  Procedural History.............................................................................................12

ARGUMENT……...........................................................................................................13

    I.  360networks Need Not Show It Was Ready, Willing, And
       Able To Perform In Order To Obtain An Allowed Claim
       Based On 360networks' $100 Million Prepayment..........................................13

A. Return Of A Nonbreaching Party's Down Payment Is
Required After The Counterparty's Anticipatory Breach ...........................................14

B. Unlike Specific Performance Or Consequential Damages,
Damages Arising From An Anticipatory Breach That Are
Not Premised On The Breaching Party's Performance Do
Not Require Proof Of The Nonbreaching Party's Readiness,
Willingness, And Ability ..........................................................................................16

II. 360networks Was Ready, Willing And Able To Perform In January 2003 ........................19

A. Contrary To The Bankruptcy Court's Approach, 360networks'
Burden Of Proof Was Limited And All Inferences Should Have
Been Made In Favor Of 360networks As The Nonbreaching Party...........................19

B. The Uncontroverted Evidence Demonstrated 360networks Was
Ready And Willing To Perform ................................................................................22

1. 360networks Was Well-Positioned To Order Asia Capacity ...............................23

2. 360networks' Conduct Concerning The Asia Capacity Showed
360networks Was Ready And Willing .................................................................23

3. 360networks' Business Practices Showed It Was Ready And
Willing ..............................................................................................................24

4. 360networks' Economic Interests Show It Was Ready And
Willing ..............................................................................................................25

5. AGC's Statements Demonstrate 360networks Was Ready
And Willing. ......................................................................................................26

C. The Bases Cited For The Bankruptcy Court's Determination
That 360networks Was Not Ready And Willing Do Not
Withstand Scrutiny ..................................................................................................27

III. The Evidence 360networks Was Ready And Willing To Perform Is
Even Stronger When Evaluated As Of The Dates Prior To January
2003 That AGC Also Anticipatorily Breached AGC's Guaranty ......................................36

A. 360networks Was Entitled To Assert That AGC Anticipatorily
Breached Its Guaranty Prior To January 29, 2003 ...................................................36

B. AGC Anticipatorily Breached The Guaranty In June 2002.......................................39

C. AGC's Contemporaneous Execution Of An Agreement To
Sell Substantially All Its Assets To Asia Netcom And Filing
Of The Related Motion To Approve That Sale Constituted

An Anticipatory Breach Of The Guaranty As Of
November 17, 2002 .................................................................................41

IV. 360networks Is Entitled To An Allowed $100 Million (Plus) Claim
Without A Remand For Further Proceedings ...........................................46

A.   The Bankruptcy Court Already Determined 360networks Is
Entitled To A $100 Million Claim...........................................................46

B.   Alternatively, 360networks Is Entitled To An Allowed Claim
Of $100 Million Because That Was The Benefit Of The
Bargain The Parties Reasonably Expected .............................................47

C.   Alternatively, 360networks Is Entitled To Its Restitution
Interest Equaling A $100 Million Allowed Claim ....................................48

D.   360networks' Allowed Claim Also Should Include Costs
of Collection ........................................................................................49

E.   If The Court Were To Rule In Favor Of 360networks' Appeal,
No Remand For Further Proceedings Would Be Necessary .....................49

CONCLUSION................................................................................................50

# TABLE OF AUTHORITIES

## Federal Cases

Aetna Cas. and Surety Co. v. Aniero Concrete Co.,
404 F.3d 566 (2d Cir. 2005) ...................................................................16

Amber Res. Co. v. United States,
68 Fed. Cl. 535 (Fed. Cl. 2005) ..........................................................48, 49

Argonaut P'ship, L.P. v. Sidek, S.A.,
No. 96 Civ. 1967, 1996 WL 617335 (S.D.N.Y Oct. 25, 1996) .........................32, 45

In re Asia Global Crossing,
379 B.R. 490 (Bankr. S.D.N.Y. 2007)............................................................. *passim*

In re Asia Global Crossing,
332 B.R. 520 (Bankr. S.D.N.Y. 2005)..........................................................37, 48

In re Asia Global Crossing,
326 B.R. 240 (Bankr. S.D.N.Y. 2005)..............................................36, 43, 44, 45

Bausch & Lomb, Inc. v. Bressler,
977 F.2d 720 (2d Cir. 1992) ...................................................................49

Celle v. Filipino Reporter Enters. Inc.,
209 F.3d 163 (2d Cir. 2000) ...................................................................50

Celotex Corp. v. Catrett,
477 U.S. 317 (1986)...............................................................................36

In re Food Mgmt. Group, LLC,
372 B.R. 171 (Bankr. S.D.N.Y. 2007)............................................................. *passim*

Hospital Ass'n of New York State, Inc. v. Toia,
73 F.R.D. 565 (S.D.N.Y. 1976) ................................................................50

Jenkins v. Greyhound Lines, Inc.,
No. C-46141, 1971 WL 529 (N.D. Cal. May 4, 1971)............................................38

King World Productions v. FNN,
660 F. Supp. 1381 (S.D.N.Y), aff'd. 834 F.2d 267 (2d Cir. 1987)...................20, 32

Landmark Land Co. v. F.D.I.C.,
256 F.3d 1365 (Fed. Cir. 2001) ................................................................48

Lucente v. Int'l Bus. Machines Corp.,
    310 F.3d 243 (2d Cir. 2002) .................................................................................24

Mobil Oil Exp. and Producing Southeast, Inc. v. United States,
    530 U.S. 604 (2000)....................................................................................48, 49

Pan Am Corp. v. Delta Airlines, Inc.,
    175 B.R. 438 (Bankr. S.D.N.Y. 1994)..................................................................14

In re Randall's Island Family Golf Centers, Inc.,
    261 B.R. 96 (Bankr. S.D.N.Y. 2001).....................................................................24

Saewitz v. Epstein,
    6 F. Supp. 2d 151 (N.D.N.Y. 1998).......................................................................16

In re St. Casimir Dev. Corp.,
    358 B.R. 24 (S.D.N.Y. 2007) .................................................................................2

Scholle v. Cuban-Venezuelan Oil Voting Trust,
    285 F.2d 318 (2d Cir. 1960) .................................................................................32

Scott-Macon Secs., Inc. v. Zoltek Cos.,
    No. 04 Civ. 2124, 2005 WL 1138476 (S.D.N.Y. May 12, 2005)...........................47

In re Silberman, Inc.,
    30 B.R. 219 (E.D. Penn 1983) ..............................................................................29

Towers Charter & Marine Corp. v. Cadillac Ins. Co.,
    894 F.2d 516 (2d Cir. 1990) .................................................................................14

Trans World Metals, Inc. v. Southwire Co.,
    769 F.2d 902 (2d Cir. 1985) .................................................................................47

United States v. Hon,
    17 F.3d 21 (2d Cir. 1994) .....................................................................................14

Waxman v. Envipco Pick Up & Processing Servs.,
    No. 02 Civ. 10132, 2006 WL 236818 (S.D.N.Y. Jan. 17, 2006)............................47

Weed v. Lyons Petroleum Co.,
    294 F. 725 (D. Del. 1923)......................................................................................32

**State Cases**

Abdul v. Subbiah,
    747 N.Y.S.2d 372 (App. Div. 2001)................................................................48, 49

Ahearn v. Anderson-Bishop P'ship,
    946 P.2d 417 (Wyo. 1997)..................................................................................21

American List Corp. v. U.S. News and World Report, Inc.,
    549 N.E.2d 1161 (N.Y. 1989).........................................................................17, 18

Cipriano v. Glen Cove Lodge #1458, B.P.O.E.,
    801 N.E.2d 388 (N.Y. 2003).........................................................................15, 18

DeForest Radio Telephone & Telegraph Co. v. Triangle Radio Supply Co.,
    153 N.E. 75 (N.Y. 1926)...................................................................................45

Fridman v. Kucher,
    826 N.Y.S.2d 104 (App. Div. 2006)..................................................................14

G.G.F. Properties, LLC v. Hong,
    726 N.Y.S.2d 454 (App. Div. 2001)..................................................................15

Heart Constr. Corp. v. Gower,
    No. 33139/03, 2004 N.Y. Misc. LEXIS 2975 (Dist. Ct. Oct. 14, 2004) .................45

Huntington Mining Holdings, Inc. v. Cottontail Plaza, Inc.,
    459 N.E.2d 492 (N.Y. 1983).............................................................................14

Lavoie v. Safecare Health Serv., Inc.,
    840 P.2d 239 (Wyo. 1992)................................................................................21

Moray v. DBAG, Inc.,
    760 N.Y.S.2d 193 (App. Div. 2003)..................................................................15

Musick v. 330 Wythe Ave. Assocs., LLC,
    838 N.Y.S.2d 620 (App. Div. 2007)..................................................................14

Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.,
    705 N.E.2d 656 (N.Y. 1998).........................................................................31, 45

Petrelli Assocs., Inc. v. Germano,
    702 N.Y.S.2d 360 (App. Div. 2000)..................................................................14

Ross Bicycles Inc. v. Citibank, N.A.,
    606 N.Y.S.2d 192 (App. Div. 1994)..................................................................14

Ross Bicycles Inc. v. Citibank, N.A.,
    613 N.Y.S.2d 538 (Sp. Ct. 1994)......................................................................29

Satellite Dev. Co. v. Bernt,
    492 N.W.2d 334 (Neb. 1988) ...................................................................29

Scull v. Sicoli,
    668 N.Y.S.2d 827 (App. Div. 1998)......................................................14, 15, 16

Sunrise Assocs. v. Pilot Realty Co.,
    565 N.Y.S.2d 108 (Sup. Ct. 1991)..............................................................14, 15

Updike v. Oakland Motor Car Co.,
    242 N.Y.S. 329 (App. Div. 1930) ...........................................................44, 45

## **Rules and Statutes**

Fed. R. Civ. P. 56(c) ...................................................................................36

Fed. R. Civ. P. 56(d) .........................................................................37, 38, 39

28 U.S.C. § 158(a) (2006).................................................................................2

**BRIEF OF APPELLANT 360NETWORKS CORPORATION ON APPEAL**
**FROM BANKRUPTCY COURT'S ORDER EXPUNGING CLAIM NUMBER 5**

       360networks Corporation ("360networks"), by its attorneys, respectfully submits this brief in support of its appeal from the Bankruptcy Court's final order, dated January 2, 2008 (the "January 2 Order"), expunging 360networks' claim (the "Claim"), the decision, dated December 13, 2007 (the "Post Trial Decision" or "Opinion"), 379 B.R. 490 (Bankr. S.D.N.Y. 2007), finding the Claim should be expunged, the Bankruptcy Court's opinion and order, dated June 28, 2005 (the "Summary Judgment Order"), finding, inter alia, that Asia Global Crossing Ltd. ("AGC" or "Asia Global") anticipatorily breached its guaranty obligation to 360networks on January 29, 2003, but that AGC would have no liability unless 360networks was ready, willing, and able to perform on that date, and the Bankruptcy Court's opinion and order, dated November 10, 2005 (the "Reargument Order"), adhering to the Summary Judgment Order.

## STATEMENT OF ISSUES PRESENTED

       1.     Did the Bankruptcy Court err as a matter of law in concluding that despite AGC's anticipatory repudiation of its guaranty obligations to 360networks, 360networks still had to prove it was ready, willing and able to perform solely to recover based on 360networks' $100 million prepayment?

       2.     In determining whether 360networks was ready, willing and able to perform, did the Bankruptcy Court err by either: (a) overstating or misapplying 360networks' burden of proof; or (b) making inferences in favor of the Chapter 7 Trustee for AGC (the "Trustee") instead of in favor of 360networks as the nonbreaching party?

       3.     Did the Bankruptcy Court err in holding AGC did not anticipatorily breach its contractual obligations earlier than January 29, 2003?

## STANDARD OF REVIEW

When reviewing a bankruptcy court's decision, a district court reviews conclusions of law de novo, but accepts factual findings unless clearly erroneous.  In re St. Casimir Dev. Corp., 358 B.R. 24, 35 (S.D.N.Y. 2007) (citations omitted).

## JURISDICTION

This Court has jurisdiction to review the Bankruptcy Court's final order pursuant to 28 U.S.C. § 158(a) (2006), which provides, in part, that "[t]he district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders, and decrees … entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title."

## PRELIMINARY STATEMENT

This appeal should be analyzed in light of four unchallenged premises confirmed by the Bankruptcy Court.  First, 360networks prepaid $100 million for the right to order an equivalent amount of telecommunications capacity in Asia from AGC.  Second, AGC anticipatorily breached its obligation to provide such capacity to 360networks.  Third, until AGC's anticipatory breach, 360networks consistently sought to realize the value of its right to order the Asia Capacity.  Fourth, 360networks always was able to order the Asia Capacity, as the ordering mechanics were straightforward and, in light of 360networks' $100 million prepayment, essentially cost free.  Nevertheless, despite the self-evident fact it was overwhelmingly in 360networks' economic interest not to forfeit a prepaid asset worth $100 million (or whatever reduced, but still substantial value that asset would have after AGC's bankruptcy filing), the Bankruptcy Court found 360networks was not ready and willing to order Asia Capacity at the time of AGC's anticipatory breach and, therefore, disallowed 360networks' $100 million Claim.

The Bankruptcy Court's ruling was incorrect for multiple reasons, most of which concerned matters of law.    First, as a matter of law, after AGC's anticipatory breach, 360networks did not need to prove it was ready, willing, and able to perform to the extent 360networks sought to recover based solely on 360networks' $100 million prepayment, as opposed to seeking specific performance or consequential damages.    Second, even if 360networks had that burden, as a matter of law, 360networks could establish it was ready and willing to order capacity without proof 360networks had taken formal steps towards ordering capacity months before the contractual deadline.    Third, due to AGC's anticipatory breach, as a matter of law, all fact inferences regarding whether 360networks was ready and willing to order must be made in favor of 360networks, as the nonbreaching party.    Fourth, under any applicable burden of proof, the facts here demonstrate 360networks was ready and willing to order Asia Capacity in January 2003.    Fifth, even if 360networks somehow was not ready and willing in January 2003, as a matter of law, AGC's unequivocal communications in June and November 2002 that AGC would not provide Asia Capacity to 360networks signify AGC anticipatorily breached its obligations as of those earlier times.    As those earlier breaches preceded 360networks' deadline to order Asia Capacity by five to nine months, it is even more apparent on those earlier dates that 360networks was ready and willing to order Asia Capacity.

Consequently, the Bankruptcy Court's January 2 Order should be reversed and 360networks' Claim should be allowed for $100 million plus 360networks' costs of collection.

## STATEMENT OF THE CASE

**A.**    Nature Of The Case

This appeal is from the January 2 Order, which expunged 360networks' Claim. 360networks also appeals certain rulings in the Summary Judgment Order, specifically that AGC did not anticipatorily breach its Guaranty before January 29, 2003, and that to obtain an allowed

claim for its $100 million prepayment based on AGC's anticipatory breach, 360networks had to prove it was ready, willing, and able to perform under the Master Agreement. 360networks also appeals the Reargument Order to the extent it left those rulings in place.

**B.    Course Of The Proceedings And Statement Of Facts**

1.    <u>The Parties And Other Relevant Entities</u>.

360networks is a provider of telecommunications capacity to other telecommunications companies and to businesses.

Robert L. Geltzer is the Trustee for AGC and its wholly-owned subsidiary Asia Global Crossing Development Co. (collectively with AGC, the "<u>Debtors</u>").

At all relevant times, the Debtors were indirect majority owned subsidiaries of Global Crossing, Ltd. ("<u>Global Crossing</u>"). Global Crossing was an international provider of telecommunications capacity to businesses.

At all relevant times, Pacific Crossing Ltd. ("<u>PCL</u>"): (a) owned the PC-1 system, which provides telecommunications connections between the United States and Japan ("<u>PC-1 Capacity</u>") and represented one of the two types of capacity comprising the Asia Capacity 360networks was entitled to order; and (b) was an indirect majority-owned subsidiary of AGC.

East Asia Crossing Limited (Bermuda) ("<u>EA Crossing</u>") owned the EAC system, which provides telecommunications connections between Japan and other key Asian countries ("<u>EAC Capacity</u>") and represented the other type of capacity comprising Asia Capacity. Prior to the ANC Sale (defined below), EA Crossing was an indirect, wholly-owned subsidiary of AGC.

Global Crossing Bandwidth, Inc. ("<u>GC Bandwidth</u>") was a selling agent for Global Crossing entities, including AGC. GC Bandwidth was an indirect, wholly-owned subsidiary of Global Crossing. At all relevant times, GC Bandwidth was affiliated with and

under common control of AGC.  (See Guaranty by Asia Global Crossing, dated as of March 30, 2001 (Ex. 15, the "Guaranty" § 3.2, Dkt. 967, App. 1).[1]

       2.     Summary Of Key Facts.

          a.     The Master Agreement And AGC's
                     Unconditional Guaranty Thereof.

On March 30, 2001, 360networks (Holdings) Ltd. and 360Pacific (Bermuda) Ltd. entered into a contract with GC Bandwidth under which the 360networks entities could order certain telecommunications capacity.  (See the Ex. 14 "Master Agreement," Dkt. 967, App. 1; July 26 Tr., 25-26, Dkt. 918, App. 2.)  $100 million of that capacity connected the United States to Asia and various countries within Asia through fiber optic cable systems known as the PC-1 System and EAC System, owned by AGC's subsidiaries EA Crossing and PCL respectively (the "Asia Capacity").  (July 26 Tr. 25-26, Dkt. 918, App. 2.)  The 360networks entities prepaid $100 million for the right to order Asia Capacity (the "Asia Commitment").[2]  (See Ex. 16, GC Bandwidth's Receipt, Dkt. 967, App. 1.)

Contemporaneously, AGC delivered the Guaranty, which provides, inter alia, for AGC to provide an "unconditional" guaranty of full performance of the Asia Commitment.  (Ex. 15, Guaranty § 2.3, Dkt. 967, App. 1.)  Also, the Guaranty provides that if GC Bandwidth filed for bankruptcy, 360networks could demand performance under the Master Agreement directly from AGC.  (Ex. 15, Guaranty § 2.5, Dkt. 967, App. 1.)

In acquiring the Asia Commitment, 360networks implemented part of a business plan to operate a worldwide telecommunications network.  (July 26 Tr. 27, Dkt. 918, App. 2;

---

[1]     All references herein to "Ex. ___" refer to trial exhibits admitted in the Bankruptcy Courts hearing in this matter.  All references herein to "Dkt. ___" refer to the docket entries for In re Asia Global Crossing, Case No. 02-15749.  All reference to "App. ___" refer to Appendix exhibit numbers.  An appendix will be submitted upon filing of Appellant's reply brief.

[2]     While the Trustee has repeatedly asserted that 360networks paid for the Asia Capacity in kind, rather than in cash, the Bankruptcy Court has held that 360networks paid $100 million for the Asia Capacity.  See Opinion at 3.

July 27 Tr. 7-9, 64, Dkt. 907, App. 3.)  In effect, 360networks obtained immediate access to the Asian market while saving substantial upfront capital expenditures for building its own Asia network.  (July 26 Tr. 31, Dkt. 918, App. 2; July 27 Tr. 8, Dkt. 907, App. 3.)

> b.    360networks Was Entitled To $100 Million Worth Of
>        Asia Capacity At Market Prices At The Time Of Delivery.

Rather than providing the specific price, wavelength size, and route of each telecommunications circuit, the Master Agreement entitled 360networks to specify later which Asia Capacity to "takedown."  The amount of capacity to which 360networks was entitled would be determined by the price of capacity at the time of delivery.  (See Ex. 14, Master Agreement §§ 2(a), 2(l)), Dkt. 967, App 1.)  This pricing mechanism, referred to as a most favored customer clause ("MFC Clause"), entitled 360networks to $100 million worth of Asia Capacity at the lower of: (1) the price listed in a schedule; or (2) the lowest price offered by Global Crossing or its affiliates to non-affiliate third parties.  (See id. § 2(l), App. 1.)  The MFC Clause protected 360networks from fluctuations in Asia Capacity prices by enabling 360networks to purchase capacity at its market price when delivered.  Thus, as the Bankruptcy Court recognized, "[i]f the market price for capacity declined, GC Bandwidth [or AGC] would be required to deliver proportionately more capacity to meet its obligations."  (Opinion at 3, Dkt. 946, App. 4.)

> c.    The Ordering Process Under The Master Agreement.

Section 2(d) of the Master Agreement details the relatively simple process by which 360networks could order Asia Capacity:

> Each takedown of capacity pursuant to this Agreement shall be effected by the parties or their Affiliates *executing and delivering a CPA*, substantially in the form of Exhibit B … *and a service order form* in a form mutually agreeable to the parties, reflecting the takedown of any additional capacity and the routing thereof (together the "Order").  Each takedown of capacity hereunder shall be afforded the additional rights, and shall be subject to the

> additional provisions of the CPA.  Each takedown of capacity
> hereunder shall be noted in the Takedown Schedule attached
> hereto as Exhibit F (the "Takedown Schedule").

(Id. § 2(d) (emphasis added), Dkt. 967, App. 1.)

> d.    360networks Had Enormous Flexibility To Order
>        And Use Asia Capacity For 15 To 25 Years.

Under the Master Agreement, 360networks had 24 months, until March 2003, to

order Asia Capacity.  (Ex. 14, Master Agreement § 2(a), Dkt. 967, App. 1.)  Further, the Master

Agreement allowed 360networks to "take down" or accept delivery of any order for an additional

12 months (i.e., until 36 months after the closing date.)   (See id. § 2(g).)   Also, while

360networks had to specify the route and capacity size of each circuit when ordering,

360networks could "port" (i.e., rearrange) capacity between routes on the PC-1 and/or EAC

systems.  (Id. § 2(m).)  Further, once ordered, capacity was available for 360networks' use for a

minimum of 15 (and up to 25 years, depending on whether 360networks exercised two easily

exercisable 5 year options -- at no charge).  (See Id. § 5.)  AGC was responsible for the costs of

operating and maintaining the Asia Capacity for the first 15 years.  (Id. § 4; July 27 Tr. 20, Dkt.

907, App. 3.)  Hence, at the end of the ordering period, 360networks had the ability - at virtually

no cost - to order and "warehouse" Asia Capacity for future use over the next 15 to 25 years.

> e.    360networks' Efforts To Market The Asia Capacity.

360networks began actively marketing the Asia Capacity immediately after

executing the Master Agreement.  Despite a telecommunications industry downturn that caused

many of 360networks' affiliates -- as well as Global Crossing and AGC -- to seek bankruptcy

protection, 360networks sought to sell the capacity, in whole or in part, to various telecom

companies, including, Deutche Telecom, WorldCom, Aleron and many others.  (July 26 Tr. 115-

116, Dkt. 918, App. 2.)  360networks' initial efforts, included, inter alia: (i) 360networks

repeatedly requesting Asia Capacity pricing from GC Bandwidth and/or AGC (July 26 Tr. 118, 147, Dkt. 918, App. 2; Exs. 74, 113, 180, 204, Dkt. 967-968, App. 1, 5); (ii) after locating interested customers, contacting AGC and/or GC Bandwidth to obtain prices and determine availability (July 26 Tr. 115, 118, Dkt. 918, App. 2); and (iii) sending a letter of intent to order two 2.5 gigabyte waves under the Master Agreement, but GC Bandwidth would not permit 360networks to utilize the Asia Commitment to buy such waves because they were "on sale." (July 26 Tr. 123-26, Dkt. 918, App. 2; Ex. 82, Dkt. 967, App. 1.)

From the outset, the Global Crossing entities, including AGC, frustrated 360networks' attempts to order and/or sell the Asia Capacity by:  (a) failing to comply with the MFC Clause in the Master Agreement; (b) failing to provide pricing to 360networks in a timely fashion; and (c) actively seeking to "steal" interested 360networks customers. (July 26 Tr. 119-121; 127-29, 139, Dkt. 918, App. 2; Exs. 64, 74; 113, Dkt. 967-68, App. 1, 5.)[3]

During the entire ordering period under the Master Agreement, 360networks' sales force was under direction to seek to sell Asia Capacity.  (July 27 Tr. 71, Dkt. 907, App. 3.) Thus, 360networks continued its marketing efforts respecting Asia Capacity even after June 28, 2001, when 360networks and its affiliates filed for bankruptcy protection in Canada and 360networks' U.S. affiliates filed for chapter 11 protection in the United States.  (Stip. Fact # 2, Dkt. 904, App. 6; July 26 Tr. 132, Dkt. 918, App. 2; July 27 Tr. 12-13, Dkt. 907, App 3.)  This included, inter alia, efforts to sell Asia Capacity in pieces or as a whole and efforts to assign

---

[3]    It was 360networks' practice to provide a forecast respecting Asia Capacity by advising GC Bandwidth and/or AGC of specific customer interest. (July 26 Tr. 148-49, Dkt. 918, App. 2.) As this provided AGC with advance knowledge of customer interest in Asia Capacity, AGC could and did specifically target customers interested in purchasing capacity from 360networks and offer them better prices than AGC offered 360networks. (Id. 136-37; Ex. 64, Dkt. 967, App. 1.) It was in GC Bandwidth's and AGC's interests to sell directly to such customers for cash payment rather than to sell to 360networks under the prepaid Asia Commitment, which only would serve to reduce a prepaid liability rather than generate hard cash. Despite these obstacles, 360networks continued marketing Asia Capacity. (July 26 Tr. 137-140, Dkt. 918, App. 2, Exs. 173, 213, Dkt. 968, App. 5.)

360networks' rights under the Master Agreement and Guaranty. (July 26 Tr. 137-138, 145-147, Dkt. 918, App. 2; July 27 Tr. 10-14, Dkt. 907, App. 3; Exs. 173, 213.) Targeted buyers included major telecom companies such as Deutche Telecom, WorldCom and Aleron. (July 26 Tr. 137-138, 145-147, Dkt. 918, App. 2; July 27 Tr. 10-14, Dkt. 907, App. 3; Exs. 173, 213, Dkt. 968, App. 5.)

f.    The Global Crossing Entities' Bankruptcy Filings.

On January 28, 2002, Global Crossing and numerous of its subsidiaries, including GC Bandwidth, filed for chapter 11 protection. (Stip. Fact # 3, Dkt. 904, App. 6.) AGC then became primarily liable under the terms of the Guaranty. (Ex. 15, Guaranty § 2.5, Dkt. 967, App. 1.)

In February 2002, hoping to avoid its own bankruptcy filing due in part to the loss of financing from Global Crossing, AGC decided to sell substantially all of its assets and retained the investment bank Lazard Freres & Co. LLC ("Lazard") to assist in that endeavor. (See Stip. Fact # 7, Dkt. 904, App. 6; July 27 Tr. 98-100, 101-102, Dkt. 907, App. 3.) In April 2002, as part of that sale effort, AGC offered 360networks $5 million to purchase the $100 million Asia Commitment, but 360networks rejected the offer as too low. (July 27 Tr. 95-98, Dkt. 907, App. 3; Ex. 220, Dkt. 968, App. 5.) In June 2002, Jim Millstein, AGC's financial advisor at Lazard, again raised the purchase with 360networks' Chief Financial Officer, Christopher Mueller. Specifically, Millstein explained that AGC intended to sell its assets unencumbered by its obligation to 360networks and if necessary, AGC would seek bankruptcy protection to do so. (July 27 Tr. 98-101, Dkt. 907, App. 3.) As such, Millstein advised Mueller that AGC would never deliver Asia Capacity to 360networks. (Id.; at 133-35.)

On July 19, 2002, PCL, through which AGC indirectly owned a controlling interest in the PC-1 System, filed for chapter 11 protection. (AGC's Voluntary Petition (Chapter

11) Dkt. 1 App. 7; Riesenfeld Aff. ¶¶ 13, 17-19, Dkt. 3, App. 8.)  As noted above, the Master Agreement and Guaranty entitled 360networks to capacity on both the EAC and PC-1 systems. There was little overlap as the PC-1 System covered U.S. to Japan connections and the EAC system was primarily for connections between other key Asian countries.  (See ANC Sale Motion ¶ 12, Dkt. 17, App. 9.)  Hence, upon PCL's chapter 11 filing, if not earlier, AGC effectively lost control of the PC-1 System so that had 360networks ordered PC-1 Capacity, AGC would have needed to purchase such capacity at full price from PCL.

In light of Mr. Millstein's statements communicating that AGC would not deliver the Asia Capacity (and AGC's loss of control over the PC-1 System), 360networks continued negotiations for AGC to buy back the Asia Commitment.  For the purposes of those negotiations, 360networks valued its right to $100 million of Asia Capacity based on the estimated present value of the likely distribution on a $100 million unsecured claim in an AGC bankruptcy case. (July 27 Tr. 103-108, 135, Dkt. 907, App. 3; Ex. 228, Dkt. 968, App. 5.)  AGC valued the Asian Commitment on the same basis.  (Ex. 228, Dkt. 968, App. 5.)  By early October 2002, 360networks and AGC reached an agreement in principle for AGC to pay 360networks $12 million.  (July 27 Tr. 102-03, Dkt. 907, App. 3; Exs. 226, 227, Dkt. 968, App. 5.)  Nonetheless, AGC's bondholders vetoed the deal.  (July 27 Tr. 106, Dkt. 907, App.3; Ex. 228, Dkt. 968, App. 5.)  Never once during the negotiations did AGC assert 360networks was entitled to anything less than a $100 million claim based on AGC's Guaranty.  (Ex. 228, Dkt. 968, App. 5.)

Contemporaneously, 360networks and various Global Crossing entities negotiated a settlement resolving multiple outstanding obligations.  (July 27 Tr. 15-16, Dkt. 907, App. 3.) During those negotiations, 360networks obtained Global Crossing's offer to purchase the Asia Commitment, but 360networks rejected the offer.  (July 27 Tr. 15, 17-18, Dkt. 907, App. 3.)  In

October 2002, a settlement agreement was approved among GC Bandwidth and 360networks (and other parties) that, inter alia, provided for GC Bandwidth and 360networks to release each other from claims relating to the Master Agreement. Notably, the settlement expressly reserved 360networks' rights against AGC under the Guaranty and made clear GC Bandwidth did not reject the Master Agreement. (Ex. 237, Settlement Agreement § 4.1, Dkt. 968, App. 5.)

g.    AGC's Bankruptcy Filing And ANC Sale Motion.

On November 17, 2002, just prior to filing for bankruptcy protection, AGC executed an agreement (the "Sale Agreement") to sell substantially all of its assets to Asia Netcom Corporation ("ANC").[4]    AGC's Guaranty was an 'excluded liability' not assumed by ANC under the ANC Sale Agreement. (July 27 Tr. 120, Dkt. 907, App. 3.) Execution of the Sale Agreement triggered AGC's obligation to pay $1 million to Lazard, which payment was made.[5]

On November 17, 2002, AGC also filed a chapter 11 petition. (Stip. Fact # 6, Dkt. 904, App. 6.) Contemporaneously, AGC filed a motion seeking approval of the ANC Sale. (Stip. Fact # 7, Dkt. 904, App. 6.) In its bankruptcy filing, the Debtors listed 360networks' $100 million claim as one of their 20 largest unsecured claims and did not describe the claim as disputed. (See Riesenfeld Affidavit, dated November 15, 2002, Schedule 1, Dkt. 3, App. 8.)

By order, dated January 29, 2003 (the "ANC Sale Order"), the Bankruptcy Court approved the ANC Sale. (Stip. Fact # 8, Dkt. 904, App. 6; ANC Sale Order, Dkt. 151, App. 13.) Among other things, the Bankruptcy Court found the following urgent reasons for the ANC Sale:

---

[4]    (See Motion to Approve (A) Authorizing and Scheduling an Auction for the Sale of All or Substantially all of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, … (the "Sale Motion") Dkt. 17, App. 9; Affidavit of Richard F. Casher, dated January 23, 2003, in Support of the ANC Sale motion ¶ 4, Ex. B to Dkt. 148, App. 10.)

[5]    (See Application to Employ Lazard as Financial Advisors … Dkt. 11, App. 11; Final Application for Interim Professional Compensation for Lazard, ¶ 11, Dkt. 248, App. 12.)

- "[AGC's] liquidity constraints were exacerbated further when, in December 2001, Global Crossing refused to honor its obligations under a $400 million subordinated standby credit facility (the "GX Credit Facility") that it had made available to [AGC] . . . . "

- "[AGC], in the exercise of its sound business judgment, has determined that, (i) due to the current slowdown affecting the telecommunications sector, [AGC] lacks the ability to avail itself of the capital markets as a means of addressing its liquidity constraints, (ii) [AGC's] liquidity "runway" extends only through approximately the end of the first quarter of 2003, rendering a stand-alone business plan infeasible, and (iii) unless a sale to [ANC] is concluded expeditiously as provided for in the Sale Motion and under the Sale Agreement, the value of the Acquired Assets may decline, and [AGC], its estate and its creditors may realize less value for the Acquired Assets."

- "Except as otherwise provided in this Approval Order, the assets remaining in [AGC's] estate following consummation of the Sale will be distributed to [AGC's] administrative and general unsecured creditors under the terms of a confirmed chapter 11 plan of reorganization."

(ANC Sale Order pp. 6-7, Dkt. 151, App. 13 (emphasis added).)

On February 20, 2003, 360networks filed its Proof of Claim against AGC for not less than $100 million. (July 26 Tr. 56-57, Dkt. 907, App. 3; Ex. 252, Dkt. 969, App. 14.)

**C.    Procedural History.**

On November 5, 2004, the Trustee filed an objection to 360networks' Claim.  On June 28, 2005, the Bankruptcy Court issued the Summary Judgment Order, which, inter alia, found AGC had anticipatorily breached the Guaranty as of January 29, 2003, but to recover on its Claim, 360networks had to show it was "ready, willing and able" to perform.  Dkt. 642, App. 15.  Thereafter, 360networks and the Trustee each sought reconsideration of certain portions of the Summary Judgment Order.  The Bankruptcy Court's November 10, 2005, opinion, 332 B.R. 520, Dkt. 690, App. 16, left intact all determinations in the Summary Judgment Order.

On July 26-27 2007, the Bankruptcy Court conducted an evidentiary hearing as to whether, as of January 29, 2003, 360networks was ready, willing, and able to order the prepaid Asia Capacity. On December 13, 2007, the Bankruptcy Court issued its Opinion, which held 360networks was "able" to order the Asia Capacity, but had not demonstrated it was "ready and willing" to do so. The January 2 Order then expunged 360networks' Claim.

## ARGUMENT

**I.    360NETWORKS NEED NOT SHOW IT WAS READY, WILLING, AND ABLE TO PERFORM IN ORDER TO OBTAIN AN ALLOWED CLAIM BASED ON 360NETWORKS' $100 MILLION PREPAYMENT.**

According to the Bankruptcy Court, New York law provides that following an anticipatory repudiation, the nonbreaching party "is excused from performing, without regard to readiness, willingness or ability to perform," but to recover any "monetary or equitable relief on account of the breach, [the nonbreaching party] must show that he was ready, willing and able to perform." Opinion pp. 11-12. The Bankruptcy Court then attempted to reconcile that paradigm with New York case law holding that recovery of a down payment does <u>not</u> require a showing the plaintiff was ready, willing, and able. Specifically, the Bankruptcy Court stated that a "cause of action to recover a deposit is a form of rescission that seeks a return to the <u>status quo</u> rather than damages caused by an anticipatory breach." <u>Id.</u> p. 12. The Bankruptcy Court's theory is flawed in several respects, including, <u>inter alia</u>, that recovery of a deposit and rescission each involve "monetary or equitable relief."

Preliminarily, 360networks concedes that following an anticipatory breach, the nonbreaching party must show it was ready, willing, and able to perform to either obtain specific performance or recover consequential damages. Indeed, those were the remedies sought in

virtually every ready, willing, and able case the Bankruptcy Court relied upon in the Opinion.[6] 360networks, however, never sought specific performance or consequential damages. Indeed, specific performance by AGC had become impossible and at no time did 360networks seek consequential damages, which (along with "incidental, indirect or special damages") were expressly prohibited by section 18(b) of the Master Agreement (Ex. 14, Dkt. 967, App. 1). Instead, 360networks merely pursued a claim based on its $100 million prepayment.

### A.  Return Of A Nonbreaching Party's Down Payment Is Required After The Counterparty's Anticipatory Breach.

Regarding prepayments, every New York case on point holds that after an anticipatory breach, recovery of a down payment by the nonbreaching party does not require a showing it was ready, willing, and able to perform. See, e.g., Scull v. Sicoli, 668 N.Y.S.2d 827, 828 (App. Div. 1998) (Seller's "repudiating the contract therefore constitutes an anticipatory breach entitling the plaintiffs to recover their down payments without proof that they were ready, willing, and able to complete the transaction."  In contrast, to recover consequential damages, "plaintiffs had the burden to establish" they were ready, willing, and able to perform.) (citations omitted) (hereafter "Scull"); Sunrise Assocs. v. Pilot Realty Co., 565 N.Y.S.2d 108, 109 (Sup. Ct. 1991) ("While it is well established that, in order to be entitled to specific performance of a

---

[6]    Thus, all those cases are irrelevant here because they do not apply to claims based on an anticipatory breach that seek return of a down payment or prepayment. See, e.g., Towers Charter & Marine Corp. v. Cadillac Ins. Co., 894 F.2d 516, 520, 523 (2d Cir. 1990) (borrower seeks specific performance on loan commitment and consequential damages); United States v. Hon, 17 F.3d 21, 26 (2d Cir. 1994) (defendant seeks specific performance of plea agreement); Pan Am Corp. v. Delta Airlines, Inc., 175 B.R. 438, 507 (Bankr. S.D.N.Y. 1994) (creditors' committee for debtor/seller seeks multiple forms of consequential damages); Huntington Mining Holdings, Inc. v. Cottontail Plaza, Inc., 459 N.E.2d 492, 492 (N.Y. 1983) (property buyer seeks specific performance); Musick v. 330 Wythe Ave. Assocs., LLC, 838 N.Y.S.2d 620, 621-22 (App. Div. 2007) (real estate purchaser asserts claim for specific performance and consequential damages); Fridman v. Kucher, 826 N.Y.S.2d 104, 106 (App. Div. 2006) (plaintiff seeks specific performance of real estate sale contract); Petrelli Assocs., Inc. v. Germano, 702 N.Y.S.2d 360, 361 (App. Div. 2000) (same); Ross Bicycles Inc. v. Citibank, N.A., 606 N.Y.S.2d 192, 193 (App. Div. 1994) (While seller may recover on its contractual letter of credit claims, seller may not recover other damages such as lost profits without showing seller was ready, willing, and able to perform).

contract, a purchaser must demonstrate that it was ready, willing, and able to perform its obligations regardless of the seller's anticipatory breach, such is not the case where the purchaser seeks return of its down payment for such breach, . . . .") (citation omitted).[7]  See Cipriano v. Glen Cove Lodge #1458, B.P.O.E., 801 N.E.2d 388, 394 (N.Y. 2003) (N.Y. Court of Appeals requires breaching seller to return down payment without any proof buyer was ready, willing, and able to perform).  The Bankruptcy Court did not cite and we have not found any case to the contrary.  Hence, as a down payment is merely a partial prepayment, the down payment cases cited above mandate allowance of 360networks' full Claim based on its $100 million prepayment.

The Bankruptcy Court attempted to distinguish one such down payment case, Scull, by characterizing the claim at issue as seeking "to recover a deposit as a form of rescission."  Opinion p. 12.  Yet, Scull and the other cited cases involve return of "down payments", not "deposits."  See, e.g., Scull, 668 N.Y.S.2d at 828.  Thus, while such cases may involve the "return to the status quo" for which the Bankruptcy Court found no need for proof of readiness, willingness and ability, such cases do not require a "deposit"  See Opinion p. 12. Moreover, the reasoning of such cases has nothing to do with the concept of a refundable deposit.  Instead, the cases concern preventing a "windfall" to the party who anticipatorily breached a contract, but still would retain the full economic benefit of the contract (or even do better because the breaching party would not even incur the cost of its own performance), while the nonbreaching party would forfeit its down payment.  See, e.g., Scull, 668 N.Y.S. at 828; Sunrise Assocs., 565 N.Y.S.2d 108; Cipriano, 769 N.Y.S.2d 168.  Indeed, exactly that result

---

[7]  See also Moray v. DBAG, Inc., 760 N.Y.S.2d 193, 194 (App. Div. 2003) (citing Scull approvingly); G.G.F. Properties, LLC v. Hong, 726 N.Y.S.2d 454, 455 (App. Div. 2001) (After buyer's anticipatory breach, seller's action to quiet title did not require proof of seller's ability to perform).

would befall 360networks if its Claim is disallowed (i.e., AGC -- the breaching party -- would obtain a windfall while 360networks would forfeit its $100 million prepayment).

Equally incorrect is the Bankruptcy Court's reliance on rescission as the basis for distinguishing the anticipatory breach down payment cases because causes of action for rescission and for anticipatory breach are distinct.  See Aetna Cas. and Surety Co. v. Aniero Concrete Co., 404 F.3d 566, 585-86 (2d Cir. 2005) (Second Circuit treats claims based on rescission and anticipatory breach of contract as distinct claims); Saewitz v. Epstein, 6 F. Supp. 2d 151, 156-58 (N.D.N.Y. 1998) (same).  Thus, not one of the cited down payment cases utilizes the word "rescission," let alone uses "rescission" conceptually as the basis for the applicable court granting a remedy for an anticipatory breach.  Indeed, in Scull, rescission could not have been at issue because the plaintiff sought not only return of its down payment, but also punitive damages and specific performance.  See 668 N.Y.S.2d at 828.  Accordingly, whether viewed as a non-damages remedy for an anticipatory breach or a form of restitution,[8] New York law warrants allowance of 360networks' $100 million Claim based on 360networks' prepayment.

> **B.** **Unlike Specific Performance Or Consequential Damages, Damages Arising From An Anticipatory Breach That Are Not Premised On The Breaching Party's Performance Do Not Require Proof Of The Nonbreaching Party's Readiness, Willingness, And Ability.**

Even, however, were 360networks' Claim deemed to be exclusively for "damages", recovery of such damages, which are limited to the $100 million paid by 360networks (plus costs of collection) and which exclude consequential damages and specific performance, do not require proof 360networks was ready, willing, and able to perform.  In effect, the critical element determining application of the ready, willing, and able standard is not, as held by the Bankruptcy Court, whether the nonbreaching party is seeking to be excused from

---

[8]     See Argument IV. C. below.

performance rather than seeking affirmative monetary or equitable relief.  See Opinion p. 11. Instead, the key is whether the nonbreaching party is seeking relief premised on the counterparty's anticipatory breach (i.e., seeking to be excused from future performance, return of a down payment, or general damages under the contract) as opposed to seeking relief based on the breaching counterparty's nonperformance (i.e., seeking specific performance or consequential damages).  Only that dichotomy reconciles the New York Court of Appeals cases cited by the Bankruptcy Court, including American List Corp. v. U.S. News and World Report, Inc., 549 N.E.2d 1161 (N.Y. 1989).  The Bankruptcy Court wrongly fit American List into its ruling only by finding that the case was wrongly decided even though it is a decision by the New York Court of Appeals as the ultimate authority on issue.  See Opinion pp. 13-15.

      In American List, the defendant had anticipatorily repudiated a long-term contract to buy mailing lists compiled by the plaintiff.  The plaintiff sued for two types of damages, "general damages" equal to the "moneys which defendant undertook to pay under the contract['s]" express terms in exchange for the plaintiff supplying a fixed number of names, and "special damages" based on additional names the plaintiff had the option to provide.  Id. at 593-94.  As to the first type, general damages, the Court of Appeals held that after an anticipatory breach, the "nonrepudiating party need not . . . prove its ability to perform the contract in the future."  Id. at 594.  In contrast, to recover special damages, the nonrepudiating party "was required to prove its ability to provide" the additional names.  Id.  Hence, American List requires proof the nonbreaching party was ready, willing, and able to perform only to obtain relief based on the breaching party's nonperformance, such as recovery of consequential damages (e.g., the plaintiff's lost profits) or specific performance.  In contrast, under American List, damages -- such as 360networks seeks here -- based solely on the anticipatory breach and limited to the

value the nonbreaching party was to receive as measured by the contract itself, do not require proof the nonbreaching party was ready, willing, and able to perform.

That interpretation also is consistent with the other New York Court of Appeals case cited by the Bankruptcy Court, Cipriano v. Glen Cove Lodge #1458, B.P.O.E. In Cipriano, the Court of Appeals initially held the holder of a right of first refusal was not entitled to specific performance despite the seller's anticipatory breach because the holder could not prove it was ready, willing, and able to perform. See id., 801 N.E.2d at 393. The Court of Appeals then could have dismissed the holder's damages claim on the same basis if such a damages claim also required the holder to show it was ready, willing, and able. Nonetheless, the Court of Appeals denied the damages claim for an entirely independent reason, that the holder had suffered no injury. See id. at 174. Moreover, the Court of Appeals required the breaching seller to return the prospective buyer's "down payment" without reference either to the buyer being ready, willing, and able to perform (indeed, the buyer had breached as well) or to rescission, which had not been sought by the buyer. See id. at 174-75.

Consequently, in American List and Cipriano, the New York Court of Appeals held that certain types of affirmative recoveries may be obtained by the nonbreaching party following the counterparty's anticipatory breach without the need to show the nonbreaching party was ready, willing, and able to perform. Instead, just as in the down payment cases, the nonbreaching party may recover damages equal to the value due under the contract without proof the nonbreaching party was ready, willing, and able to perform. That result both prevents a windfall to the party who anticipatorily breached (as well as eliminates any incentive for such party to anticipatorily breach) and avoids the nonbreaching party forfeiting its contribution to the deal without regard to the counterparty's anticipatory breach. See In re Food Mgmt. Group,

LLC, 372 B.R. 171, 192 (Bankr. S.D.N.Y. 2007) ("The law would pervert justice if it imposed upon the debtors the consequence of this uncertainty [as to the debtor's/seller's ability to perform] which was caused by [the buyer's] repudiation of the contract.").

## II.   360NETWORKS WAS READY, WILLING, AND ABLE TO PERFORM IN JANUARY 2003.

Even assuming 360networks was required to prove it was ready, willing, and able to perform in January 2003, the Bankruptcy Court overstated 360networks' burden by requiring affirmative steps towards ordering capacity and repeatedly drew incorrect inferences from the facts in finding 360networks had not satisfied its burden of proof. Preliminarily, the Bankruptcy Court did find 360networks was _able_ to perform, particularly as 360networks had ample financial and personnel resources, minimal financial obligations (because it "had prepaid for the telecommunication capacity"), and no legal or practical impediment to ordering Asia Capacity. Opinion p. 16. Further, the Bankruptcy Court acknowledged that most ready, willing, and able cases focus on the nonbreaching party's ability to perform rather than on whether such party was ready and willing, which are generally presumed based on ability and the party's economic interest. See id. p. 17 n. 12. Nonetheless, while never questioning the credibility of any 360networks witness, who were the only witnesses at trial, the Bankruptcy Court incorrectly ruled 360networks was not ready and willing in January 2003. See id. p. 17.

### A.   Contrary To The Bankruptcy Court's Approach, 360networks' Burden Of Proof Was Limited And All Inferences Should Have Been Made In Favor Of 360networks As The Nonbreaching Party.

The Bankruptcy Court overstated 360networks' burden of proof regarding the ready, willing, and able standard by effectively requiring 360networks to show affirmative steps towards ordering Asia Capacity despite AGC's anticipatory breach and the more than two months remaining before the deadline to order. Equally problematic, the Bankruptcy Court

repeatedly made inferences favoring the Trustee, the representative of AGC's estate, despite AGC's status as the breaching party here. When the appropriate burden of proof and inferences are utilized (although the same result should be reached even under the Bankruptcy Court's approach), 360networks demonstrated it was ready and willing to perform in January 2003.

While 360networks had the burden of proof on the ready, willing, and able issue, that burden was limited due to AGC's anticipatory breach. See King World Productions v. FNN, 660 F. Supp. 1381, 1387 (S.D.N.Y.), aff'd. 834 F.2d 267 (2d Cir. 1987) ("Requiring King World to bear the burden of proving [it was ready, willing and able by showing] what the landlord would have done had FNN not disavowed the sublease would permit FNN to reap an advantage from the situation created by its own unjustified repudiation of the contract."). In King World, FNN argued it should not be liable for its anticipatory breach of an agreement because King World could not prove it was ready, willing, and able to perform without showing a landlord would have approved a sublease to FNN. See id. at 1386. The Court reasoned such a burden was "not required by precedent and would, in fact, be inequitable." Id. Further, the King World Court noted such a burden "would defy common sense" because the only way to satisfy the burden would have been for King World to have continued pursuing the landlord's consent after FNN's repudiation. Id. Thus, "[w]hether the landlord would have approved the sublease was rendered inherently speculative" by FNN's repudiation. Id. Hence, to avoid FNN obtaining an advantage from the situation created by FNN's breach, King World's proof "need only go to matters not created by FNN's act of repudiation." Id. at 1387.

Similarly, here 360networks' burden of proof should have been evaluated in the context of AGC's misconduct. Consequently, the fact 360networks neither had ordered Asia Capacity nor had a formal plan in place to order Asia Capacity by the time of AGC's

anticipatory breach in January 2003 should not be construed against 360networks or used to show 360networks did not meet its burden of proof. Instead, due to AGC's breach, 360networks had no burden to show it would have ordered capacity after January 29, 2003.

Correspondingly, when evaluating the evidence, and particularly when speculating about the parties' future conduct, any inferences should have been made based on the parties' economic interests and against the breaching party. See In re Food Mgmt. Group, LLC, 372 B.R. at 192 ("'Money talks' as the saying goes" so it was appropriate to infer the nonbreaching party was ready, willing, and able to perform if it was in such party's economic interest to do so.). See also Lavoie v. Safecare Health Serv., Inc., 840 P.2d 239, 252 (Wyo. 1992) (explaining that "[b]usinesses are presumed to act in their own self-interest."); Ahearn v. Anderson-Bishop P'ship, 946 P.2d 417, 425 (Wyo. 1997) (same). Further, as to any uncertainty that the nonbreaching party would have performed, "[t]he consequence of that uncertainty must fall on one side or another, and as between the breaching party and the counter-party whose ability to perform was foreclosed by the other[] [party's] breach, it is the breaching party that must bear the consequence." In re Food Mgmt. Group, LLC, 372 B.R. at 192. Hence, "[t]he law would pervert justice if it imposed upon the debtors the consequence of this uncertainty which was caused by Matrix' repudiation of the Contract." Id.[9] Thus, any uncertainty as to 360networks' readiness and willingness to order Asia Capacity should have been resolved in 360networks' favor.

---

[9] The Bankruptcy Court maintained that Food Management could not have held that a nonbreaching party need not prove it was ready, willing, and able to perform. See Opinion p. 13. Whether or not that is true, at a minimum, Food Management holds that all inferences must be made in favor of the nonbreaching party and any burden of proof the nonbreaching party may have as to predicting the parties' future conduct is limited because the breaching party's conduct precluded proof of future conduct with certainty.

As demonstrated below, among the inferences the Bankruptcy Court should have made in 360networks' favor, are the following:

- "Money Talks" so that 360networks would have acted in its own economic interest to order $100 million of Asia Capacity before forfeiting that right at the two year contract deadline.

- The absence of a specific reference to the Asia Commitment in 360networks' CCAA Information Circular was because no such mention was required, not because 360networks had determined not to order Asia Capacity.

- AGC's $5 million offer to retire the Asia Commitment, which was gradually increased to $12 million and then withdrawn, signified AGC had communicated it would not supply 360networks with $100 million of Asia Capacity to satisfy the Asia Commitment.

- The ANC Sale motion, which sought the sale of the EAC System without the buyer assuming AGC's Guaranty because AGC no longer could survive on a standalone basis, was another clear message AGC did not intend to perform under the Guaranty.

- Once AGC had to pay fair market prices for capacity on the PC-1 and EAC Systems, AGC would not have gone out of pocket to spend 100¢ dollars to satisfy the $100 million Asia Commitment, which if unsatisfied, only would have given rise to a prepetition claim against AGC worth pennies on the dollar.

- The absence in January 2003 of a formal plan for 360networks to order Asia Capacity before the two year deadline to order meant there was still ample time to formulate such a plan, not that 360networks was not going to order.

As virtually any one of such inferences would have warranted finding 360networks was ready and willing, the Bankruptcy Court's failure to make such inferences was error.

**B.    The Uncontroverted Evidence Demonstrated 360networks Was Ready And Willing To Perform.**

Regardless of the burden of proof, the undisputed facts compelled the conclusion 360networks was ready and willing to perform.

1.    360networks Was Well-Positioned To Order Asia Capacity.

At all relevant times, 360networks was well aware of the two year deadline under the Master Agreement for ordering Asia Capacity and had a system in place to provide advance notice of that deadline to relevant 360networks personnel. See July 27 Tr. 70, 133, Dkt. 907, App. 3. As of January 2003, 360networks had ample time to order Asia Capacity during the more than two months remaining to order capacity. See id. at 121-22, 151-52. Meanwhile, 360networks' costs to order, take-down, and warehouse the capacity were minimal. See id. at 20-22, 139, 152. Also, 360networks had substantial flexibility to realize the value of the Asia Capacity over the long term due to: (x) a portability right that enabled 360networks to modify the capacity routes during the two years after an order was placed; and (y) a 15 to 25 year period to utilize capacity once ordered. See Opinion pp. 5.

2.    360networks' Conduct Concerning The Asia Capacity
      Showed 360networks Was Ready And Willing.

Correspondingly, the conclusion 360networks was ready and willing should be inferred from 360networks' conduct, which consistently demonstrated 360networks' intent to realize upon its rights under the Asia Commitment. First, 360networks repeatedly sought to market the Asia Capacity. See Opinion p. 6 (Starting in April 2001, "[t]hroughout the remainder of 2001 and into the beginning of 2002, 360networks aggressively marketed the [Asia] capacity.") (citations omitted).[10] Second, in 2002, when 360networks negotiated a settlement of its claims against GC Bandwidth under the Master Agreement, 360networks insisted upon and obtained an express carve out from the settlement that preserved 360networks' rights under AGC's Guaranty. See id. at 9. Third, from April through October 2002, 360networks negotiated

_____

[10]    Meanwhile, GC Bandwidth and AGC consistently sought to thwart those efforts because they would rather sell to customers directly for cash instead of merely reducing 360networks' prepaid claim based on the $100 million Asia Commitment. (July 26 Tr. 119-121; 127-29, 136-39, Dkt. 907, App. 3; Exs. 64, 74; 113, Dkt. 967-68, App. 1, 5.)

with AGC regarding AGC's proposed buy-out of 360networks' rights under AGC's Guaranty. (July 27 Tr. 95-98, 102-03, 106, Dkt. 907, App. 3; Exs. 220, 226, 227, Dkt. 268, App. 17.) Fourth, after AGC filed its chapter 11 petition, 360networks promptly pursued and obtained (unpaid) membership on AGC's official unsecured creditors' committee based upon and for the purpose of maximizing 360networks' $100 million claim under AGC's Guaranty. (See Amended Appointment of Official Creditors' Committee *of Unsecured Creditors*, filed April 14, 2003, Doc. No. 242, App. 18.) Fifth, in February 2003, 360networks filed its $100 million proof of claim against AGC. See Opinion p. 9.

Upon AGC's anticipatory breach, which occurred no later than January 2003, 360networks no longer could have ordered Asia Capacity without, as a matter of law, jeopardizing 360networks' right to seek recovery from AGC. In effect, ordering the Asia Capacity after AGC anticipatorily repudiated the Guaranty would have eliminated 360networks' right to recover for AGC's anticipatory breach.[11] Hence, thereafter, it would have been counterproductive for 360networks to have taken further steps towards ordering capacity.

### 3.    360networks' Business Practices Showed It Was Ready And Willing.

360networks' intent also may be inferred from its business practices. For example, 360networks took affirmative steps to preserve a similar valuable non-core asset, when 360networks warehoused telecommunications capacity on the Hibernia Cable in the Atlantic Ocean. (See Opinion p. 18. n.13; July 27 Tr. at 92-93, 139-41, Dkt. 907, App. 3.) The

---

[11]    "Under New York law, an anticipatory breach, like any other breach, gives the non-breaching party two mutually exclusive options. ... He may elect to treat the contract as terminated and exercise his remedies, or continue to treat the contract as valid." In re Randall's Island Family Golf Centers, Inc., 261 B.R. 96, 101 (Bankr. S.D.N.Y. 2001) (citing ESPN, Inc. v. Office of the Comm'r of Baseball, 76 F. Supp. 2d 383, 388 (S.D.N.Y. 1999); Lucente v. Int'l Bus. Machines Corp., 310 F.3d 243, 258 (2d Cir. 2002) ("The non-repudiating party must, however, make an affirmative election. He 'cannot at the same time treat the contract as broken and subsisting,' for '[o]ne course of action excludes the other.'") (internal citations omitted).

Bankruptcy Court acknowledged that action, but dismissed it as an isolated occurrence rather than a "general business practice." (See id.) Yet, by definition, monetization of "non-core" assets is not the regular practice of any business. Instead, the point is that when the opportunity to realize value from non-core assets arose, 360networks acted. Moreover, another example of opportunistic business practices occurred when 360networks actually ordered Asia Capacity, which was on sale, despite not having a customer in hand. See Opinion p. 17. Still another example was 360networks' efforts to monetize and preserve 360networks' rights under AGC's Guaranty without a sale by: (x) insisting on a carve out of AGC's Guaranty from the Global Crossing settlement release; and (y) seeking either a buyout by or recovery from AGC to resolve 360networks' Guaranty rights. (See, e.g., July 26 Tr. at 125, Dkt. 918, App. 2; July 27 Tr. at 17-18, Dkt. 907, App. 3.)

    4.    <u>360networks' Economic Interests Show It Was Ready and Willing.</u>

Additionally, the only logical inference is that any for-profit business, such as 360networks, would seek to maximize the value of and monetize any valuable asset, even if non-core.[12] Indeed, 360networks' chief negotiator of the Master Agreement testified the agreement was structured so 360networks could have ordered the Asia Capacity without a customer. (July 26 Tr. p. 47, Dkt. 918, App. 2.) Moreover, there was absolutely no evidence 360networks directly or indirectly expressed an intent or took any action to abandon 360networks' rights under AGC's Guaranty. To the contrary, 360networks always placed significant value on the Asia Commitment, particularly as 360networks was entitled to most favored customer treatment,

---

[12]    The Bankruptcy Court suggested a contrary inference because 360networks supposedly abandoned certain valuable assets in its foreign subsidiaries. See Opinion p. 18. n.13. Yet, title to the assets referenced by the Bankruptcy Court was held by deeply insolvent foreign subsidiaries of 360networks, not by 360networks itself. (See Ex. DI, Information Circular p. 14, Dkt. 966, App. 19.) Thus, the only referenced assets actually abandoned by 360networks were worthless stock of insolvent subsidiaries no longer controlled by 360networks, not any potentially valuable assets owned by such insolvent subsidiaries themselves. Indeed, there was <u>no</u> evidence 360networks ever abandoned potentially valuable assets.

which provided price protection by increasing the amount of capacity to which 360networks was entitled in proportion to any decline in capacity prices.  (See, e.g., July 27 Tr. 17-18, 69-70. Dkt. 907, App. 3.)

     5.    AGC's Statements Demonstrate 360networks Was Ready And Willing.

Not only did 360networks' own conduct and incentives demonstrate 360networks was ready and willing to order Asia Capacity in January 2003, but AGC's contemporaneous statements confirmed that conclusion.  The contemporaneous affidavits of AGC's chief financial officer and lead restructuring advisor filed in support of the ANC Sale Motion each contained the following statement that a primary benefit of the sale would be the buyer's assumption of "substantial" potential claims against AGC for unactivated telecommunications capacity "that otherwise would be asserted against" AGC (here called AGCL):

> As a result of the structure of the Asia Netcom Transaction, AGCL's estate will be freed of substantial claims that otherwise would be asserted against it[, as follows:]
>
>       \*    \*    \*
>
> •    Substantial claims for unactivated capacity arising under capacity contracts purchased by customers and sold and/or guaranteed by AGCL are being assumed by Asia Netcom and, therefore, will not be asserted against AGCL's estate.

(Affidavit, dated January 16, 2003, of Stefan C. Riesenfeld, AGC's Chief Financial Officer, ¶ 18, Ex. A to Dkt. 149, App. 20; and the Affidavit, dated January 17, 2003, of Jim Millstein, of Lazard, ¶ 7, Ex. B to Dkt. 149, App. 20.)  Virtually the identical language also appears at page 26 of AGC's Disclosure Statement filed May 1, 2003, (Dkt. 273, App. 21.)[13]

---

[13]    Moreover, in his affidavit filed in support of AGC's first day motions, Stefan Riesenfeld, AGC's CFO, listed 360networks' Claim against AGC as being $100 million in amount and not as being disputed (albeit being contingent).  (See Riesenfeld Affidavit, dated November 15, 2002 Schedule 1, Dkt. 3, App. 8.)

As the buyer's assumption of these claims only could have benefited AGC if the contract counterparties were likely to order Asia Capacity, the same inference should apply to 360networks.  In effect, AGC's statements were made contemporaneously with the January 2003 time frame the Bankruptcy Court utilized to evaluate 360networks' readiness and willingness to order Asia Capacity.  Also, AGC's capacity at issue in the quoted affidavits was the same Asia Capacity available to 360networks under AGC's Guaranty.  Further, the purchasers referenced by AGC and its advisors had to be wholesalers, such as 360networks, who purchased telecommunications capacity for resale, or the end users themselves, who would have been 360networks' customers.  Moreover, the capacity purchasers referenced by AGC and its advisors either were similarly situated to 360networks by having prepaid for capacity or simply had the right to order Asia Capacity subject to payment and, therefore, would have had economic incentive to order Asia Capacity equal to or less than 360networks'.   Accordingly, AGC's statements that other telecommunications companies then similarly situated to 360networks would have large claims based on the likelihood such companies would order Asia Capacity require the inference 360networks also then was ready and willing to order capacity.

**C.**  **The Bases Cited For The Bankruptcy Court's Determination That 360networks Was Not Ready And Willing Do Not Withstand Scrutiny.**

Notwithstanding such overwhelming evidence, the Bankruptcy Court concluded 360networks was not ready and willing to perform, citing five reasons: (a) 360networks did not have formal meetings with GC Bandwidth or AGC; (b) 360networks never formally ordered Asia Capacity; (c) 360networks had a general practice to seek out buyers before ordering Asia Capacity; (d) as of January 2003, 360networks had no formal plan to take down unused Asia

---

Further, AGC did not object to 360networks' appointment to AGC's official creditors' committee based on that $100 million Claim.

Capacity before the time to order expired; and (e) 360networks did not expressly disclose the Asia Commitment in a filing in 360networks' Canadian bankruptcy case. <u>See</u> Opinion pp. 17-18. Upon analysis, however, these reasons do not support the Bankruptcy Court's conclusion, let alone offset the uncontroverted evidence to the contrary recited above.

As evidence 360networks was not ready and willing, the Bankrutpcy Court noted there were no formal meetings between 360networks and GC Bandwidth (or AGC) as provided for in the Master Agreement. <u>See</u> Opinion p. 17. Yet, in January 2002, GC Bandwidth filed for chapter 11 protection and thereafter, GC Bandwidth and 360networks were negotiating a settlement consummated in October 2002. Also, as to both GC Bandwidth (prior to the settlement) and AGC, the parties were in regular contact concerning pricing, customer demand, buy-out negotiations and otherwise. (<u>See</u> July 26 Tr. 148-49, Dkt. 918, App. 2; Exs. 82, 113, 180, 204, 220 Dkt. 967-68, App. 1, 5.)[14] Moreover, as the contract obligation to meet was <u>mutual</u>, there is no more reason to infer the absence of meetings reflected 360networks' unwillingness to order than that the absence of meetings signified AGC was unwilling to provide Asia Capacity if it were ordered.

Equally unavailing are the Bankruptcy Court's concerns that prior to January 2003, 360networks never formally ordered Asia Capacity and had a general practice to seek out buyers before any such order. <u>First</u>, the Bankruptcy Court found that after the Master Agreement was entered in March 2001, "[t]hroughout the remainder of 2001 and in the beginning of 2002,

---

[14]     360networks' employees Derek Gill and Jimmy Byrd testified that 360networks, AGC, and GC Bandwidth were in frequent contact with each other respecting the Master Agreement. (July 26 Tr. pp. 148-149, Dkt. 918, App. 2; July 27 Tr. p. 18, Doc. 907, App. 3.) Derek Gill also testified that as a matter of practice, 360networks forecasted upcoming demand by informing GC Bandwidth and/or AGC whenever it had a customer interested in purchasing capacity. (<u>See</u> July 26 Tr. pp. 148-149, Dkt. 918, App. 2.) The Trustee introduced no evidence to contradict this testimony or to show anyone at AGC or GC Bandwidth ever complained about the lack of formal meetings. Correspondingly, there should be no adverse inference from the absence of meetings, particularly when absent having a buyer in hand, 360networks had every incentive to wait until the last minute to order capacity.

360networks aggressively marketed the [Asia] capacity." Opinion p. 6. Second, the Bankruptcy Court found that at least once 360networks attempted to order Asia Capacity without a backup customer, but AGC rejected the order on the alleged basis 360networks could not take advantage of a price promotion. See id. p. 17. Third, the fact 360networks did not attempt other orders due to its practice to first obtain buyers in hand made perfect economic sense until the end of the Master Agreement's Term because the right to order Asia Capacity ran for two years and the declining prices for capacity signified it was in 360networks' economic interest to wait to order capacity unless a ready buyer was available (or there was a good promotion). In effect, the later 360networks ordered: (x) the more capacity 360networks would obtain due to 360networks' price protection under the Master Agreement; (y) the better 360networks could evaluate which capacity was available at the best price; and (z) the better 360networks could assess what capacity would be the most marketable to warehouse for future sale. (See July 27 Tr. p. 119, Dkt. 907, App. 3.) In contrast, at the end of the Master Agreement's term (on January 29, 2003, that term still had more than two months to run, so 360networks still had more than ample time to order Asia Capacity), 360networks would have had every incentive to order Asia Capacity whether or not a buyer was available because the alternative was to forfeit a valuable right.[15] Consequently, the fact that during most of the Master Agreement's term 360networks had not

---

[15]    360networks' former President and Chief Operating Officer Jimmy Byrd testified it was "self-evident" 360networks would have ordered Asia Capacity at the end of the contract period because 360networks' management believed "it had value," and because 360networks would never "abandon something that clearly had value … [in the] marketplace." (July 27 Tr. p. 70, Dkt. 907, App. 3.) Chris Mueller, 360networks' Chief Financial Officer, testified that 360networks "would have been happy to inventory [the Asia Capacity] as we are sitting on the ten gig on the Atlantic system right now." (July 27 Tr. p. 133, Dkt. 907, App. 3.) This testimony is sufficient evidence 360networks intended to order Asia Capacity, rather than forfeit this valuable asset. See Ross Bicycles, Inc. v. Citibank, N.A., 613 N.Y.S.2d 538, 539-540 (Sup. Ct. 1994) (noting that plaintiff was found ready, willing and able at trial because "Plaintiff clearly established that it could easily have fulfilled the remainder of the contract and satisfy the terms of the letter of credit *through testimony* of its principal Sherwood Ross.") (emphasis added). See also In re Silberman, Inc., 30 B.R. 219, 228 (E.D. Penn. 1983) (holding plaintiffs were ready, willing and able to perform where the plaintiff testified to as much); Satellite Dev. Co. v. Bernt, 492 N.W.2d 334, 338 (Neb. 1988) (same).

placed orders and had sought to have a buyer in place before ordering did not support the inference that in January 2003, 360networks was <u>not</u> ready and willing to order by the end of the 24 month term.[16]

      While acknowledging 360networks need not have actually ordered Asia Capacity, the Bankruptcy Court also focused on 360networks' lack in January 2003 of a formal plan to order capacity despite the March 30, 2003 deadline. <u>See</u> Opinion p. 17. Yet, the uncontested facts provided a ready explanation. Further, all inferences drawn from those facts should have been drawn in favor of 360networks, as the nonbreaching party. <u>See</u> <u>In re Food Mgmt. Group, LLC.</u>, 372 B.R. at 192.

      Certainly, 360networks could not have been expected to have a formal back-up plan prior to AGC's chapter 11 filing in November 2002, particularly as five months then still remained to order. During at least the Master Agreement's first year, 360networks actively sought to market and then order Asia Capacity. <u>See</u> Opinion p. 6. During the next seven months (i.e., from April to October 2002), 360networks focused on monetizing or maintaining those rights when negotiating settlements with GC Bandwidth (successfully and with an express carveout preserving rights under AGC's Guaranty) and with AGC (almost successfully).

      By November 2002, however:

    a.     AGC had, through the buy-out negotiations, made it clear AGC only was prepared to pay 360networks a few cents on

---

[16]    The undisputed evidence also established that 360networks, while negotiating the Master Agreement had anticipated it might not have a specific customer when it ordered the Asia Capacity. Patrick Duffy, 360networks' former in-house counsel who negotiated the Master Agreement and Guaranty, testified 360networks anticipated the possibility it would need to order the Asia Capacity before it found a specific customer for such capacity and negotiated for that ability. (July 26 Tr. p. 47, Dkt. 918, App. 2.) Specifically, 360networks negotiated for provisions in the Master Agreement, including the pricing protection and portability rights, because 360networks wanted to be able to draw down the full amount of capacity to which it was entitled (and for which 360networks had paid $100 million) at the contract period's end, even if 360networks then had no customer. (July 26 Tr. p. 47, Dkt. 918, App. 2; July 27 Tr. p 17, Dkt. 907, App. 3.)

the dollar (initially 5¢) to satisfy 360networks' $100 million entitlement under the Asia Commitment;

b.    PCL had filed for chapter 11 protection, thereby depriving AGC of any ability to obtain the PC-1 Capacity, which represented one of the two types of Asia Capacity that 360networks was entitled to order under the Master Agreement, absent paying full price to PCL;

c.    Jim Millstein, AGC's restructuring financial adviser and agent at Lazard, had told 360networks that its only realistic way to recover on AGC's Guaranty was to obtain the best cents on the dollar deal possible, representing the present value of a $100 million unsecured bankruptcy claim against AGC (See July 27 Tr. 98-101, 134, Dkt. 907, App. 3.);

d.    AGC had filed for chapter 11 protection;

e.    Just before such filing, AGC (i) executed an agreement to sell substantially all of AGC's assets, including the EAC System (that with the PC-1 System, represented all of the Asia Capacity); (ii) made AGC's Guaranty an "excluded liability" the buyer would not assume; (iii) publicly announced the agreement; and (iv) paid $1 million to its financial advisor, Lazard, based on such announcement. (See Final Application for Interim Professional Compensation for Lazard, filed April 15, 2003, Dkt. 248, App. 12); and

f.    Concurrent with its chapter 11 filing, AGC filed motions (i) seeking approval of the ANC asset purchase agreement and a related $16 million break-up fee; (ii) emphasizing that absent an immediate sale, AGC's operations would need to cease; and (iii) stating that the net proceeds of the sale would go to unsecured creditors (i.e., not to satisfy AGC's Guaranty). (See Motion to Approve Sale Procedures, filed on November 17, 2002, Dkt. 17, App. 9.)

Cumulatively, those facts show 360networks' readiness and willingness to order Asia Capacity

in January 2003 must be evaluated at a time when based on AGC's conduct, 360networks had

every reason to believe ordering Asia Capacity would have been futile.[17]    Otherwise, AGC

---

[17]    The Bankruptcy Court alludes to 360networks' ability to demand adequate assurance of future performance, but that pointless effort was a right, not an obligation.  See Opinion at p. 8, fn 8; see, e.g., Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp., 705 N.E.2d 656, 658-59 (N.Y. 1998)

would be rewarded for its anticipatory breach.[18]  See King World Prods. v. FNN, 660 F. Supp. at 1387 ("Requiring King World to bear the burden of proving [it was ready, willing and able by showing] what the landlord would have done had FNN not disavowed the sublease would permit FNN to reap an advantage from the situation created by its own unjustified repudiation of the contract.").

In such circumstances, the fact 360networks had not taken more affirmative steps towards ordering capacity by January 2003 was perfectly understandable and hardly warrants the inference 360networks was not ready and willing.  Indeed, at that juncture, 360networks had every incentive to wait until the last moment to order Asia Capacity and ample time to order should the situation change. Additionally, the individuals responsible for deciding when and what to order testified they were aware of the time frame during which 360networks must order and that they would have ordered if not for AGC's anticipatory breach. (July 27 Tr. pp. 70, 133.,

---

(finding that a party has the right to demand adequate assurances.) Also, while the Bankruptcy Court ruled that AGC's anticipatory breach happened on January 29, 2003 and no earlier, Mr. Millstein's June 2002 statements (as confirmed by AGC's subsequent conduct) that AGC intended to sell its assets unencumbered by its obligations under the Guaranty, and thus, would never deliver the capacity to 360networks, are relevant to 360networks' mindset and actions in the period leading to the anticipatory breach. (July 27 Tr. 98-101, Dkt. 907, App 3.)  In Argonaut P'ship L.P. v. Sidek, S.A., plaintiffs' failure to perform their remaining obligation of tendering put notes to defendants was excused because defendants' statement in a press conference that "it would not pay any Noteholder who exercised its Put constituted an anticipatory repudiation." No. 96 Civ. 1967, 1996 WL 617335, at *6 (S.D.N.Y. Oct. 25, 1996) (finding an anticipatory breach and holding that plaintiffs were entitled to damages even though they had failed to tender the required notes).

[18]  At the time AGC breached, 360networks was not required to have a plan to order the Asia Capacity to be found 'ready, willing and able.'  Weed v. Lyons Petroleum Co., 294 F. 725, 732 (D. Del. 1923) (holding that "if formal acts are essential to constitute 'readiness,' the plaintiff *may be as clearly excused ... from acts of preparation* as of performance" by the defendant's anticipatory breach, "and that under such circumstances an allegation of readiness, willingness, and ability to perform means only that the plaintiff was disposed and would have been able to perform the contract on his part, if it had not been renounced by the defendant.") (emphasis added).  Therefore, to satisfy the "ready, willing and able" standard, 360networks only must demonstrate it was disposed to and would have been able to order the Asia Capacity if not for AGC's anticipatory repudiation. See, e.g., Scholle v. Cuban-Venezuelan Oil Voting Trust, 285 F.2d 318, 321-22 (2d Cir. 1960) (holding that despite the fact that plaintiff did not have financing in place, hearsay evidence that plaintiff could have borrowed the necessary funds was sufficient evidence to show intent to perform and capability of performing).

Dkt. 907, App. 3.)[19]  Moreover, the uncontested fact, acknowledged by the Bankruptcy Court, that 360networks placed significant value on the Asia Capacity signifies 360networks then was ready and willing to order.  (See Opinion p. 19; July 27 Tr. p.17, Dkt. 907, App. 3.)  Indeed, in such circumstances all inferences as to whether or not 360networks was ready and willing should have been in favor of 360networks as the nonbreaching party and because "[m]oney talks" (i.e., it should be presumed 360networks would have acted in its own economic interests).  See In re Food Mgmt. Group, LLC, 372 B.R. at 192.

The Bankruptcy Court nonetheless found 360networks' substantial economic interest somehow was neutralized because 360networks did not expressly reference the value of the Asia Capacity in a Canadian CCAA bankruptcy disclosure document, dated July 24, 2002 (the "Information Circular").  See Opinion pp. 18-19.  Yet, there was no legal requirement under the CCAA for 360networks to include such detail.  Indeed, a review of the Information Circular, which was approved by the Canadian Bankruptcy Court without objection, reveals it contains no detail on any specific asset, let alone on a contingent, unliquidated, non-core asset, such as the Asia Commitment, and contains less than two pages discussing 360networks' entire ongoing business.  (See Ex. DI, Information Circular pp. 10-11, Dkt. 966, App. 19.)  Thus, no adverse inference regarding 360networks' intent to order Asia Capacity could have been made from the Information Circular.

---

[19]    There was ample time to order as no advanced planning was necessary to order the Asia Capacity.  (July 27 Tr. pp. 121, 151-52, Dkt. 907, App. 3.)  Indeed, when the officer in charge of disposing of non-core assets during the restructuring was asked why he didn't memorialize his thoughts in writing, Mr. Mueller testified that "I generally don't write a lot of memos . . . again, we're getting back to practically speaking, as business people, knowing that a restructuring was coming, that we didn't have much chance of having them perform under the contract.  And I wasn't going to write a memo to myself."  (July 27 Tr. pp. 121-122, Dkt. 907, App. 3.)  Mr. Mueller further testified that any necessary analysis to determine what circuits to order from AGC would not have taken much time, "I think we would -- within half hour look at the schedule of what's available and taken down the least number of circuits with the highest capacity that -- absorb the bucket [of Asia Capacity] and moved on that basis."  (July 27 Tr. 151-152, Dkt. 907, App. 3.)

The Bankruptcy Court's interpretation of the Information Circular is unfounded for another reason. As of July 2002, 360networks had rejected AGC's $5 million buy-out offer for the Asia Commitment and was in active negotiations for a higher price that ultimately led to the $12 million preliminary deal with AGC. (July 27 Tr. 95-98, 102-03, 106, Dkt. 907, App. 3; Exs. 220, 226, 227, Dkt. 968, App. 5.) Thus, if a non-core asset then having a value in the $5 to $12 million range needed to be identified in the Information Circular, then based on the buy-out negotiations alone, 360networks would have specified AGC's Guaranty as an asset whether or not 360networks then intended to order Asia Capacity. Hence, the absence of an express reference to the Asia Commitment in the Information Circular signifies no reference to such a non-core asset was required and, therefore, cannot support the Bankruptcy Court's inference 360networks did not intend to order Asia Capacity.

Nevertheless, the Bankruptcy Court found 360networks still needed to mention the Asia Capacity in the Information Circular because 360networks valued the capacity at $100 million. See id. Yet, such a high valuation was irreconcilable with the Bankruptcy Court's finding that 360networks was ready to abandon the Asia Capacity. Moreover, that valuation is inconsistent with the undisputed facts. In effect, in July 2002, when the Information Circular was filed, 360networks' right to order Asia Capacity was subject to buy-out discussions in which AGC had offered only $5 million to extinguish 360networks' right and 360networks was willing to be bought-out at a substantial discount. Further, AGC was on the verge of filing for chapter 11 protection so that the likelihood and amount of any recovery for 360networks on AGC's Guaranty was uncertain at best. (See July 27 Tr. 100-102, Dkt. 907, App. 3.) Thus, while 360networks may have been confident it had a $100 million unsecured Guaranty claim against AGC, that claim was: (a) a non-core asset; (b) of uncertain value and contingent on the outcome

in the AGC bankruptcy case; and (c) in any event, modest in value relative to the at least $558 million valuation for 360networks' core operating assets and cash that were of primary concern to 360networks' creditors receiving the CCAA Information Circular.[20]  Indeed, such a valuation approach is consistent with 360networks' liquidation analysis in Schedule III to the Information Circular, which placed a liquidation value  for "Network Assets" (which included the Asia Commitment) at 7% of book value.  (Ex. DI, Dkt. 966, App. 19.)  Hence, when analyzed in appropriate context and regardless of any legal disclosure requirement, it is perfectly understandable why 360networks' CCAA filings did not specifically reference the Asia Commitment or AGC's Guaranty.  Certainly, no reasonable inference could be drawn that the absence of such a reference signified 360networks intended to abandon the Asia Capacity.

The Bankruptcy Court also speculated that 360networks might have decided not to order Asia Capacity because:  (a) IRUs for the Asia Capacity were not then saleable and declining in value, 360networks had lacked success in selling Asia Capacity, and there could be incidental costs to redesignating routes; and (b) 360networks had not gone out of pocket to acquire the Asia Capacity and wanted it solely for swap purposes.  See Opinion pp. 19-20.  Yet, there was no evidence to support these theories and they are inconsistent with the Bankruptcy Court's findings 360networks highly valued the Asia Capacity, obtained it as part of a global business plan, repeatedly had sought to monetize it, and would incur de minimus costs from ordering.  Instead, the only appropriate inference was that 360networks would have acted to realize upon a valuable asset because "[m]oney talks".  See In re Food Mgmt., LLC, 372 B.R. at 192.

---

[20]  The balance sheet for reorganized 360networks showed "Total Assets" of $423 million.  (See Ex. DI, Information Circular, Schedule IV, p. 7, Doc. No 966, App. 19.)  Also, the Information Circular discussed an additional $135 million in cash to be distributed to 360networks' "Senior Lenders" under the CCAA reorganized plan.  (See Ex. DI, Information Circular, p. 2, Dkt. 966, App. 19.)

Consequently, it is apparent that in January 2003, 360networks was ready, willing, and able to order Asia Capacity.

## III. THE EVIDENCE 360NETWORKS WAS READY AND WILLING TO PERFORM IS EVEN STRONGER WHEN EVALUATED AS OF THE DATES PRIOR TO JANUARY 2003 THAT AGC ALSO ANTICIPATORILY BREACHED AGC'S GUARANTY.

Even if 360networks was not ready and willing to perform as of January 2003 (a conclusion 360networks strongly disputes), 360networks was ready and willing as of the Summer and Fall of 2002, when AGC also anticipatorily breached AGC's Guaranty.

### A. 360networks Was Entitled To Assert That AGC Anticipatorily Breached Its Guaranty Prior To January 29, 2003.

In the parties' initial summary judgment motions, the Trustee argued 360networks could have no valid claim because 360networks had failed to order Asia Capacity during the two year contract period. 360networks responded that the absence of such an order was not determinative because AGC anticipatorily breached its Guaranty multiple times during that period. The Bankruptcy Court granted 360networks' partial summary judgment by finding AGC had anticipatorily breached in January 2003. See In re Asia Global Crossing, 326 B.R. at 249-50, 256 (Bankr. S.D.N.Y. 2005).

Although unnecessary to its holding, the Bankruptcy Court further found that no anticipatory breach occurred prior to January 29, 2003. See id. at 255-56. The Bankruptcy Court denied 360networks' request for reconsideration of that ruling even though, inter alia, no meaningful discovery then had taken place. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 325 (1986) (Rule 56(c) mandates summary judgment "after adequate time for discovery" and "Rule 56(f) . . . allows a summary judgment motion to be denied . . . if the nonmoving party has not

had an opportunity to make full discovery.").[21]  Hence, the Bankruptcy Court incorrectly found 360networks somehow lost the right to assert that AGC anticipatorily breached prior to January 29, 2003.[22]  See Opinion p. 10.

The Bankruptcy Court based its finding of no pre-January 2003 breach on Federal Rule 56(d).  See 332 B.R. at 521.  Rule 56(d) provides in pertinent part as follows:

> (d)  Case Not Fully Adjudicated on Motion.  If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted.  It shall thereupon make an order specifying the facts that appear without substantial controversy . . . . Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

Id. at 530 (Emphasis added).  Thus, by its terms, Federal Rule 56(d) required that the Bankruptcy Court:  (a) examine the pleadings and evidence before it; (b) interrogate counsel; and (c) "if practicable ascertain what material facts exist without substantial controversy" or "are actually and in good faith controverted."  Id.  None of these requirements were satisfied here.

---

[21]  Notably, "the burden [is] on the moving party [to show] … there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. at 325, 330.  Yet, whatever may have been said about 360networks' summary judgment submissions, in no sense could the Bankruptcy Court have concluded "there is an absence of evidence to support" 360networks' position.  In contrast, there was an absence of evidence from the Trustee to show AGC had not anticipatorily breached its Guaranty obligation prior to January 29, 2003.  See id. at 332 ("as the Court confirms, a party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence on the record."  "Plainly, a conclusory assertion that the nonmoving party has no evidence is insufficient.")  (Brennan dissenting) (citations omitted)).

[22]  See In re Asia Global Crossing, 332 B.R. 520, 531-33 (Bankr. S.D.N.Y. 2005).  The Bankruptcy Court suggested 360networks could have, but never sought to revisit the Court's Rule 56(d) order.  See Opinion p. 10.  In fact, 360networks tried to again argue AGC had anticipatorily breached the Guaranty prior to January 29, 2003.  Nonetheless, the Bankruptcy Court already had rejected 360networks' reconsideration motion and at trial made it clear that AGC's breach date had been decided and would not be revisited.  (See, e.g., July 26 Tr. pp. 113-114, Dkt. 918, App. 2; July 27 Tr. p. 163, Dkt. 907, App. 3.)

As to the first element, the Bankruptcy Court could not have meaningfully evaluated the "evidence" because discovery had not been taken regarding AGC's anticipatory breaches. See Jenkins v. Greyhound Lines, Inc., No. C-46141, 1971 WL 529, at *3 (N.D. Cal. May 4, 1971). After denying the plaintiff's summary judgment motion, the Court stated:

> "The Court has been invited, pursuant to Federal Rule 56(d), to specify what triable issues of fact remain. In view of the fact that discovery procedures are still pending, and for other reasons, the Court does not deem it 'practicable' to do so and rather deems it desirable to await the completion of the discovery and pretrial procedures provided for in the Federal and Local Rules before any such determination is made."

As to the second element of Federal Rule 56(d), while there were limited inquiries of counsel concerning anticipatory breaches, the inquiries confirmed 360networks in good faith asserted that anticipatory breaches occurred prior to January 2003. As to the third element of Federal Rule 56(d), the material facts determined by the Bankruptcy Court regarding prior anticipatory breaches were "actually and in good faith controverted". Indeed, as detailed below, an analysis of facts raised by 360networks, individually and on a cumulative basis, demonstrated, at a minimum, that a "substantial controversy" existed as to whether AGC anticipatorily breached its Guaranty prior to January 29, 2003.

Thus, it was not "practicable" for the Bankruptcy Court to have specified that any material facts regarding AGC's pre-January 2003 anticipatory breaches were uncontroverted because there was no consensus on their existence. Id. Indeed, the Jenkins Court determined it was not "practicable" to make findings under Federal Rule 56(d) because, inter alia, even though substantial discovery had been taken, the Court would "await completion of the discovery". Id. at *3. Hence, Jenkins supports the conclusion that at least two of Federal Rule 56(d)'s three requirements were not satisfied here (i.e., the requirements that the Bankruptcy Court: (a) examine evidence; and (b) determine that material facts exist without substantial controversy

only "if practicable"). Consequently, under Federal Rule 56(d) and particularly prior to discovery, there was -- as a matter of law -- no basis for the Bankruptcy Court's definitive finding that AGC did not anticipatorily breach prior to January 29, 2003, and the exclusion of evidence to that effect was reversible error.

**B.    AGC Anticipatorily Breached The Guaranty In June 2002.**

A series of events culminating in certain statements made to 360networks by Jim Millstein, AGC's lead restructuring advisor at Lazard, constituted AGC's anticipatory breach of its Guaranty in June 2002. Those events included the following:

- On January 27, 2002, Global Crossing, GC Bandwidth and their affiliates filed chapter 11 petitions.

- In February 2002, based in part on AGC's severely deteriorating financial circumstances and Global Crossing's failure to honor its loan commitments to AGC, AGC determined to sell substantially all of its assets promptly and retained Lazard to assist in that process.

- Substantial decreases in the prices for telecommunications capacity signified a substantial increase in the amount of capacity to which 360networks was entitled under the Asia Commitment because under the Master Agreement and Guaranty, 360networks remained entitled to $100 million of Asia Capacity based on market prices. (See Ex. 14, Master Agreement § 2(l), Dkt. 967, App. 1.)

- On April 5, 2002, AGC offered 360networks $5 million to reacquire AGC's $100 million Asia Commitment.

A logical inference from these facts is that AGC intended and needed to sell its assets and such a sale only could occur if 360networks' $100 million Asia Commitment was either reacquired by AGC in an out-of-court deal or rejected by AGC in a bankruptcy case. First, due to its financial circumstances, AGC had to sell its business. Second, under the Guaranty, 360networks remained entitled to $100 million of telecommunications capacity at then current market prices and, therefore, AGC's Guaranty was a major obstacle to the sale. Third, through

AGC's April 5, 2002 offer to 360networks of $5 million to retire the $100 million Asia Commitment, AGC had communicated it was going to either: (a) resolve AGC's Guaranty obligation inexpensively outside of court; or (b) reject the Guaranty obligation in chapter 11 in order to sell AGC's assets free of the Asia Commitment while again paying only pennies on the dollar on 360networks' Guaranty Claim.[23] Indeed, AGC's proposed $5 million buy-out roughly corresponded to the present value of the low-end anticipated pay-out on unsecured claims in an AGC bankruptcy case.[24] Hence, AGC presented 360networks with only two options for recovery on the $100 million Asia Commitment, either take $5 million (or some slightly higher negotiated amount) now or take its chances on a general unsecured Guaranty claim in AGC's bankruptcy case. Thus, AGC's $5 million offer constituted a strong signal by AGC to 360networks that AGC would not perform under the $100 million Guaranty.[25]

With that background, it is apparent that the June 2002 statements by AGC's financial advisor, Jim Millstein of Lazard, informed 360networks that AGC would never deliver the capacity. (See July 27 Tr. pp. 98-101, Dkt. 907, App. 3.) As Mr. Mueller testified, Millstein said AGC was selling substantially all of its assets and, therefore, AGC needed 360networks to

---

[23]   The Bankruptcy Court suggested AGC's low offer might have reflected that 360networks' financial problems meant it was unlikely it would order the Asia Capacity. 326 B.R. at 255. Yet any such inference would have been mere speculation and inconsistent with the fact 360networks needed to expend no cash to obtain the $100 million of Asia Capacity and valued AGC's Asia Commitment. See id. at 244.

[24]   (See July 27 Tr. 103-104, Dkt. 907, App. 3; Ex. 228, Dkt. 968, App. 5; AGC's Response to Objections to Sale Procedures Motion, dated December 5, 2002, ¶ 9, Dkt. 81, App. 22 (projecting a distribution to AGC's general unsecured creditors of 13.3% on the dollar based on the ANC Sale); Affidavit of Jim Millstein, dated January 17, 2003, in Support of Asia Netcom Sale Motion ¶ 8, Dkt. 149, App. 20.) (projecting recoveries to AGC's unsecured creditors of "7.9% to 8.6% of their claims" in a liquidation and "approximately 14.9%" based on the proposed sale to Asia Netcom).

[25]   That inference was reinforced by AGC's strong incentive not to provide the Asia Capacity to 360networks because: (x) the price of telecommunications capacity had declined significantly (so that the Asia Commitment entitled 360networks to increasing amounts of capacity); and (y) GC Bandwidth and AGC already had received the $100 million from 360networks and had filed or were soon to file chapter 11 petitions (which meant that at best 360networks would obtain a $100 million unsecured claim -- worth pennies on the dollar -- if the Asia Capacity was not provided, as opposed to $100 million worth of capacity if it were provided).

release AGC's Guaranty obligation or AGC would eliminate that obligation through a bankruptcy filing:

> we had dialogue with Jim Millstein [of Lazard] that acknowledged the fact that they were going through the process of trying to sell their assets at Asia Global Crossing following up on the discussion that they would either try to do it out of [bankruptcy] by buying out our capacity [with] our agreement or in [an AGC bankruptcy]. And I knew what that meant.
>
> Q.    What did it mean?
>
> A.    It means that if [AGC] filed for [bankruptcy] protection that they were not going to have to honor in our [Guaranty because in bankruptcy] . . . they would have avenues to gain clearance or freedom from our obligation under the Asia Global Crossing commitment.

(July 27 Tr. 98-100, 101-102, Dkt. 907, App. 3.)  Millstein then advised 360networks to respond to AGC's $5 million offer, which 360networks had previously rejected.  Particularly in light of the events leading up to his statements as AGC's agent, Millstein's statements constituted AGC's anticipatory breach of its Guaranty in June 2002.

> **C.    AGC's Contemporaneous Execution Of An Agreement To Sell Substantially All Its Assets To Asia Netcom And Filing Of The Related Motion To Approve That Sale Constituted An <u>Anticipatory Breach Of The Guaranty As Of November 17, 2002.</u>**

All these facts underlying AGC's anticipatory breach in June 2002 also support the conclusion that another anticipatory breach resulted from AGC's prepetition execution of the ANC Sale agreement and public announcement of that signing combined with AGC's post-petition filing of the ANC Sale and sales procedure motions, all of which occurred on November 17, 2002.  Before reaching that point, however, two other noteworthy events occurred after Jim Millstein's June 2002 remarks that confirmed Millstein's message.

On July 19, 2002, PCL filed for chapter 11 protection.  (<u>See</u> Debtors' Voluntary Petition (Chapter 11) Dkt. 1, App. 7.)  Through PCL, AGC had indirectly owned a controlling

interest in the PC-1 System that represented one of the two telecommunications systems constituting the Asia Capacity.[26]  Notably, the PC-1 System did not meaningfully overlap with the other half of the Asia Capacity, the EAC System.[27]  At the request of its lenders, PCL then was managed by a "crisis management firm" unconnected with AGC.  (See Riesenfeld Aff. in Support of Debtors' Voluntary Petition ¶ 18, Dkt. 3, App. 8.)  Accordingly, the only reasonable inference is that by no later than PCL's chapter 11 filing, AGC definitively had lost control over PCL so that AGC could not have obtained PC-1 Capacity from PCL without paying full price.[28]  As AGC then expected to pay its unsecured creditors pennies on the dollar, it would have made no economic sense for AGC to have paid PCL full price to obtain PC-1 Capacity to satisfy 360networks' unsecured Guaranty claim.

Another noteworthy event preceding AGC's chapter 11 filing was AGC's October 2002 cancellation of the $12 million cash buy-out that AGC and 360networks had preliminarily agreed upon.  (July 27 Tr. 95-98, 102-03, 106, Dkt. 907, App. 3; Exs. 220, 226, 227, Dkt. 968, App. 5.)  AGC's rejection of that deal, which would have eliminated AGC's Guaranty obligations for $12 million, signified AGC believed it could do better in bankruptcy by not performing under its Guaranty.

With those two events confirming the import of Jim Millstein's June 2002 statements, in November, 2002, the non-PC-1 half of AGC's Asia Capacity, the EAC System,

---

[26]    (See Trustee's Motion for Reconsideration, dated July 8, 2005, p. 6, Dkt. 645, App. 23) ("since AGC never owned capacity on the PC-1 system directly, it was always the case that in order to obtain such capacity, AGC might turn to PCL as the supplier.").

[27]    (See Trustee's Motion for Reconsideration, dated July 8, 2005, pp. 5-6, Dkt. 645, App. 23) ("The PC-1 system is owned by Pacific Crossing Ltd. ("PCL"), which is also an indirect, wholly-owned subsidiary of AGC.  The EAC and PC-1 systems have both similar and different destination points in the Far East.").

[28]    (See PCL's Objection to ANC Sale Motion, dated January 2003, ¶ 17, Dkt. 136, App. 24) (AGC has "a series of agreements with capacity purchasers under which it has agreed to provide capacity across PC-1 to the non-debtor contracting party.  Of course, because [AGC] has no contract with [PCL] allowing [AGC] … to perform such capacity purchase contracts and deliver the trans-Pacific capacity contemplated therein, … [AGC] cannot provide adequate assurance" AGC will be able to deliver PC-1 capacity").).)

became one subject of the proposed ANC Sale, under which AGC was to sell substantially all of its assets for a net recovery of approximately $81 million in cash plus ANC's assumption of certain liabilities other than the Asia Commitment. (See ANC Sale Motion ¶ 20, Dkt. 17, App. 9.) Notably, just before filing its chapter 11 petition on November 17, 2002, AGC executed the ANC Sale agreement, publicly announced that agreement, and paid Lazard $1 million that was due based on such announcement.[29]  Later the same day, AGC filed its chapter 11 petition together with motions seeking to sell substantially all of AGC's assets and approval of related sales procedures. The motions, inter alia, repeatedly emphasized the urgent need for a prompt sale and sought a $16 million break-up fee for ANC.[30]  (ANC Sale Motion p. 22, Dkt. 17, App. 9.) The proposed sale agreement annexed to the ANC Sale motion provided that "the Guaranty was an 'excluded liability' that Asia Netcom would not assume." 326 B.R. at 247.

Together, AGC's November 17, 2002 prepetition execution of the ANC Sale agreement and announcement of the deal combined with AGC's postpetition filing of the ANC Sale motion constituted AGC's unequivocal statement that it would not perform under the Guaranty. In effect, AGC stated: (x) it was liquidating, including the sale of all its remaining Asia Capacity; (y) 360networks' Guaranty was excluded from the obligations to be assumed by the buyer; and (z) after the sale AGC would have less than $90 million in cash to satisfy all of AGC's liabilities, including 360networks' $100 million Guaranty. Indeed, AGC's clear

---

[29]    (See Affidavit of Richard F. Casher, dated January 23, 2003, in Support of the ANC Sale motion ¶ 4 , Ex. B to Dkt. 148, App. 10) (Counsel to AGC states, "Immediately prior to the commencement of its chapter 11 case, . . . , AGC [] executed a definitive [sale] agreement . . . with Asia Netcom . . . ."); Affidavit of Xingcha Fan, dated January 16, 2003, in support of ANC Sale motion, ¶ 3, Dkt. No. 149, App. 20 (same). See Lazard Fee Application, p. 12, n.4, Dkt. 248, App. 12 (On November 17, 2002, the ANC Sale was publicly announced just before AGC filed its chapter 11 petition and AGC became obligated to pay Lazard $1 million).

[30]    (See Affidavit of Stefan Riesenfeld, dated January 16, 2003, in Support of the ANC Sale Motion ¶ 14(c)(ii), Dkt. 149, App. 20) (AGC's CFO says sale is necessary because AGC will run out of cash by the end of March 2003).

statement that it would not perform under the Guaranty was far more tangible than such a statement of intent typically might be because the statement: (a) was written; (b) was to be enforced with a $16 million break-up fee; (c) was preceded by AGC's prepetition (i) execution of the ANC Sale agreement, (ii) public announcement of the sale agreement, and (iii) payment of $1 million to Lazard based on that public announcement; (d) was based on AGC's statements that such an immediate sale was essential; and (e) was backed up by all of the time, effort, and money that AGC had invested in the lengthy ANC Sale and sales procedures motions, the fully negotiated and executed ANC Sale agreement, and AGC's continuing active efforts to obtain approval of and consummate the ANC Sale.

Notwithstanding AGC's clear statement of intent, the Bankruptcy Court found AGC's filing of the ANC Sale motion was not an anticipatory breach because the motion "without more, did not prevent [AGC] from living up to its performance guaranty." In re Asia Global Crossing, 326 B.R. at 256. The Bankruptcy Court reasoned that the ANC Sale required court approval. Hence, as AGC was not yet bound, AGC "could withdraw the application and abandon the contract, or the terms of the sale contract could change." Id.

Yet, AGC had executed the ANC Sale agreement prepetition, and, therefore, was bound before any court approval was required.[31] Even, however, if AGC somehow was not bound prepetition and the filing of the ANC Sale motion did not yet legally bind AGC (so that it theoretically could have backed out of the ANC Sale), AGC's signing of the ANC Sale agreement, the related public announcement of the agreement, the filing of the ANC Sale Motion, and all AGC's contemporaneous actions still satisfied the alternative basis for an anticipatory breach, that a party "states that he cannot or will not perform his obligations." 326

---

[31]     See infra footnote 29.

B.R. at 249 (citations omitted) (emphasis added).  See Updike v. Oakland Motor Car Co., 242

N.Y.S. 329, 333 (App. Div. 1930) ("A voluntary petition by the bankrupt admitting its

insolvency, and praying that its affairs be wound up and its assets distributed pro rata among its

creditors, admits its complete disablement to perform the agreement . . ." for the purposes of

establishing an anticipatory breach.).[32]  Correspondingly, the New York Court of Appeals has

found that an anticipatory "repudiation can be either 'a statement by the obligor to the obligee

indicating that the obligor will commit a breach that would of itself give the obligee a claim for

damages for total breach' or 'a voluntary affirmative act which renders the obligor unable or

apparently unable to perform without such a breach.'"  Norcon Power Partners, L.P. v. Niagara

Mohawk Power Corp., 705 N.E.2d 656, 659 (N.Y. 1998) (quoting Restatement (Second) of

Contracts § 250); see also Heart Constr. Corp. v. Gower, No. 33139/03, 2004 N.Y. Misc. LEXIS

2975, at *5 (Dist. Ct. Oct. 14, 2004) (citing Norcon, 92 N.Y.2d at 463; other citations omitted.)

("The repudiation may be express or implied.  An express repudiation is a clear, positive,

unequivocal refusal to perform . . ., an implied repudiation results from conduct where the

promissor put out of its power to perform so as to make substantial performance of its promise

impossible . . . .").

     Consequently, it is apparent AGC anticipatorily breached the Guaranty in both

June and November 2002.  As those breaches long preceded any point at which 360networks

---

[32]  The fact AGC theoretically could later change its mind regarding the ANC Sale was irrelevant because that potential is inherent in any statement by a party that it will not perform in the future.  See DeForest Radio Telephone & Telegraph Co. v. Triangle Radio Supply Co., Inc., 153 N.E. 75, 78 (N.Y. 1926) (New York Court of Appeals holds in anticipatory breach case that the breaching party "could at any time [until the non-breaching party sued] have reconsidered and revoked its cancellation, or repudiation and could have entered once more upon performance of the contract."); Argonaut P'ship L.P. V . Sidek, S.A. de C.V., No. 96 Civ 1967, 1996 WL 617335, at *6 (S.D.N.Y. Oct. 25, 1996) (The finding of an anticipatory breach based on a statement the party would not perform is appropriate even if the party later wanted to change its mind because, as here, the party "failed to issue a retraction.")  Here, the Trustee submitted no evidence to contradict the conclusion that the ANC Sale motion was an unambiguous statement of intent not to perform and never suggested AGC ever considered, let alone attempted, to repudiate that statement of intent.

reasonably could have been expected to have had a formal plan in place to order Asia Capacity at the end of the Master Agreement's term, there can be no question that 360networks was ready, willing, and able to perform at the time of each such anticipatory breach.

## IV. 360NETWORKS IS ENTITLED TO AN ALLOWED $100 MILLION (PLUS) CLAIM WITHOUT A REMAND FOR FURTHER PROCEEDINGS

As 360networks either did not need to show it was ready, willing, and able to order capacity or established it was ready, willing, and able, 360networks is entitled to an allowed claim for $100 million due to AGC's anticipatory breach.

### A. The Bankruptcy Court Already Determined 360networks Is Entitled To A $100 Million Claim.

The Bankruptcy Court explained that "[s]ince 360networks had prepaid $100 million, it was entitled to a credit" for that amount of Asian Capacity. (Opinion at 3.) Due to the MFC Clause in the Master Agreement, "[i]f the market price for capacity declined, GC Bandwidth would be required to deliver proportionately more capacity to meet its obligations." (Id.; see Ex. 14, the Master Agreement § 2(l), Dkt. 967, App. 1.) Thus, even assuming market prices for Asia Capacity generally fell after March 2001, that simply entitled 360networks to proportionately more capacity to satisfy AGC's $100 million obligation.

Correspondingly, in granting 360networks' motion in limine to exclude the Trustee's damages expert, the Bankruptcy Court effectively ruled that, if 360networks demonstrated it was, "ready, willing and able," then 360networks was entitled to a $100 million claim. (See July 26 Tr. 11, Dkt. 918, App. 2.) The Trustee's damages expert concluded that because the market price of capacity generally declined throughout the contract period, 360networks was entitled to a claim for less than $100 million dollars. In granting 360networks' motion in limine, therefore, the Bankruptcy Court held that the Trustee's expert's report and

anticipated testimony was not relevant because 360networks is "entitled to $100 million dollars worth of capacity." (July 26 Tr. 11, Dkt. 918, App. 2; see July 26 Tr. 5-11, Dkt. 907, App. 3.) Indeed, in rejecting the Trustee's argument that 360networks had to further establish the value of the Asia Capacity, the Bankruptcy Court stated, "I still don't understand how [360networks'] share is worth anything less than 100,000,000 dollars." (July 26 Tr. 94, Dkt. 918, App. 2.)

**B.    Alternatively, 360networks Is Entitled To An Allowed Claim Of $100 Million Because That Was The Benefit Of The Bargain The Parties Reasonably Expected.**

"Under New York law, the normal measure of damages for breach of contract is expectation damages -- the amount necessary to put the aggrieved party in as good a position as it would have been had the contract been fully performed." Scott-Macon Secs., Inc. v. Zoltek Cos., No. 04 Civ. 2124MBM, 2005 WL 1138476, at *17 (S.D.N.Y. May 12, 2005). Thus, 360networks should be given the benefit of the bargain by being put in as good a position monetarily as if AGC had fully performed, rather than anticipatorily breached, AGC's obligations. See Trans World Metals, Inc. v. Southwire Co., 769 F.2d 902, 908 (2d Cir. 1985). "[T]he best measure of the value of the broken promise is the value assigned to it by the parties themselves. … [This] reflects better than any other measure the loss caused by the breach..." Waxman v. Envipco Pick Up & Processing Servs., No. 02 Civ. 10132, 2006 WL 236818, at *5 (S.D.N.Y. Jan. 17, 2006) (quoting 24 Richard A. Lord, Williston on Contracts § 64:2 (4th ed. 2002)).

Here, 360networks prepaid for $100 million of Asia Capacity. Therefore, 360networks is entitled to what it would have received had AGC performed under the Guaranty. The plain language of the contract called for 360networks to receive $100 million worth of capacity, based on current market prices when 360networks ordered. (See Ex. 14, Master

Agreement § 2(l), Dkt. 967, App. 1.)  Accordingly, for 360networks to obtain the benefit of its

bargain, expectation damages should be $100 million.

### C.    Alternatively, 360networks Is Entitled To Its Restitution Interest Equaling A $100 Million Allowed Claim.

Where, as here, there is a "total breach," 360networks also could elect to recover

its restitution interest.  Adbul v. Subbiah, 747 N.Y.S.2d 372 (App. Div. 2001).  See Mobil Oil

Exp. and Producing Southeast, Inc. v. United States, 530 U.S. 604, 608 (2000) (quoting

Restatement (Second) of Contracts § 373 (1979)) ("when one party to a contract repudiates that

contract, the other party 'is entitled to restitution for any benefit that he has conferred on' the

repudiating party 'by way of part performance or reliance.'")  Restitution provides two

alternative measures of relief.  First, the restitution interest can be "the value of the benefits

received by the defendant due to the plaintiff's performance."  Landmark Land Co. v. F.D.I.C.,

256 F.3d 1365, 1372 (Fed. Cir. 2001).  Alternatively, recovery under restitution can be "the cost

of plaintiff's performance, which includes both the value of the benefits provided to the

defendant and the plaintiff's other costs incurred as a result of its performance under the

contract."  Id.

In Mobil Oil the Supreme Court explained that a "total breach" is a breach that

"so substantially impairs the value of the contract to the injured party at the time of the breach

that it is just in the circumstances to allow him to recover damages based on all his remaining

rights to performance."  530 U.S. at 608.  Here also, AGC's breach was total as it negated the

value of the Master Agreement and Guaranty to zero.  See id.; see also Amber Res. Co. v. United

States, 68 Fed. Cl. 535, 548 (Fed. Cl. 2005).  As the Bankruptcy Court held, "360networks

prepaid $100 million in exchange for GC Bandwidth's promise, and Asia Global's Guaranty, to

deliver $100 million of capacity in the future."  In re Asia Global Crossing, 332 B.R. at 529; see

also Amber Res. Co., 68 Fed. Cl. at 560-61 (holding restitution award appropriate and ordering the return of a $1.1 billion pre-payment for exploration rights).   Accordingly, the analysis in Mobil Oil is analogous to the situation here -- "these principles amount to the following: if … [AGC] said it would break, or did break, an important contractual promise, thereby substantially impair[ing] the value of the contract to [360networks] then … [AGC] must give [360networks its] money back." Mobil Oil, 530 U.S. at 608 (internal quotations omitted); see also Adbul, 747 N.Y.S.2d at 372 (holding that the trial court's award of restitution interest was appropriate where the breach was "total").   Further, "[AGC] must [pay 360networks its money back] whether the contract would, or would not, ultimately have proved financially beneficial to the companies." Mobil Oil, 530 U.S. at 608.   Thus, 360networks is entitled to restitution interest equalling $100 million.[33]   Moreover, restitution would be particularly appropriate where, as here, the Trustee may dispute the market value of the capacity.   See Bausch & Lomb, Inc. v. Bressler, 977 F.2d 720, 730 (2d Cir. 1992) ("Indeed, in the absence of a readily available market price, the value that the parties ascribed to a benefit in their contract may be the best valuation measure available to the court.").

**D.    360networks' Allowed Claim Also Should Include Costs Of Collection.**

In addition to 360networks' $100 million basic claim, AGC is obligated to pay 360networks' costs of collection.  (See Ex. 15, the Guaranty § 4.9, App. 1.)  Hence, 360networks is entitled to an allowed claim for all of its costs of collection, including but not limited to attorneys' fees.

---

[33]    AGC received a benefit from executing the Guaranty. Indeed, § 3.2 of the Guaranty explicitly states that "the agreement of [360networks] to enter into the Basic Agreements with [GC Bandwidth] is of substantial and material benefit to [AGC] . . . ."

E.    **If The Court Were To Rule In Favor Of 360networks' Appeal,
No Remand For Further Proceedings Would Be Necessary.**

This Court need not remand to the Bankruptcy Court for further proceedings (other than to determine 360networks' costs of collection) if the Court finds the Bankruptcy Court erred in holding either (i) 360networks had to prove it was ready, willing, and able to order; or (ii) 360networks was not ready, willing, and able to perform as of January 29, 2003 or any earlier anticipatory breach date. See Celle v. Filipino Reporter Enters. Inc., 209 F.3d 163, 191 (2d Cir. 2000) (modifying order from below instead of remanding for new determination); Hospital Ass'n of New York State, Inc., v. Toia, 73 F.R.D. 565, 568 (S.D.N.Y. 1976) (appellate court can determine issue of law instead of remanding case if only one possible outcome).

## CONCLUSION

For the reasons set forth above, 360networks respectfully requests that this Court reverse the January 2 Order and award 360networks an allowed general unsecured claim of $100 million plus costs of collection.

Dated:  April 11, 2008

WILLKIE FARR & GALLAGHER LLP

By: _____
Alan J. Lipkin
(A Member of the Firm)

787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000
alipkin@willkie.com

Attorneys for 360networks Corporation

4064046

-50-

## CERTIFICATE OF SERVICE

The undersigned, a member in good standing of the bar of this Court, hereby certifies that he caused to be served a copy of the Brief of Appellant 360networks Corporation On Appeal From Bankruptcy Court's Order Expunging Claim Number 5 on the following person on April 11, 2008, by ECF and hand delivery:

Adam C. Silverstein, Esq.
Golenbock Eiseman Assor Bell & Peskoe LLP
437 Madison Avenue
New York, New York  10022-7302

Attorney for Appellee

Adam S. Ross, Esq.
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY  10019
(212) 728-8000
aross@willkie.com