GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
Jonathan L. Flaxer, Esq.
Adam C. Silverstein, Esq.
Stacy H. Schneider, Esq.
Pamela B. Zimmerman, Esq.
437 Madison Avenue
New York, New York 10022
(212) 907-7300

*Attorneys for Robert L. Geltzer, Chapter 7 Trustee*
*of the Estate of Asia Global Grossing, Ltd.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

In re                                                       :
                                                            :        Chapter 7
ASIA GLOBAL CROSSING, LTD. *et al.*,                        :        Case Nos. 02-15749
                                                            :        Through 02-15750 (SMB)
                            Debtors.                        :        Substantively Consolidated)
-------------------------------------------------------------- X
                                                            :
360NETWORKS COPRORATION,                                    :
                                                            :
                            Appellant,                      :        08 Civ. 03148 (RJH)
             v.                          .                  :
                                                            :
ROBERT L. GELTZER, as Chapter 7 Trustee of                  :
the Estate of Asia Global Crossing, Ltd.,                   :
                                                            :
                            Appellee.                       :
-------------------------------------------------------------- X

## **BRIEF OF APPELLEE-TRUSTEE ROBERT L. GELTZER**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF ISSUES PRESENTED ............................................................ 1

STATEMENT OF FACTS .................................................................................... 3

A.      BACKGROUND OF THE BANKRUPTCY
        CASE AND THIS CONTESTED MATTER ..................................................... 3

B.      THE CROSS-MOTIONS FOR SUMMARY JUDGMENT ............................... 7

C.      THE OPINION AND ORDER GRANTING IN PART AND DENYING
        IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT ...................... 10

D.      THE CROSS-MOTIONS FOR REARGUMENT ......................................... 14

E.      THE OPINION AND ORDER GRANTING LIMITED REARGUMENT,
        BUT UPON REARGUMENT, ADHERING TO THE ORIGINAL DECISION ...... 15

F.      THE TRIAL ........................................................................................ 17

G.      THE POST-TRIAL DECISION AND ORDER
        EXPUNGING 360NETWORKS' CLAIM .................................................... 20

H.      THIS APPEAL AND THE PARTIES' MUTUAL
        AGREEMENT TO EXPEDITE IT ............................................................ 23

ARGUMENT ....................................................................................................... 24

I.      THE SUMMARY JUDGMENT AND REARGUMENT
        ORDERS SHOULD BE AFFIRMED ........................................................ 24

        A.      The Standard of Review ........................................................... 24

        B.      The Bankruptcy Court Did Not Err in Denying, in Part,
                360networks' Motion for Summary Judgment and Then
                Adhering to It on Reargument .................................................. 25

        1.      The Bankruptcy Court Properly Decided that 360networks
                Must Show That It Was Ready, Willing and Able to Perform
                in Order to Recover on Its Claim ............................................ 25

*The Bankruptcy Court Properly Applied the Law* ................................................25

*360networks' Arguments Are Meritless* ................................................27

*360networks' Down Payment Argument* ................................................27

*360networks' Nature of the Relief Argument* ................................................31

2.  The Bankruptcy Court Properly Found as a Fact Without
    Substantial Controversy that Asia Global Did Not Repudiate
    the Guaranty Before January 29, 2003 ................................................35

*The Bankruptcy Court Properly Applied the Law* ................................................35

*360networks' Arguments Are Meritless* ................................................37

*360networks' Argument that the Rule 56(d) Requirements Were Not Satisfied* ................................37

*360networks' Argument that the Anticipatory Breach
Occurred Before January 29, 2003* ................................................39

II.   THE POST-TRIAL DECISION AND EXPUNGEMENT
      ORDER SHOULD BE AFFIRMED ................................................43

A.    The Standard of Review ................................................43

B.    The Bankruptcy Court's Finding that 360networks Was Not
      "Ready, Willing and Able" Was Not Clearly Erroneous ................................................44

*The Bankruptcy Court's Finding Was Supported by the Record* ................................44

*360networks' Arguments Are Meritless* ................................................45

C.    The Court Did Not Err in Applying the Burden of Proof ................................................47

CONCLUSION ................................................50

# TABLE OF AUTHORITIES

## CASES

*In re 310 Associates,*
        346 F.3d 31 (2d Cir. 2003)..........................................................................25

*Alberty-Vlez v. Corporacin de Puerto Rico Para la Difusin Pblica,*
        242 F.3d 418 (1st Cir. 2001)............................................................... 35-36

*American List Corp. v. U.S. News and World Report, Inc.,*
        75 N.Y.2d 38, 550 N.Y.S.2d 590 (1989)..........................31, 32, 33, 34

*Anderson v. City of Bessamer City,*
        470 U.S. 56 (1985)....................................................................................43

*Aniero Concrete Co. v. New York City Construction Authority,*
        No. 94 Civ. 9111, 1997 WL 3268 (S.D.N.Y. Jan. 3, 1997)........................34

*Argonaut P'ship L.P. v. Sidek,*
        No. 96 Civ. 1967 (MBM), 1996 WL 617335 (S.D.N.Y. Oct. 25, 1996)....................26

*In re Asia Global Crossing, Ltd.,*
        326 B.R. 240 (Bankr. S.D.N.Y. 2005)............................................... *passim*

*In re Asia Global Crossing, Ltd.,*
        332 B.R. 520 (Bankr. S.D.N.Y. 2005)............................................... *passim*

*In re Asia Global Crossing, Ltd.,*
        379 B.R. 490 (Bankr. S.D.N.Y. 2007)............................................... *passim*

*Banker v. Nighswander, Martin & Mitchell,*
        37 F.3d 866 (2d Cir. 1994)........................................................................43

*In re Bridge to Life. Inc.,*
        Nos. CV-05-5499 (CPS), 05-19154 (jf), 2006 WL 1329778
        (E.D.N.Y. May 16, 2006) ...................................................................25

*Cipriano v. Glen Cove Lodge #1458,*
        B.P.O.E., 1 N.Y.3d 53, 769 N.Y.S.2d 168 (2003)................................34 n.3

*In re Crysen/Montenay Energy Co.,*
        156 B.R. 922 (S.D.N.Y. 1993)...................................................................24

*DeForest Radio Telegraph & Telegraph Co. v. Triangle Radio Supply Co.,*
        243 N.Y. 283 (1926) ................................................................................26

*Doe v. Menefee,*
    391 F.3d 147 (2d Cir. 2004)...................................................................43

*Ellsworth v. Tuttle,*
    148 Fed.Appx. 653, 2005 WL. 1427638 (10th Cir. June 20, 2005) ...........................35

*In re Food Management Group, LLC,*
    372 B.R. 171 (Bankr. S.D.N.Y. 2007) ................................................................49, 50

*In re G. Marine Diesel Corp.,*
    155 B.R. 851 (Bankr. E.D.N.Y. 1993).......................................................................47

*In re Gorgeous Blouse Co.,*
    106 F. Supp. 465 (S.D.N.Y. 1952) ...........................................................................47

*Huntington Mining Holdings, Inc. v. Cottontail Plaza, Inc.,*
    60 N.Y.2d 997, 471 N.Y.S.2d 267 (1983) ................................................................26

*In re King,*
    305 B.R. 152 (Bankr. S.D.N.Y. 2004).......................................................................47

*King World Products, Inc. v. Financial News Network, Inc.,*
    660 F. Supp. 1381 (S.D.N.Y. 1987) ...............................................................48, 49, 50

*Lucente v. International Bus. Machines Corp.,*
    146 F. Supp. 2d 298 (S.D.N.Y. 2001).......................................................................30

*In re M. Silverman Laces, Inc.,*
    No. 01 Civ. 6209 (DC), 2002 WL. 31412465 (S.D.N.Y. Oct. 24, 2002) ....................24

*National Market Share, Inc. v. Sterling National Bank,*
    392 F.3d 520 (2d Cir. 2004).....................................................................................43

*In re Pappas,*
    239 B.R. 448 (E.D.N.Y. 1999) .................................................................................32

*Penthouse International Ltd. v. Dominion Federal Svgs. & Loan Association,*
    855 F.2d 963 (2d Cir. 1988).....................................................................................48

*In re Plagakis,*
    No. 03 Civ. 0728 (SJ), 2004 WL 203090 (S.D.N.Y. Jan. 27, 2004) ...........................43

*In re Prudential Lines, Inc.,*
    No. 93 Civ. 1481, 1994 WL 142017 (S.D.N.Y. Apr. 20, 1994)..................................40

*In re Randall's Island Family Golf Ctr.,*
    272 B.R. 521 (S.D.N.Y. 2002)...........................................................................26, 44

*Record Club of America, Inc. v. United Artists, Records, Inc.,*
    890 F.2d 1264 (2d Cir. 1989)...............................................................................26, 48

*Roberts v. Karimi,*
    251 F.3d 404 (2d Cir. 2001)..........................................................................................44

*Saewitz v. Epstein,*
    6 F. Supp. 2d 151 (S.D.N.Y. 1998) ......................................................................26, 30

*Scholle v. Cuban-Venezuelan Oil Voting Trust,*
    285 F.2d 318 (2d Cir. 1960)..........................................................................................26

*Schwimmer v. Sony Corp. of Am.,*
    637 F.2d 41 (2d Cir. 1980)) .........................................................................................39

*In re Tender Loving Care Health Care Services, Inc.,*
    377 B.R. 798 (E.D.N.Y. 2007) ...............................................................................24, 25

*In re Tower Automotive, Inc.,*
    241 F.R.D. 162 (S.D.N.Y. 2006) ............................................................................40, 46

*Towers Charter & Marine Corp. v. Cadillac Insurance Co.,*
    894 F.2d 516 (2d Cir. 1990)..........................................................................................26

*Traveller's International, A.G. v. Trans World Airlines, Inc.,*
    41 F.3d 1570 (2d Cir. 1994)..........................................................................................43

*William Raveis R.E., Inc. v. Stawski,*
    31 Conn. App. 608, 626 A.2d 797 (Conn. App. 1993)...............................................44

## STATUTES

Fed.R.Civ.P. 56(a) .............................................................................................................38

Fed.R.Civ.P. 56(d) ....................................................................................................... *passim*

Fed.R.Civ.P. 56(d) Advisory Committee Note (1946) ......................................................36

Fed.R.Civ.P. 56(f).............................................................................................................38

Fed.R.Civ.P. 59(e) ......................................................................................................14, 15

## PRELIMINARY STATEMENT

Appellee Robert L. Geltzer (the "Trustee"), as chapter 7 trustee of the estates of Asia Global Crossing, Ltd. ("Asia Global") and its wholly-owned subsidiary, Asia Global Crossing Development Co. (each a "Debtor" and collectively "the Debtors"), respectfully submits that (i) the Opinion and Order Granting in Part and Denying in Part Cross-Motions for Summary Judgment, entered June 28, 2005 and reported as *In re Asia Global Crossing, Ltd. ("In re Asia Global I")*, 326 B.R. 240 (Bankr. S.D.N.Y. 2005), (ii) the Opinion and Order Granting Limited Reargument, But Upon Reargument, Adhering to the Original Decision, entered November 10, 2005 and reported as *In re Asia Global Crossing, Ltd. ("In re Asia Global II")*, 332 B.R. 520 (Bankr. S.D.N.Y. 2005), and (iii) the Post-Trial Decision Expunging Claim No. 5, entered December 13, 2007 and reported as *In re Asia Global Crossing, Ltd. ("In re Asia Global III")*, 379 B.R. 490 (Bankr. S.D.N.Y. 2007), and Order Expunging Claim No. 5 of 360Networks Corp., entered January 2, 2008, of the United States Bankruptcy Court for the Southern District of New York (Bernstein, C.B.J.) (the "Bankruptcy Court") should be affirmed.

## STATEMENT OF ISSUES PRESENTED

1.    Whether the Bankruptcy Court erred by denying, in part, the motion for summary judgment of appellant-claimant 360networks Corporation ("360networks") on 360networks' claim for $100 million in damages against the Debtors' estates, where, after finding as a matter of law that Asia Global had anticipatorily repudiated an executory contract with 360networks, the Bankruptcy Court applied well-settled law to hold that 360networks was required to prove at trial that it was

"ready, willing and able" to perform its contractual obligations at the time of Asia Global's anticipatory repudiation in order to recover on its claim?

      2.     Whether the Bankruptcy Court erred by finding as a fact without substantial controversy, pursuant to Fed.R.Civ.P. 56(d), in connection with the parties' cross-motions for summary judgment, that Asia Global anticipatorily repudiated a guaranty in favor of 360networks on January 29, 2003, but not before then, where (i) in connection with its cross-motion for summary judgment, 360networks took the position that there were no genuine issues of material fact in dispute regarding the existence and timing of Asia Global's anticipatory repudiation, (ii) 360networks did not submit any evidence in connection with its cross-motion for summary judgment that an anticipatory repudiation had occurred prior to January 29, 2003, and (iii) following the Bankruptcy Court's adherence, after reargument, to its determination that no anticipatory repudiation had occurred prior to January 29, 2003, 360networks never asked the Bankruptcy Court to revisit that determination?

      3.     Whether the Bankruptcy Court committed clear error by finding, after analyzing the live testimony of five witnesses and 51 exhibits admitted into evidence during a two-day trial, that 360networks was not "ready, willing and able" to perform its contractual obligations at the time of Asia Global's anticipatory repudiation, where, among other things, 360networks' chief witness admitted that he could not identify any plan, any document or anything else evidencing 360networks' intention to perform at that time?

*423484.2*

2

## STATEMENT OF FACTS

**A.    BACKGROUND OF THE BANKRUPTCY CASE AND THIS
CONTESTED MATTER**

This contested matter arises in the context of the bankruptcy case of a

former subsidiary of Global Crossing, Ltd. ("Global Crossing"), the erstwhile telecom

darling of stock analysts the much-publicized collapse of which, including its own

bankruptcy filing, spawned abundant litigation within this District.    Asia Global,

primarily through its subsidiaries, Pacific Crossing, Ltd. ("PCL") and East Asia Crossing,

Ltd. ("EAC"), owned and operated the trans-Pacific and pan-Asian components of the

worldwide Global Crossing telecommunications network.    Specifically, by virtue of its

indirect ownership of undersea fiber optic cables linking the United States to Japan (the

"PC-1 Cable") and Japan to East Asia (the "EAC Cable"), Asia Global sold long-term

telecommunications capacity to customers who sought circuits connecting either (i)

points in the United States with points in Asia or (ii) points in Japan with other points in

Asia. *See In re Asia Global Crossing I*, 326 B.R. at 242.  Asia Global (along with its

subsidiary Asia Global Crossing Development Co.) filed for bankruptcy protection on

November 17, 2002.  At the same time, it filed a motion to sell substantially all of its

assets to Asia Netcom Corporation ("ANC"), which motion was approved on January 29,

2003.  In June 2003, after substantially all of Asia Global's assets had been sold to ANC

(the "ANC Sale"), the Bankruptcy Court entered an order converting the Debtors' chapter

11 cases to cases under chapter 7 of the Bankruptcy Code, and Robert L. Geltzer was

appointed as trustee of the Debtors' chapter 7 estates. *See id.*, at 247.

This contested matter involves a now expunged unsecured proof of claim

(Claim No. 5) filed against the Debtors' estates by appellant-claimant 360networks on

*423484.2*

February 20, 2003, in the amount of $100 million.    The genesis of the claim was a "swap" transaction entered into by the Global Crossing group of companies and the 360networks group of companies (another group of companies engaged in the sale of telecommunications capacity) on March 30, 2001.    *See In re Asia Global Crossing III,* 379 B.R. at 491-92, 502.    In the transaction, pursuant to a series of separate written agreements, the Global Crossing group agreed to purchase capacity on 360networks' North American terrestrial network and trans-Atlantic cable for a total purchase price of $200 million; and the 360networks group agreed to purchase capacity on Global Crossing's Asian network (PC-1 and/or EAC), as well as lit or dark fiber anywhere on the Global Crossing network, for a total of $150 million.    The parties' respective payment obligations were netted, and the only money that actually changed hands in the transaction was $50 million, which Global Crossing paid to 360networks. *See id.*    That is, 360networks engaged in a swap consisting of mutual, but unequal, offsets, and never actually went "out of pocket" to acquire the rights to the capacity. *See id.*, at 502.

Among the instruments executed in connection with the swap transaction were (i) a Master Agreement, between GC Bandwidth, on the one hand, and 360networks (Holdings) Ltd. (predecessor to 360networks) and 360pacific (Bermuda) Ltd., on the other, and (ii) a Guaranty executed by Asia Global in favor of 360networks (Holdings) Ltd. and 360pacific (Bermuda) Ltd -- both of which instruments were expressly governed by New York law.    The Master Agreement was not a contract for the sale or transfer of any specific capacity.    Rather, it provided 360networks with the *right to order or "take down"* capacity in the future, like an option agreement.    *See id.*, at 492.    More specifically, under the Master Agreement, 360networks was credited with having paid

$100 million, and, for that consideration, was entitled to order, at no additional cost, as much capacity, on specified routes on either or both of the PC-1 and EAC Cables, as that credit could purchase under Global Crossing's and its affiliates' most favored customer prices at the time of the order. Like an option agreement, however, there was a time limit on 360networks' exercise rights: 360networks had to order the capacity within 24 months of the closing date, *i.e.*, by March 30, 2003. If, by March 30, 2003, 360networks had not taken down any capacity, or had not taken down the full $100 million commitment, then GC Bandwidth was not required to deliver any of the capacity that was not ordered or to refund any unused balance. *See In re Asia Global Crossing I*, 326 B.R. at 244.

The Master Agreement imposed a number of obligations and elaborate procedures on the parties as preconditions to 360networks' placing an order. *See id.*, at 244. Among other things, 360networks was obligated to provide to GC Bandwidth on a monthly basis a six-month rolling forecast of the capacity 360networks expected to order. *See id.*, at 245. The parties also were directed periodically to meet and review such forecasts and anticipated availability of capacity. *See id.* In the Guaranty, Asia Global unconditionally guarantied GC Bandwidth's payment and performance obligations under the Master Agreement, subject to any available defense that such guarantied obligations were "not currently due under the terms of the [Master Agreement.]" *See id.*, at 245.

Within weeks after entering into the swap transaction, in the midst of a severe downturn in the telecommunications industry and with its financial condition deteriorating, 360networks decided to abandon its plans to enter into the trans-Pacific and pan-Asian telecommunications markets -- its purported rationale for entering into the

Master Agreement in the first place. *See In re Asia Global Crossing III*, 379 B.R. at 494. Faced with the choice of either utilizing the capacity to which it acquired rights from GC Bandwidth or conducting a fire sale of it, 360networks -- which filed for bankruptcy less than three months after entering into the Master Agreement -- chose the fire sale as the cheaper alternative. *See id.* However, despite aggressive efforts to market the capacity throughout 2001 and into the beginning of 2002, 360networks did not receive a single offer for it. *See id.* Unable to liquidate any of the capacity available to it, and without the wherewithal or need to utilize any of it itself, 360networks then failed in its attempt to sell back the capacity to Global Crossing or Asia Global, even at a fraction of the original $100 million price. *See id.*, at 494-95. After relinquishing its rights vis-à-vis GC Bandwidth in a settlement with Global Crossing and being unable to consummate an agreement with Asia Global in October 2002, 360networks did nothing further with respect to the capacity, other than to file a proof of claim against the Debtors' estates on February 20, 2003. *See id.*

At no time during the 24 months after the closing of the swap transaction did 360networks order any of the $100 million of Asian capacity available under the Master Agreement. *See In re Asia Global Crossing I*, 326 B.R. at 248-49. Nor did it take any of the preparatory steps under the Master Agreement, such as providing forecasts, it was required to take before ordering the capacity. *See In re Asia Global III*, 379 B.R. at 500-01. Accordingly, on November 5, 2004, the Trustee objected to 360networks' proof of claim.

**B.    THE CROSS-MOTIONS FOR SUMMARY JUDGMENT**

On April 26, 2005, the Trustee filed a motion for summary judgment, seeking the sustaining, as a matter of law, of his objection to 360networks' proof of claim. (*See* Dkt. Nos. 603-07.)    On the basis of the instruments at issue, 360networks' responses to requests for admission and certain bankruptcy filings of 360networks' affiliates, the Trustee advanced two arguments. *First*, he asserted that because (i) "the Master Agreement involved [GC] Bandwidth's agreement to commit to provide capacity, if such capacity was ordered by 360networks during the 24 month period after the agreement was signed," and (ii) "360networks has admitted that it never ordered such capacity," GC Bandwidth had no obligation to deliver capacity to 360networks; consequently, Asia Global had no obligation under its guarantee. (Dkt. No. 604, at ¶ 6.) *Second*, the Trustee argued that the "Master Agreement was an executory contract that was rejected by 360networks" in its bankruptcy proceeding and, thus, GC Bandwidth and Asia Global were relieved of their respective obligations under the Master Agreement and Guaranty. (*Id.*)

On May 6, 2005, 360networks filed both an objection to the Trustee's motion and a cross-motion for summary judgment with respect to 360networks' proof of claim. (Dkt. Nos. 611-13; *also* 619.)    In opposing the Trustee's motion and in moving for summary judgment, 360networks did not dispute that it never ordered any of the capacity available to it under the Master Agreement. To the contrary, it admitted that fact. (Dkt. No. 619, Ex. A, at ¶¶ 22-23.)    Instead, 360networks argued that it was excused from its obligation to order the capacity by virtue of GC Bandwidth's and/or

Asia Global's anticipatory repudiation. (Dkt. No. 612.)    It also disputed that it had rejected the Master Agreement in any bankruptcy proceeding. (*See id.*)

Notably, 360networks did not contend that any issues of fact prevented the entry of summary judgment. Nor did it assert that any discovery was necessary in order to defeat or prevail on summary judgment. Rather, 360networks took the position that GC Bandwidth and/or Asia Global anticipatorily repudiated their obligations as a matter of law. 360networks cited a number of circumstances that purportedly gave rise to such an anticipatory repudiation: (1) "GC Bandwidth advised 360networks that the capacity due under the [Master Agreement] would not be provided and actively worked to preclude such usage"; (2) "GC Bandwidth had no ability to fulfill" the capacity requirement, due to changing market conditions and a severe downturn in the economy; (3) Asia Global "made it clear it would not cooperate by offering to acquire the $100 million [of capacity rights] for $5 million [in April 2002], by other express statements and by liquidating through the ANC Sale all of Asia Global's assets necessary to fulfill "the Master Agreement and Guaranty; (4) "GC Bandwidth entered into the Settlement Agreement" with 360networks; (5) "GC Bandwidth rejected the Master Agreement" in its bankruptcy case; and (6) "GC Bandwidth and [Asia Global] each filed for chapter 11 protection." (Dkt. No. 612, at p. 13.)

In support of its position, 360networks submitted copies of Global Crossing's Disclosure Statement, the "first day" Debtor's Affidavit (filed pursuant to Local Bankruptcy Rule 1007-2) in each of the Global Crossing and Asia Global bankruptcy cases, the affidavit of service in connection with Global Crossing's bankruptcy motion to approve its and GC Bandwidth's settlement with 360networks, and

the Share and Asset Purchase Agreement between Asia Global and ANC.  (*See* Dkt. No. 613.)  It submitted nothing else, other than the speculation and unsupported statements of its attorneys.  In particular, it offered no evidence for its position that "GC Bandwidth (and [Asia Global]) communicated to 360networks through words and deeds that the Asia Commitment [under the Master Agreement] would not be honored" and that "GC Bandwidth actively worked to preclude 360networks from using Asia capacity under the Master Agreement."  (Dkt. No. 612, at p. 13.)    Consistent with the foregoing, its Statement Pursuant to Local Bankruptcy Rule 7056-1 lacked any citation to the record to support those factual propositions. (Dkt. No. 611, Ex. A, at ¶ 15.)  And, when challenged during oral argument by the Bankruptcy Court to identify anywhere in the record where there was evidence to support 360networks' argument that GC Bandwidth and/or Asia Global had communicated an intention not to perform, 360networks' counsel was unable to identify any specific evidence, replying that "I don't think our burden is to give every piece of evidence." (*See* Dkt. No. 680/699, at pp. 45-46, *also* pp. 19-20.)

   In its appellate brief, 360networks strains to create the suggestion -- through a William Faulkner-like blurring of past, present and future -- that purported "statements [in June 2002] by [Asia Global's] financial advisor, Jim Millstein of Lazard, informed 360networks that [Asia Global] would never deliver the capacity" and thus "constituted [Asia Global's] anticipatory repudiation of its Guaranty in June 2002." (Brief of Appellant 360networks Corporation on Appeal from Bankruptcy Court's Order Expunging Claim Number 5 ("360 App. Br."), at 41.   But these purported statements -- 360networks' interpretation of which was expressly rejected as "disingenuous" by the Bankruptcy Court (*see In re Asia Global III*, 379 B.R. at 495) --were never offered by

360networks on the parties' cross-motions for summary judgment.[1] Rather, 360networks did not offer them until the trial, more than two years *after* the parties had filed their cross-motions for summary judgment, and, even then, the Bankruptcy Court did not receive them as evidence of an anticipatory repudiation but, rather, purely as evidence of 360networks' state of mind. (*See* Dkt. No. 918, at pp. 98-104.)

## C. THE OPINION AND ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT

On June 28, 2005, the Bankruptcy Court entered a thorough, 35-page Opinion and Order Granting in Part and Denying in Part Cross-Motions for Summary Judgment (the "Summary Judgment Order"). *See In re Asia Global I*, 326 B.R. at 240. After analyzing in detail various provisions of the Master Agreement and Guaranty, as well as the standards governing summary judgment, the Bankruptcy Court concluded that the Trustee had made out a *prima facie* showing in support of his summary judgment motion. *See id.*, at 248. The court found that "360networks had to order capacity in accordance with the Master Agreement to trigger the obligation of GC Bandwidth or Asia Global, or both, to provide that capacity," but that "[t]here is no evidence that 360networks ever ordered capacity . . . in accordance with the Master Agreement." *Id.* It thus ruled that that "the trustee [had] established the estate's defense to 360networks' claim for payment or performance as a matter of law." *Id.*

The Bankruptcy Court went on to find, however, that 360networks had shown as a matter of law that Asia Global anticipatorily repudiated the Guaranty, thereby

---

[1] Nor did 360networks place into the record on its summary judgment other documents on which it now seeks to rely, including the PCL Voluntary Petition (Dkt. No. 1, cited in 360 App. Br. at 41), Affidavits of Richard Casher and Xingcha Fan (Dkt Nos. 148-49, cited in 360 App. Br. at 43 n.29), Lazard Fee Application (Dkt. No. 248, cited in 360 App. Br. at 43 n.29) and ANC Sale Motion (Dkt. 17, cited in 360 App. Br. at 243).

*423484.2*

10

excusing 360networks from its obligation to order the capacity.    The court based that

conclusion on well-settled law, citing to more than ten cases decided within the Second

Circuit and State of New York, as well as to numerous secondary authorities. *See id.*, at

249-52. On the basis of those authorities, the court recited the familiar principles that (a)

"[a]n anticipatory repudiation occurs when a party to a contract (1) states that he cannot

or will not perform his obligations, or (2) commits a voluntary affirmative act that

renders the obligor unable or apparently unable to perform his obligations," and (b) if an

anticipatory repudiation occurs, the non-breaching party has the mutually exclusive

options of either "treat[ing] the contract as terminated and exercis[ing] his remedies, or

continu[ing] to treat the contract as valid." *Id.*, at 249. If he elects to terminate the

contract for breach, the court observed, "he is excused from tendering his own

performance." *Id.*, at 249-50. But, in order to recover damages, the non-breaching party

"must . . . show that he was ready, willing and able to perform his own obligations but for

the repudiation." *Id.*

The court then applied these black-letter principles of law to the record

before it, and found that one, but not more than one, of the circumstances cited by

360networks constituted an anticipatory repudiation. The Bankruptcy Court rejected

360networks' contention that an anticipatory repudiation had occurred either because

"GC Bandwidth advised 360networks that the capacity due under the Asia Commitment

would not be provided and actively worked to preclude such usage" or because of similar

"express statements" by Asia Global, on the grounds that "[t]here is not evidence to

support this position beyond the hearsay statements of 360networks' attorneys." *Id.*, at

252-53, 255. It further ruled that:

- While "changing market conditions may explain why 360networks and its financially-distressed affiliates never took down any capacity," "[t]hey do not . . . constitute anticipatory repudiations," because "[t]hey were neither statements nor acts by GC Bandwidth or Asia Global relating to their willingness to perform the Master Agreement or the Guaranty." *Id.*, at 252. "At most, they may have given rise to the type of insecurity that would have justified a demand for adequate assurance of future performance," which demand 360networks never made. *Id.;*

- With respect to Asia Global's $5 million repurchase offer, "[t]here are many reasons why Asia Global might be willing to pay $5 million in exchange for 360networks' rights and a release," and thus, "[a]ssuming the fact of the offer was admissible, it does not imply anything in particular"; and it "certainly does not imply that Asia Global did not intend to perform its obligations." *Id.*, at 255;

- The Settlement Agreement among Global Crossing, GC Bandwidth and 360networks -- pursuant to which 360networks *paid* money in order to settle -- did *not* "imply . . . that GC Bandwidth could not fulfill" its obligations." *Id.*, at 254. To the contrary, "360networks' willingness to pay Global Crossing $500,000.00 despite its alleged entitlement to a $100 million credit under the Master Agreement suggests -- if it suggests anything at all -- that 360networks was in breach of the Master Agreement, it was unable to order capacity, and it had no right to demand the repayment of the $100 million." *Id.;* and

- GC Bandwidth's bankruptcy filing "did not constitute an anticipatory repudiation since it could have opted to assume the Master Agreement at any time prior to rejection." *Id.*, at 252 n.20. Furthermore, GC Bandwidth's later rejection of the Master Agreement, on December 23, 2003, also "was irrelevant," since it took place "after the [expiration of the] twenty four month period within which 360networks had to take down capacity" and did not "relate back" to the filing of GC Bandwidth's petition on January 28, 2002. *Id.*, at 254.

The only circumstance cited by 360networks that the Bankruptcy Court did find constituted an anticipatory repudiation related to Asia Global's motion for approval of the ANC Sale. The court found that "Asia Global's motion to sell all of its assets, without more, did not prevent it from living up to the performance guaranty,"

insofar as Asia Global "was not . . . bound to perform the ANC Sale contract until Court approval." *Id.*, at 256. "Once the Court approved the contract [on January 29, 2003], however, Asia Global lost control of the ability to satisfy the performance guaranty." *Id.* Hence, the court ruled that its approval of the sale "rendered Asia Global incapable of satisfying the performance guaranty," and thus "Asia Global breached the Guaranty through anticipatory repudiation on January 29, 2003, with two months remaining during which 360networks could take down capacity." *Id.*

The Bankruptcy Court, thus, denied the Trustee's motion for summary judgment, and granted 360networks' cross-motion, "but only to the extent that Asia Global's anticipatory repudiation, as of January 29, 2003, has been established as a matter of law." *Id.* The court made clear that, in order for 360networks to recover on its proof of claim, it still would have to prove "that it was ready, willing and able to perform its obligations but for Asia Global's anticipatory repudiation," or, in other words, that "it was ready, willing and able to take down capacity between January 29, 2003 and March 30, 2003." *Id.*, at 257. Given the extensive briefing submitted by the parties (Dkt. Nos. 603-07, 611-13, 619, 623, 626, 629 & 630) and the ample argument heard by the court (Dkt. No. 680/699), the court also ruled that "several material facts are deemed to be established and will not be revisited at the trial." *Id.* The facts that the court determined to exist "without substantial controversy," pursuant to Fed. R.Civ.P. 56(d), were: (1) "360networks never ordered capacity in accordance with the Master Agreement from either GC Bandwidth or Asia Global prior to March 30, 2003"; (2) "360networks never demanded adequate assurance of future performance from either GC Bandwidth or Asia Global prior to March 30, 2003"; (3) "GC Bandwidth did not repudiate the Master

Agreement"; and (4) "Asia Global repudiated the Guaranty on January 29, 2003, but not before then." *Id.*

## D.   THE CROSS-MOTIONS FOR REARGUMENT

On July 8, 2005, both the Trustee and 360networks filed motions, pursuant to Fed.R.Civ.P. 59(e), for reconsideration of the Summary Judgment Order. The Trustee sought to have the Bankruptcy Court reconsider its determination that Asia Global anticipatorily repudiated the Guaranty on the date the ANC Sale was approved, *i.e.*, January 28, 2003. He argued that the ANC Sale (which included the EAC Cable, but not the PC-1 Cable), did not prevent Asia Global from performing under the Guaranty, because, notwithstanding the sale, it was able to source capacity from PC-1 or from another cable system. (*See* Dkt. No. 645, at pp. 5-7.) He further contended that even if the ANC Sale did render Asia Global unable to perform, such inability to perform did not occur until the closing of the sale on March 10, 2003, rather than on the date when the sale was approved on January 29, 2003. (*See id.*, at pp. 7-9.)

360networks sought reconsideration of those portions of the Summary Judgment Order that (1) found Asia Global did not anticipatorily breach the Guaranty on November 17, 2002, when it filed its motion for approval of the ANC Sale, (2) ruled that 360networks must prove it was ready, willing and able to perform under the Master Agreement in order to recover on its proof of claim, and (3) deemed facts to be established without substantial controversy. (*See* Dkt. No. 647.)   360networks argued that even if filing the motion for approval of the ANC Sale was not a voluntary act that rendered Asia Global unable to perform, it still was an anticipatory repudiation because it constituted a statement that Asia Global would not perform. (*See id.*, at pp. 4-6.)

360networks also argued that the court's ruling that it was required to prove it was ready, willing and able to perform in order to recover on its claim was in error, because that "general rule does not apply where, as here, the non-breaching party . . . already paid the entire purchase price." (*Id.*, at pp. 6-7). Lastly, 360networks argued that the Bankruptcy Court should not have deemed as a fact established for trial that no anticipatory repudiation had occurred prior court approval of the ANC Sale on January 29, 2003, because 360networks "had raised a material issue of fact" concerning earlier anticipatory breaches and "believe(d) discovery will help demonstrate (and 360networks should be entitled to seek to prove) that Asia Global repudiated the Guaranty before January 29, 2003" (*Id.*, at pp. 14.)

On September 7, 2005, the Bankruptcy Court indicated that it wished to have additional briefing on the issue raised by 360networks concerning the appropriateness of the finding facts without substantial controversy pursuant to Fed.R.Civ.P. 56(d). The parties submitted such additional briefing on September 26 and October 12, 2005. (*See* Dkt. Nos. 664, 665, 669 and 672.)

## E.    THE OPINION AND ORDER GRANTING LIMITED REARGUMENT, BUT UPON REARGUMENT, ADHERING TO THE ORIGINAL DECISION

On November 10, 2005, the Bankruptcy Court entered a well-reasoned, 28-page Opinion and Order Granting Limited Reargument, But Upon Reargument, Adhering to the Original Decision (the "Reargument Order"). *See In re Asia Global II*, 332 B.R. at 520. The court "denie[d] the Trustee's motion in its entirety, grant[ed] 360networks' motion for the limited purpose of addressing the Rule 56(d) order, and upon reargument, adhere[d] to its original [summary judgment] decision." *Id.*, at 523.

The court found that both the Trustee and 360networks had "failed to show that the Court overlooked something, made a clear error or committed manifest injustice," *i.e.*, the standard for reconsideration. *Id.*, at 525, 528,530.    Notably, the court found that 360networks' argument that the "ready, willing and able" requirement does not apply, because 360networks had paid the entire purchase price and had few, if any, remaining obligations, was "self-defeating." *Id.*, at 529.    The court reasoned:

> The doctrine of anticipatory repudiation "evolved as a defense to performance by the injured party". . . .    By downplaying its own remaining obligations, 360networks necessarily undercuts its basis for invoking the doctrine of anticipatory repudiation.    If its remaining obligations were so minimal or non-existent, or if performance of those obligations was independent of the debtor's duties, the doctrine would not apply.    In that circumstance, the Trustee would be entitled to summary judgment[, because] 360networks did not request the full $100 million worth of telecommunications capacity.

*Id.*, at 529.    Further, the court rejected the notion that 360networks did not have significant remaining obligations under the Master Agreement. *See id.*

The only aspect of the Summary Judgment Order that the Bankruptcy Court did reconsider was the propriety of its findings of fact without substantial controversy under Fed.R.Civ.P. 56(d).    After carefully reviewing the governing standards, the court found that "several factors" supported its decision to find facts regarding the timing of Asia Global's anticipatory repudiation:

> First, 360networks had the burden of proof on the issue of anticipatory repudiation.    Second, 360networks had access to the evidence it needed, and was in the best position to know if had been informed by Asia Global or GC Bandwidth that they did not intend to perform.    This conclusion is bolstered by two additional facts; 360networks did not seek a continuance to conduct discovery, and made its own motion for summary judgment. Third, in light of the "ready, willing and able" requirement, 360networks had the motive to show the earliest possible anticipatory breach.    Despite the burden, access and motive, 360networks' failed to marshal the proof to

> raise a substantial controversy or show the existence of a good faith
> dispute regarding an earlier anticipatory repudiation.

*Id.*, at 532-33.    The court thus adhered to the Summary Judgment Order, although it

noted that "[a]n order under Rule 56(d) is not final, and the order may be revised at a

later stage in the litigation, upon the appropriate notice to the parties, if the circumstances

warrant the change." *Id.,* at 531.    360networks never subsequently sought to revisit the

findings at any time before the trial. *See In re Asia Global III*, 379 B.R. at 496.

## F.    THE TRIAL

Following months of discovery (involving the collective production of

tens of thousands of pages of documents, the exchange of three expert reports and the

depositions of ten witnesses), the parties appeared for trial on July 26 and 27, 2007.  Over

the course of those two days, the live testimony of five witnesses (one, an expert), each

called by 360networks, and more than 50 exhibits were received in evidence.  In total, the

trial record consisted of nearly 400 pages of transcript and 900 pages of exhibits.[2]  As the

Bankruptcy Court ultimately concluded, the record did not reveal that 360networks was

"ready, willing and able" to order or take down the claimed $100 million of capacity.

The four fact witnesses who testified at trial were current or former

executives or employees of 360networks.  They admitted that 360networks acquired the

capacity rights under the Master Agreement and Guaranty as part of a "reciprocal"

transaction with Global Crossing, in which 360networks not only did not pay anything

out of pocket but actually received $50 million in cash.  (*See* Dkt. No. 917, at pp. 57-60;

---

[2]    As extensive as the trial record was, it nevertheless did not include several documents on which
360networks now relies as proof that it was ready, willing and able.  Thus, none of the Amended
Appointment of Official Committee of Unsecured Creditors (Dkt. No. 242, cited in 360 App. Br. at 24),
Affidavit of Stefan Riesenfeld (Dkt. No. 149, cited in 360 App. Br. at 26), Affidavit of Jim Millstein (Dkt.
No. 149, cited in 360 App. Br. at 26) and Asia Global Disclosure Statement (Dkt. No. 272, cited in 360
App. Br. at 26), cited in 360networks' appellate brief, was even offered, let alone admitted, into evidence at
trial.

Dkt. No. 918, at pp. 28-29.)   While, on direct examination, the witnesses tried to ignore this larger context and to focus solely on the rationale and need for the capacity rights under the Master Agreement, they conceded, on cross examination, that "an important part of," if not the primary motivation for, the transaction was 360networks' receipt of fifty million dollars at a time when 360networks was under pressure to meet quarterly financial targets. (Dkt. No. 917, at p. 67; Dkt. No. 918, at pp. 28-30.)

360networks' witnesses admitted that, within weeks after entering into the Master Agreement, its already tenuous financial condition deteriorated further, and the company decided to suspend its plans to enter into the trans-Pacific and pan-Asian regions.  (*See* Dkt. No. 918, at pp. 34-36.)   In other words, shortly after the swap transaction, 360networks' purported rationale for acquiring the capacity rights under the Master Agreement evaporated.  (*See id.*, at p. 35.)    At that point, according to the testimony and trial exhibits, 360networks began to consider two options with respect to the capacity available under the Master Agreement:  (1) to retain the capacity and lease it to other telecommunications carriers on an ongoing basis in order to generate a stream of revenue; or (2) to conduct a "fire sale" of it.   As the leasing option required the expenditure of significant operating and capital expenses, 360networks' management elected to pursue the fire sale option.  (*See id.*, at pp. 37-51; *also* Exs. 43, Q, R, DM.) They also elected, less than three months after execution of the Master Agreement, to reorganize 360networks and its affiliates in bankruptcy -- where 360networks determined to "concentrate its efforts on operating its North American networks" solely, and to sell its "other network assets," rendering the capacity available under the Master Agreement entirely extraneous to its business. (*See id.*, at pp. 32, 51; *also* Ex. DI, at p. 12.)

In the months that followed (*i.e.*, throughout 2001 and into the beginning of 2002), as its witnesses testified, 360networks made concerted efforts to market and sell the capacity available under the Master Agreement. (*See* Dkt. No. 917, at pp. 114-17, 131-33, 137-39; Dkt. No. 918, at pp. 11-16.) But, in the face of extremely depressed market conditions marked by excess supply and diminished demand, 360networks did not receive a single offer for any of the capacity -- even after marketing it at a discount of up to 50%. (*See* Dkt. No. 917, at pp. 150-55; Exs. 213, BU, CM, CN, CO & DQ.) Unable to dispose of any of the capacity, 360networks turned its efforts to selling the capacity rights back to Global Crossing or Asia Global. (*See* Dkt. No. 918, at pp. 58, 95-97, 105-05.) By October 2002, however, those efforts also had completely failed. 360networks' discussions with Global Crossing -- which began with 360networks' idea to sell back the capacity rights to Global Crossing as an offset to a $25 million credit 360networks owed to Global Crossing -- culminated in a Settlement Agreement, pursuant to which the parties released each other from all claims, including 360networks' claims against GC Bandwidth under the Master Agreement, in return for 360networks' payment to Global Crossing of $500,000. (*See* Ex. 237.) Discussions with Asia Global ended when a tentative agreement for Asia Global to repurchase the capacity rights from 360networks for pennies on the dollar was rejected by Asia Global's bondholders. (*See* Dkt. No. 918, at p. 106.) At that point, according to the testimony, Asia Global filed for bankruptcy protection and for approval of the ANC Sale, on November 17, 2002, and 360networks decided "to wait and see whether or not the sale was approved." (Dkt. No. 918, at p. 13.)

The trial evidence showed that, when the ANC Sale was approved on January 29, 2003, not only had 360networks not ordered any of the capacity, it had not

even decided whether to order the capacity. 360networks' witnesses were repeatedly asked whether, at any time, 360networks had made a decision, formed a plan or even engaged in discussions as to whether or not to take down the capacity in light of the fact that there was no customer demand for it; uniformly, the witnesses admitted that no such decision, plan or discussions ever took place. (*See* Dkt. No. 917, at pp. 172-73; Dkt. No. 918, at pp. 72-73, 131.)    While the witnesses self-servingly testified that they nevertheless "would have" ordered the capacity before the expiration of the 24-month period, that testimony, as 360networks' chief financial officer and Board member admitted, was purely "hypothetical." (Dkt. No. 918, at p. 131.)    Asked on cross-examination to identify any "plan, intention, a document, something evidencing an intent to actually place the order and order" the capacity, 360networks' chief financial officer could not. (Dkt. No. 918, at p. 129.)    In short, at the end of the two days of trial, 360networks had offered evidence of its ability to order the capacity at the time of Asia Global's anticipatory repudiation on January 29, 2003, but not a shred of evidence to suggest that it intended to order it at that, or any subsequent, time. Simply put, there was no evidence of its readiness or willingness to perform.

## G.    THE POST-TRIAL DECISION AND ORDER EXPUNGING 360NETWORKS' CLAIM

Following the submission of extensive post-trial papers, including five submissions from 360networks (*see* Dkt. Nos. 909-11, 924, 925), the Bankruptcy Court entered a 20-page Post-Trial Decision Expunging [360networks'] Claim No. 5 ("the Post-Trial Decision"). *See In re Asia Global III*, 379 B.R. at 490. The court concluded that "360networks failed to sustain its burden of proof, and expunge[d] 360networks' proof of claim." *Id.*, at 491.

The court held that while "360networks demonstrated at trial that it was financially capable of performing, and no legal impediments prevented its performance," it "failed . . . to show that it was ready and willing to perform but for Asia Global's breach." *Id.*, at 500. It based that holding on a number of unassailable findings of fact, including that:

- "There was no proof that [360networks] held the period planning meetings with GC Bandwidth (or Asia Global) called for by the Master Agreement" as prerequisites to placing an order for capacity," *id.*;

- "It never ordered capacity during the first 22 months of the 24-month window," *id.*;

- "[I]ts general practice was to seek out possible buyers before placing any order, and its efforts were unsuccessful," *id.*; and

- "360networks never developed a plan to take down and warehouse any unused capacity at the end of the 24 months," *id.*, at 501;

The court found that "[t]he most compelling evidence of the lack of intent to order capacity was the utter failure to disclose the Asia Commitment [*i.e.*, the capacity rights under the Master Agreement] in 360networks' Canadian bankruptcy proceeding." *Id.*, at 501. It reasoned:

> 360networks was required to disclose all relevant and material information to its creditors. The information circular that it sent to solicit their votes did not mention the Asia Commitment or a plan to market capacity in Asia. The failure to mention the Asia Commitment . . . implied that its value, if any, was immaterial and played no part in 360networks' future plans.

*Id.*, at 502.    Furthermore, the court rejected as both conjectural and incredible the testimony of 360networks' witnesses that they "would have" ordered the capacity before the 24-month deadline. *Id.*, at 501. It labeled their testimony as "pure speculation," and remarked that if it were true, *i.e.*, that 360networks "would have" ordered the capacity,

"[o]ne would think that . . . someone would have mentioned it or written about it during the 22-months that the Asia Commitment was open," but "[n]o one did." *Id.*

While the court was unwilling to speculate as to why 360networks was unwilling to order the capacity, it nevertheless found that there were reasons in the record for 360networks' reluctance to place an order: Namely, (1) "[t]he [capacity] w[as] not saleable, and declining in value"; and (2) while"360networks' portability rights allowed 360networks to switch previously designated routes for two years," it would have "to pay a redesignation fee." *Id.* The court reasoned that "[t]hese facts and its past lack of success may have led 360networks to decide not to divert its sales efforts from its North American core business." *Id.* Additionally, the court noted that "360networks had never gone out of pocket to acquire the capacity." *Id.* Rather, "[t]he Asia Commitment was part of [a] swap with Global Crossing in which neither ordered capacity from the other, and 360networks netted $50 million." *Id.* The court expounded:

> Born as a swap, 360networks also sought to end it as a swap. It planned to offer the Asian capacity back to Global Crossing for $25 million to offset a $25 million obligation owed to Global Crossing. After the Settlement Agreement [with Global Crossing] in October 2002, 360networks no longer needed the offset. *Id.*

Notably, in reaching its decision, the Bankruptcy Court rejected a number of the critical facts on which 360networks now rests its appeal. Thus, while 360networks predicates its argument that Asia Global anticipatorily breached the Guaranty in June 2002 entirely on the factual proposition that "June 2002 statements by [Asia Global]'s financial advisor, Jim Millstein of Lazard, informed 360networks that [Asia Global] would never deliver the capacity" (360 App. Br. at pp. 39-41), the court rejected that proposed factual finding as "disingenuous." *In re Asia Global III*, 379 B.R. at 495.    It

found "there was no evidence that Millstein said any such thing." *Id.*   Likewise, 360networks bases its argument that it was "ready, willing and able" to order the Asian capacity on a purported "business practice" it had of ordering and inventorying unnecessary capacity, but the court found that 360networks "did not show [any such] general business practice." *Id.*, at 501 n.13.

In the final analysis, the court found that 360networks' "entire case rested on the strength of the inference that it would have ordered all of the capacity because it didn't cost anything" to do so. *Id.*, at 502. "That inference," it concluded, "was not strong enough to overcome the contrary evidence of lack of intent." *Id.*   On January 2, 2008, accordingly, the Bankruptcy Court entered the Order Expunging Claim No. 5 of 360Networks (the "Expungement Order").

## H.    THIS APPEAL AND THE PARTIES' MUTUAL AGREEMENT TO EXPEDITE IT

360networks timely filed a Notice of Appeal from the Post-Trial Decision and Expungement Order, as well as the prior Summary Judgment and Reargument Orders, on January 11, 2008. (Dkt. No. 955.)  Three days earlier, in light of the Expungement Order, the Trustee had filed a motion with the Bankruptcy Court for authorization and approval to make an interim distribution to creditors of the approximately $20 million that the Trustee had been, and is, holding in reserve in connection with 360networks' claim. (*See* Dkt. Nos. 952-53.)  360networks objected to the motion on the grounds of its pending appeal.  The court heard argument. (*See* Dkt. 983).  In response to both the Trustee's and the Bankruptcy Court's concerns regarding the delay that the creditors would suffer if further distributions were conditioned on the outcome of this appeal, 360networks represented during argument that it would jointly

423484.2

23

seek acceleration of this appeal. (*See id.*) Partly on the basis of that representation, the

Bankruptcy Court denied the Trustee's interim distribution motion.

Unfortunately, as a result of a misunderstanding by the Clerk of the

Bankruptcy Court, it took nearly three months after the filing of this appeal to transmit

the record to, and to docket the appeal in, this Court.  In order to avoid any further

delays, and in the interest of fairness and justice to all estate creditors, the Trustee

requests, and has agreed with 360networks to submit a joint letter requesting, that this

appeal be treated in an expedited manner.

As the Trustee now shows, the Summary Judgment Order, Reargument

Order and the Post-Trial Decision and Expungement Order should each be affirmed.

## ARGUMENT

### I.

## THE SUMMARY JUDGMENT AND REARGUMENT ORDERS SHOULD BE AFFIRMED

### A.    The Standard of Review

The "law in this circuit requires a district court reviewing a bankruptcy

court's grant [or denial] of summary judgment to apply the same standard of review that

the Court of Appeals would apply when reviewing such determinations from a district

court." *In re Crysen/Montenay Energy Co.*, 156 B.R. 922, 924 (S.D.N.Y. 1993).  Hence,

"[o]n appeal to the district court from an order of the Bankruptcy Court [ruling on]

summary judgment, the standard of review is *de novo*." *In re M. Silverman Laces, Inc.*,

No. 01 Civ. 6209 (DC), 2002 WL 31412465, at *3 (S.D.N.Y. Oct. 24, 2002).

The standard of review of a bankruptcy court's order denying

reconsideration is generally abuse of discretion. *See In re Tender Loving Care Health*

423484.2

24

*Care Servs., Inc.*, 377 B.R. 798, 802 n.4 (E.D.N.Y. 2007); *see also In re 310 Assocs.*, 346

F.3d 31, 34 (2d Cir. 2003). However, where as here, the appellant is challenging not only

the decision not to reconsider, but also the underlying decision, a district court reviews

the reconsideration decision under the same standard of review as the underlying decision

-- in this instance, *de novo. See In re Tender Loving Health Care Servs., Inc.*, 377 B.R. at

802 n.4; *accord In re Bridge to Life. Inc.*, Nos. CV-05-5499 (CPS), 05-19154 (jf), 2006

WL 1329778, at *3 (E.D.N.Y. May 16, 2006).

**B.      The Bankruptcy Court Did Not Err in Denying, in Part, 360networks'
         Motion for Summary Judgment and Then Adhering to It on Reargument**

The Bankruptcy Court applied well-settled law in determining that,

notwithstanding Asia Global's anticipatory repudiation, 360networks was not entitled to

judgment on its proof of claim unless it showed that it was ready, willing and able to

perform its contractual obligations, *i.e.,* order the $100 million of capacity prior to March

30, 2003.    The court likewise applied basic legal standards in concluding that it was

appropriate on summary judgment to determine as a fact without substantial controversy,

pursuant to Fed.R.Civ.P. 56(d), that Asia Global anticipatorily repudiated the Guaranty

on January 29, 2003, but not before then.    The Bankruptcy Court committed no error in

making either ruling or in adhering to those rulings on reargument.    Hence, both the

Summary Judgment and Reargument Orders should be affirmed.

**1.      The Bankruptcy Court Properly Decided that 360networks Must
         Show That It Was Ready, Willing and Able to Perform in Order to
         Recover on Its Claim**

*The Bankruptcy Court Properly Applied the Law*

The law of New York is crystal clear -- and, indeed, 360networks has

acknowledged that it is the "general rule" (Dkt. No. 647, at p. 6) -- that in order to

recover damages on a claim of anticipatory repudiation, the non-breaching party must show that it was "ready, willing and able" to perform its own obligations but for the repudiation. *See, e.g., Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 523 (2d Cir. 1990); *In re Randall's Island Family Golf Ctr.*, 272 B.R. 521, 524 (S.D.N.Y. 2002); *Saewitz v. Epstein*, 6 F.Supp.2d 151, 157-58 (S.D.N.Y. 1998); *Argonaut P'ship L.P. v. Sidek*, No. 96 Civ. 1967 (MBM), 1996 WL 617335, at *5 (S.D.N.Y. Oct. 25, 1996), *aff'd*, 141 F.3d 1151 (2d Cir. 1998); *Huntington Mining Holdings, Inc. v. Cottontail Plaza, Inc.*, 60 N.Y.2d 997, 471 N.Y.S.2d 267 (1983); *DeForest Radio Tel. & Tel. Co. v. Triangle Radio Supply Co.*, 243 N.Y. 283, *rearg. Denied*, 243 N.Y. 618 (1926). This basic principle is "merely an application of the general rule that the complaining party must demonstrate the breach caused him injury; '[t]o do this he must prove that he intended to and was able to perform when his performance was due.'" *Record Club of America, Inc. v. United Artists, Records, Inc.*, 890 F.2d 1264, 1275 (2d Cir. 1989) (quoting *Scholle v. Cuban-Venezuelan Oil Voting Trust*, 285 F.2d 318, 320 (2d Cir. 1960)).

In denying, in part, 360networks' summary judgment motion, and then adhering to that decision on reargument, the Bankruptcy Court simply applied this basic principle. While it found that Asia Global had anticipatorily repudiated the Guaranty, it held that, in order for 360networks to recover on its claim of $100 million against the Debtors' estates, it was required to "show that it was ready, willing and able to perform its obligations but for Asia Global's anticipatory repudiation"; "[i]n other words, it must show that it was ready, willing and able to takedown capacity between January 29, 2003 and March 30, 2003." *In re Asia Global I*, 326 B.R. at 257; *In re Asia Global II*, 332

B.R. at 528-30. As that ruling is supported by an abundance of legal authority, the Bankruptcy Court did not commit error.

### 360networks' Arguments Are Meritless

360networks advances two arguments for why the Bankruptcy Court erred in imposing a readiness, willingness and ability requirement. (*See* 360 Br. at 14-19.) Neither has merit.

*360networks' Down Payment Argument*

360networks' principal argument is that, in contrast to the case law on which the Bankruptcy Court relied, "every New York case on point holds that after an anticipatory repudiation, recovery of a down payment by the nonbreaching party does *not* require a showing it was ready, willing and able to perform." (360 App. Br. at 14 (emphasis in original.) Hence, according to 360networks, because a "down payment is merely a partial prepayment, the down payment cases . . . mandate allowance of 360networks' full Claim based on its $100 million prepayment." (*Id.*, at 15.) The argument is completely disingenuous.

360networks' claim against the Debtors' estates was not to recover the $100 million that it purportedly "down paid" or "prepaid." Nor could it have been. As its witnesses conceded, and the Bankruptcy Court found, 360networks did not "go[] out of pocket" at all, let alone provide a $100 million "down payment," to acquire the capacity rights under the Master Agreement. *In re Asia Global III*, 379 B.R. at 502; *see* Dkt. No. 917, at pp. 57-60; Dkt. No. 918, at pp. 28-29. Furthermore, even if 360networks was credited with having paid $100 million, it was credited with having paid that amount to GC Bandwidth, not to Asia Global; and 360networks has not articulated, and cannot

articulate, any cognizable legal theory under which Asia Global would be liable to refund money that purportedly was paid to GC Bandwidth. Although, under the Guaranty, Asia Global guarantied the "full and punctual payment when due . . . of any payment obligations included in the Asia Obligations" (Tr. Ex. 15), 360networks has not even argued that there existed -- let alone, that there was any breach or repudiation of -- a "payment obligation" under the Master Agreement to remit the $100 million credit to 360networks.

360networks' claim, therefore, was not for a refund. Rather, 360networks was asserting "a *claim for damages* in excess of $100 million." (Dkt. No. 910, at p. 30; *also* Dkt. No. 991, at ¶ 85 (emphasis added).) As it explained, in no uncertain terms, in its post-trial submissions:

> 'Under New York law, the normal measure of damages for breach of contract is expectation damages – the amount necessary to put the aggrieved party in as good a position as it would have been had the contract been fully performed.' [citation omitted] . . . [Here,] the Master Agreement . . . protected the value of the Asian Capacity to 360networks. The value of the Asian Capacity would remain constant at $100 million notwithstanding dropping market prices because 360neworks would be entitled to more capacity as the price fell and the increase in the amount of capacity it would receive would offset the decrease in price. . . Thus, the plain language of the contract called for 360networks to receive at least $100 million worth of capacity, no matter what the current market prices were at the time 360networks took delivery of the capacity. Accordingly, for 360networks to obtain the benefit of its bargain, expectation damages should be at least $100 million. (Dkt. No. 910, at p. 30; *see also* Dkt. No. 911, at ¶ 85.)

Thus, 360networks' claim was not to recover a down payment, but for "benefit of the bargain" damages, based on the theory that "[i]f [Asia Global] performed, 360networks would have received $100 million worth of capacity from [Asia Global]." (Dkt. No. 910, at p. 30.) As such, 360networks' reliance on "down payment" cases is sorely misplaced;

and the Bankruptcy Court's application of the fundamental precept that "[t]o recover damages . . . the non-breaching party must also show that he was ready, willing and able to perform his own obligations but for the repudiation" (*In re Asia Global I*, 326 B.R. at 249-50; *In re Asia Global II*, 332 B.R. at 528), was entirely appropriate.

Even if 360networks' claim could be construed as one for the recovery of the money it purportedly paid (which it cannot be), its reliance on cases involving the return of down payments in the real estate context are still of no assistance to it. The $100 million that 360networks was credited with having paid bore no resemblance to a real estate buyer's down payment. As *Black's Law Dictionary* makes clear, a "down payment" in the real estate context is a form of "earnest money," *i.e.*, "[a] sum of money paid by a buyer at the time of entering into a contract to indicate the intention and ability of the buyer to carry out the contract" and which "[n]ormally . . . is applied against the purchase price." *Black's Law Dictionary* (5th Ed. 1979) (*see* definitions of "Down payment" and "Earnest Money"). When the seller anticipatorily repudiates the contract, he is no longer entitled to that "earnest money," since his repudiation excuses the buyer from having to carry out the contract and to pay the full purchase price; thus, the buyer is entitled to its return, without regard to whether she was ready, willing and able to perform.

Those circumstances are not remotely similar to the $100 million with which 360networks was credited under the Master Agreement. 360networks' $100 million credit was not "earnest money," provided by 360networks as partial performance of its ultimate payment obligation in order to demonstrate its intention and ability to carry out the contract. Rather, the $100 million was akin to the purchase price of an option,

entitling 360networks, as the Bankruptcy Court noted, to "the right to order or 'takedown' capacity in the future," in as much quantity as a $100 million could purchase under Global Crossing's or Asia Global's then most favorite customer pricing. *In re Asia Global I*, 326 B.R. at 244; *see Lucente v. International Bus. Machs. Corp.*, 146 F.Supp.2d 298, 313 (S.D.N.Y. 2001)("An optionee buys a right, and with that right the optionee has the burden to make a sufficient tender or offer of performance and to make this to the [optionor] within the time named") (quotations omitted). Like an option, 360networks could exercise its right -- to order or take down all or some of the capacity   -- at any time within a defined period.   Also like an option, if, by the expiration of that period, 360networks elected not to take down any of the capacity or to take down less than the full amount, it was not entitled to a refund of all or any portion of its purchase price. *Id.*

While the law in New York may provide that to recover a down payment a non-breaching buyer in the real estate context need not show that he was ready, willing and able to perform in order to prevail on a claim of anticipatory repudiation (*see* cases cited in 360 App. Br. at 14-15), it also provides that a non-breaching party seeking the return of money under an option does need to show that she was ready, willing and able to exercise the option in order to prevail on an anticipatory repudiation claim. *See Saewitz v. Epstein*, 6 F.Supp.2d 151, 57-58 (S.D.N.Y. 1998) ("because plaintiffs have failed to show that they were ready, willing and able to perform under the option contract, their claim of anticipatory repudiation must fail").   The law governing options is apposite to 360networks' claim; the law governing real estate down payments is not. For the foregoing reasons, 360networks' contention that the Bankruptcy Court erred by

not applying down payment cases -- to find that 360networks was not required to show it was ready, willing and able to perform -- is entirely meritless.

*360networks' Nature of the Relief Argument*

360networks also asserts that even a non-breaching party who seeks damages, as opposed to a down payment, need not establish that he was ready, willing and able to perform in order to recover for an anticipatory repudiation -- provided that the nonbreaching party's claim "exclude[s] consequential damages and specific performance." (360 App. Br. at 16.) In advancing that argument, 360networks relies on a contrived, if not confusing, pronouncement of law that can be found in no case or hornbook. According to 360networks:

> [T]he critical element determining application of the ready, willing and able standard is not, as held by the Bankruptcy Court, whether the nonbreaching party is seeking to be excused from performance rather than seeking affirmative or equitable relief. Instead, the key is whether the nonbreaching party is seeking relief premised on the counterparty's anticipatory breach (i.e., seeking to be excused from future performance, return of down payment, or general damages under the contract) as opposed to seeking relief based on the breaching counterparty's *non*performance (i.e., seeking specific performance or consequential damages)." (360 App. Br. at 16-17 (emphasis in original).)

This dichotomy is important to 360networks, because it argues that under a New York Court of Appeals case, *American List Corp. v. U.S. News and World Report, Inc.*, 75 N.Y.2d 38, 550 N.Y.S.2d 590 (1989), "damages . . . based solely on the anticipatory breach and *limited to the value the nonbreaching party was to receive as measured by the contract itself* do not require proof the nonbreaching party was ready, willing and able to perform." (360 App. Br. at 18 (emphasis in original).) While 360networks never clearly states on which side of the "relief premised on anticipatory repudiation" versus "relief based on nonperformance" line its claim falls, it seeks to align

itself with the plaintiff in *American List* and, thus, suggests that its claim is the sort that did not require proof of readiness, willingness and ability. 360networks' strained argument provides no basis for overturning the Summary Judgment or Reargument Orders.

To begin, 360networks never even made this argument below, on either the summary judgment or reconsideration motions. While it cited *American List,* it did so summarily and without drawing any distinction between "relief premised on anticipatory breach" and "relief based on n onperformance." (*See* Dkt. No. 11, at p. 14.) As 360networks failed to present this argument below, the Court should not consider it now, on appeal, for the first time. *See, e.g., In re Pappas*, 239 B.R. 448, 454 (E.D.N.Y. 1999) ("As a general rule, an appellate court will not address arguments that initially were not presented to the lower court.").

Even if the Court were to consider it, the argument should be rejected out of hand. 360networks' fanciful interpretation of *American List* and attempt to "reconcile" it with the overwhelming body of "ready, willing and able" cases cited by the Bankruptcy Court provide no grounds for finding error by the Bankruptcy Court. In fact, *American List* did not even address the question of whether a party seeking to recover damages on a claim of anticipatory repudiation must show that it was ready, willing and able to perform, and the case's language on which 360networks relies was nothing but dicta.

*American List* involved a contract "whereby, for a 10-year period, plaintiff would compile and rent to defendant [a magazine publisher] mailing lists of college student names." 75 N.Y.2d at 41, 550 N.Y.S.2d at 592. Less than two years into the

contract's 10-year term, the defendant "canceled the contract," and the plaintiff sued for the present discounted value of the payments due under the remaining eight years of the contract. *Id.* The primary question for the Court of Appeals was "whether the damages suffered by the plaintiff are general, thus requiring only the plaintiff prove that they flowed naturally from the breach, or whether the damages were special damages for lost profits which, to be compensable, must have been foreseeable and within the contemplation of the parties." *Id.*, at 41, 550 N.Y.S.2d at 591. Secondarily, the Court of Appeals addressed whether in calculating the amount of the plaintiff's damages, it was appropriate for the lower court to discount the present value of the remaining payments due under the contract "based on the risk that the plaintiff would be unable to perform the contract in the future." *Id.*, at 41, 550 N.Y.S.2d at 591-92. The Court held that the "the money [plaintiff] [sought] -- the present value of the balance owed by defendant under the contract . . . -- are general damages." *Id.*, at 44, 550 N.Y.S.2d at 593. The Court further held that "the Supreme Court erred in discounting to present value the balance due under the contract by a figure which incorporated a consideration of plaintiff's ability to perform the contract in the future." *Id.*

*American List,* therefore, stands for the proposition that where a party wrongfully terminates early a multi-year contract that obligated it to make payments over the term of the contract (such as a tenant under a lease or an employer under an employment contract), then that breaching party will be liable for general damages in the amount of the remaining payments due under the contract. Moreover, in calculating those damages, the breaching party is not entitled to any reduction based on the possibility that the non-breaching party might not have performed its obligations in the

future. In other words, the tenant that breaks its lease is not entitled to reduce the amount it owes under the remainder of the lease based on the possibility that the landlord might have breached the covenant of quiet enjoyment in the future; or the employer who terminates an employee before the end of a multi-year contract is not entitled to any reduction of future salary payments on the theory that the employee might have resigned. These basic propositions have nothing to do with the ruling, based on black letter law, of the Bankruptcy Court that 360networks was required to prove that it was ready, willing and able to perform in order to recover damages on its claim of anticipatory repudiation -- a ruling that the Court of Appeals did not address in *American List*.

Moreover, to the extent that *American List* contains language suggesting that a non-breaching party need not demonstrate readiness, willingness and ability to recover damages on a claim of anticipatory repudiation, that language -- as courts in this Circuit, including the Bankruptcy Court, have observed -- is "contradicted [by] the Second Circuit law regarding the New York doctrine of anticipatory repudiation." *In re Asia Global III*, 379 B.R. at 498; *see Aniero Concrete Co. v. New York City Constr. Auth.*, No. 94 Civ. 9111, 1997 WL 3268, at *17 (S.D.N.Y. Jan. 3, 1997).

Accordingly, 360networks' contention that "the Court of Appeals in *American List* . . . held that certain types of *affirmative* recoveries may be obtained by the nonbreaching party following the counterparty's anticipatory breach *without* the need to show the nonbreaching party was ready, willing and able to perform" (360 App. Br. at 18 (emphasis in original)) is flat-out wrong.[3]  The case has no bearing on the issue of

---

[3]  360networks' ascription of the same holding to *Cipriano v. Glen Cove Lodge #1458, B.P.O.E.*, 1 N.Y.3d 53, 769 N.Y.S.2d 168 (2003), is equally incorrect. *Cipriano* was an action to enforce by specific performance, or, in the alternative, to recover damages for breach of, a right of first refusal with respect to a proposed sale of real property that ultimately did not come to fruition. The Court of Appeals held that

whether 360networks was required to show readiness, willingness and ability. And 360networks' pronouncement of a new rule of law, based on that case, distinguishing "relief premised on anticipatory repudiation" versus "relief premised on nonperformance" provides no basis for overturning the well-grounded rulings of the Bankruptcy Court on summary judgment and reargument.

2.    **The Bankruptcy Court Properly Found as a Fact Without Substantial Controversy that Asia Global Did Not Repudiate the Guaranty Before January 29, 2003**

*The Bankruptcy Court Properly Applied the Law*

Under Fed.R.Civ.P. 56(d), if a court finds that a motion for summary judgment should not be granted in its entirety because genuine issues of material fact remain for trial, it may nonetheless enter an order that specifies those facts that appear to be without substantial controversy. *See, e.g., Ellsworth v. Tuttle*, 148 Fed.Appx. 653, 662, 2005 WL 1427638, at *8 (10th Cir. June 20, 2005). "The primary purpose of Rule 56(d) is to salvage some result from the effort expended in the denial of a motion for summary judgment." *Id.* The rule is "akin to the preliminary order under Rule 16," in that it likewise "serves the purpose of speeding up litigation by eliminating before trial [those] matters wherein there is no genuine issue of fact." Fed.R.Civ.P. 56(d) Advisory Committee Note (1946). "Orders entered following Rule 16 conferences are not lightly disturbed," and Rule 56(d) orders should be treated with equal deference. *Alberty-Vélez*

---

while there had been a breach of the right of first refusal, the holder of that right was not entitled to specific performance (requiring the property owner to offer the property to the holder of the right of first refusal), because "there is little in the record to support his assertion that he was ready, willing and able to buy the property." *Id.*, at 61, 769 N.Y.S.2d at 173. The Court also found that damages were inappropriate because the holder of the right of first refusal still had his rights intact and thus had "suffered no injury." *Id.*, at 61, 769 N.Y.S.2d at 174. 360networks' attempt to draw from the decision a holding "that certain types of *affirmative* recoveries may be obtained by nonbreaching party following the counterparty's breach *without* the need to show the nonbreaching party was ready, willing and able to perform" (360 App. Br. at 18) is utterly without foundation.

*v. Corporación de Puerto Rico Para la Difusión Pública*, 242 F.3d 418, 423 (1st Cir. 2001).

Here, the Bankruptcy Court -- having been presented on cross-motions for summary judgment with five sets of submissions (including 24 exhibits and four Local Rule 7056-1 Statements), as well as extensive oral argument (Dkt. 603-07, 611-613, 619, 623, 626, 629, 630, 680) -- properly utilized Rule 56(d) to determine that a certain limited number of facts existed without substantial controversy in order to narrow the focus of the case to "one material factual dispute," *i.e.*, whether 360networks was ready, willing and able to perform. *In re Asia Global I*, 326 B.R. at 257. It did so with good reason, given that (i) the court had "a very thorough record"; (ii) the parties had "the burden, access and motive" to lay bare their own proof on summary judgment; and (iii) neither party argued that summary judgment should be denied, or sought a continuance, under Rule 56(f), because they did not have access to essential facts. *In re Asia Global II*, 332 B.R. at 532-33. Moreover, on reargument, the court observed that "[a]n order under Rule 56(d) is not final . . . and may be revised at a later stage in the litigation," and thereby expressly afforded the parties the opportunity to revisit its factual findings in the future. *Id.*, at 531. 360networks never sought to revisit those findings at any time before trial. *See In re Asia Global III*, 379 B.R. at 490. Accordingly, the Bankruptcy Court committed no error, either in finding facts under Rule 56(d) or in adhering to that decision on reargument.

### 360networks' Arguments Are Meritless

360networks nevertheless argues that the Bankruptcy Court erred with respect to one of its factual findings -- that Asia Global anticipatorily repudiated the

Guaranty on January 29, 2003, "but not before then." According to 360networks, the court misapplied Rule 56(d), because none of the "requirements" for fact finding under the rule had been satisfied; furthermore, the record established that Asia Global anticipatorily repudiated the contract, as a matter of law, in June 2002, and certainly by the time Asia Global filed its motion for approval of the ANC Sale in November 2002. (360 App. Br. at 37-45.) These contentions have no basis in law or fact.

*360networks' Argument that the Rule 56(d) Requirements Were Not Satisfied*

Parsing each word of Rule 56(d), 360networks devises a rigid tripartite test -- a test neither applied nor articulated in any case of which we are aware -- that it contends the Bankruptcy Court did not properly apply. Thus, according to 360networks, Rule 56(d) required the Bankruptcy Court to "(a) examine the pleadings and evidence before it, (b) interrogate counsel and (c) 'if practicable ascertain what material facts exist without substantial controversy' or 'are actually and in good faith controverted'"; here, "*[n]one* of the requirements were satisfied." (360 App. Br. at 37; emphasis in original.) As to the first "requirement," 360networks asserts that the "Bankruptcy Court could not have meaningfully evaluated the 'evidence' because discovery had not been taken regarding [Asia Global's] anticipatory breaches." (*Id.*, at 38.) It concedes, with respect to the second factor, that the court did make inquiries of counsel during argument, but contends that such inquiries "confirmed 360networks in good faith asserted that anticipatory breaches occurred prior to January 2003." *Id.* Regarding the third requirement, it argues that "facts raised by 360networks, individually and on a cumulative basis, demonstrated . . . that a 'substantial controversy' existed as to whether [Asia Global] anticipatorily breached its Guaranty prior to January 29, 2003." (*Id.* at 38.)

These assertions reflect a fundamental misapprehension of the standards governing summary judgment.

*First*, there is nothing in Rule 56 that requires or implies that a ruling on summary judgment need or should await the completion of discovery. To the contrary, as the Bankruptcy Court noted on reargument, the rule expressly authorizes a party to move for judgment as early as 20 days after the commencement of the action. *See In re Asia Global II*, 332 B.R. at 531; Fed.R.Civ.P. 56(a). Furthermore, the rule includes procedures that specifically address the situation where a party believes discovery is needed in order to present a complete record on summary judgment. *See* Fed.R.Civ.P. 56(f); *In re Asia Global II*, 332 B.R. at 531. Yet 360networks never sought to avail itself of those procedures. In fact, just the opposite: 360networks itself moved for summary judgment on the premise that there were no genuine issues of material fact regarding Asia Global's anticipatory repudiation. Under these circumstances, 360networks cannot claim error where the Bankruptcy Court effectively agreed with it and found there were no genuine issues of material fact with respect to the existence and timing of Asia Global's anticipatory repudiation.

*Second*, the fact that, during interrogation by the court and in attorney affidavits, 360networks' counsel asserted that an anticipatory repudiation had occurred prior to January 29, 2003 did not create a "genuine issue of material fact." As the Bankruptcy Court correctly observed below, on a motion for summary judgment:

> The moving party bears the initial burden of showing that the undisputed facts entitle him to judgment as a matter of law. Where the nonmoving party bears the burden of persuasion at trial on an issue, the moving party can satisfy its initial burden on the motion by demonstrating the absence of factual support for an essential element of the nonmoving party's claim.

> If the movant carries this initial burden, the nonmoving party must produce "substantial evidence" to defeat the motion, and the court must evaluate "the evidence through the prism of the substantive evidentiary burden." The nonmovant must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials.

*In re Asia Global I*, 326 B.R. at 247-48 (citations omitted).    The court also properly noted that a "party that opposes a motion for partial or total summary judgment but withholds its evidence acts at its peril." *In re Asia Global II*, 332 B.R. at 531.

Once the Trustee established on his summary judgment motion that 360networks failed to order any capacity under the Master Agreement, the burden shifted to 360networks to come forward with "evidence" raising a triable issue of fact that its performance was excused by virtue of Asia Global's anticipatory repudiation; and the "hearsay statements of 360networks' attorneys" were not sufficient. *In re Asia Global I*, 326 B.R. at 253 (quoting *Schwimmer v. Sony Corp. of Am.*, 637 F.2d 41, 45 n.9 (2d Cir. 1980)).  As the Bankruptcy Court concluded after a painstaking analysis of 360networks' submissions (*see* pp. 10-14 *supra*), 360networks failed to come forward with any "evidence" of an anticipatory repudiation excusing 360networks' performance prior to January 29, 2003. *See id.*, at 252-56. Accordingly, the Bankruptcy Court's application of Rule 56(d) to determine that Asia Global anticipatorily repudiated the Guaranty on January 29, 2003, but not before then, was proper.

*360networks' Argument that the Anticipatory Breach*
*Occurred Before January 29, 2003*

360networks also contends that Asia Global breached the Guaranty by as early as June 2002, when Asia Global's financial advisor made certain statements, and certainly by no later November 17, 2002, when Asia Global entered into a contract to sell

substantially all of its assets to ANC; thus, the finding that Asia Global did not anticipatorily repudiate the Guaranty prior to January 29, 2003 was erroneous. These contentions provide no basis for reversing either the Summary Judgment Order or Reargument Order.

To start, 360networks did not submit on summary judgment much of the "evidence" on which it now relies in an effort to establish an earlier anticipatory repudiation date. Not until the trial, more than two years after the summary judgment motion, did 360networks first offer the purported statements by Asia Global's financial advisor which it now contends constituted an anticipatory repudiation in June 2002. (*See* Dkt. No. 918, at pp. 98-104.) And it never offered, at any time, the PCL bankruptcy filings and Asia Global affidavits concerning the ANC Sale on which it relies to show the purported anticipatory repudiation in November 2002. (360 App. Br. at 41-43.) The law is clear that, on a bankruptcy appeal, the Court's review "is limited to 'all documents and evidence bearing on the proceedings below and considered by the bankruptcy judge in reaching his decision.'" *In re Tower Automotive, Inc.*, 241 F.R.D. 162, 171 n.8 (S.D.N.Y. 2006) (quoting *In re Prudential Lines, Inc.*, No. 93 Civ. 1481, 1994 WL 142017, at *2 (S.D.N.Y. Apr. 20, 1994)). As 360networks did not present any of the foregoing materials, and the Bankruptcy Court necessarily did not consider any of them in reaching its decision either on summary judgment or reargument, the Court cannot consider such materials now in reviewing the orders.

Even if 360networks had come forward with such materials, it would not have created a triable issue of fact, much less established as a matter of law, that Asia Global anticipatorily repudiated the Guaranty prior to January 29, 2003. With respect to

the claimed June 2002 repudiation, 360networks simply mischaracterizes the evidence (in this instance, the trial evidence) when it claims that "June 2002 statements by [Asia Global's] financial advisor, Jim Millstein of Lazard, informed 360networks that [Asia Global] would never deliver the capacity." (360 App. Br. at 40.)   As the Bankruptcy Court found in the Post-Trial Decision, "there was no evidence that Millstein said any such thing." *In re Asia Global III*, 379 B.R. at 495. Rather, Millstein merely "informed 360networks' Chief Financial Officer, Christopher Mueller, that Asia Global was considering a sale of its assets, possibly through a restructuring." *Id.*   Given the ruling by the court that Asia Global's motion to sell its assets in bankruptcy as a matter of law did not constitute an anticipatory repudiation [a ruling not directly challenged by 360networks on this appeal], any statement by Asia Global's advisor that foreboded such events also would not constitute an anticipatory repudiation. *Id.* Hence, Millstein's June 2002 statements, even if they were part of the pertinent record, would not have created a triable issue of fact as to Asia Global's anticipatory repudiation.

As for the claimed anticipatory repudiation in November 2002, 360networks also fails to raise a triable issue of fact.  360networks argued below that Asia Global's filing of a motion for approval of the ANC Sale on November 17, 2002 constituted an anticipatory repudiation.  But the Bankruptcy Court rejected that argument on the grounds that "Asia Global's motion to sell all of its assets, without more, did not prevent it from living up to the performance guaranty," inasmuch as Asia Global "was not . . . bound to perform the ANC Sale contract until Court approval." *In re Asia Global I*, 326 B.R. at 256.  On appeal, 360networks does not directly challenge that ruling. Instead, relying on material that it did not submit below, 360networks now asserts that

Asia Global's *"pre-petition execution of the ANC Sale agreement and public announcement of that signing* combined with Asia Global's post-petition filing of the ANC Sale and sales procedure motions" constituted the anticipatory breach. (360 App. Br. at 41 (emphasis added).) The contention is no more availing than the contention that the motion by itself was an anticipatory repudiation. The ANC Sale agreement expressly provided that it was "subject to approval of the U.S. Bankruptcy Court." (Dkt. 18, Ex. A, § 2.01.) Hence, Asia Global's execution and announcement of the contract, like the motion for its approval, also "did not prevent [Asia Global] from living up to the performance guaranty." *In re Asia Global I*, 326 B.R. at 256.[4]    Furthermore, given the contingent nature of the agreement, the execution and announcement of it did not constitute, contrary to 360networks' suggestion, a definitive statement by Asia Global that it will not perform its obligations. (360 App. Br. at 44.) At most, the statement was conditional, and dependent on the outcome of Bankruptcy Court approval. Accordingly, 360networks' attempt to create a triable issue of fact regarding a claimed anticipatory repudiation in November 2002 -- and on a record that was not before the Bankruptcy Court at the time of the summary judgment and reargument motions -- is entirely unavailing.

360networks thus has failed to demonstrate any error by the Bankruptcy Court in entering the Summary Judgment and Reargument Orders, and both orders should be affirmed.

---

[4]   Had the ANC Sale motion been denied, Asia Global would not have been dispossessed of its assets. Hence, it would not have been rendered unable to perform, *i.e.*, anticipatorily repudiated, unless the Bankruptcy Court approved the sale.

*423484.2*

## II.

## THE POST-TRIAL DECISION AND EXPUNGEMENT ORDER SHOULD BE AFFIRMED

### A.    The Standard of Review

"While a bankruptcy judge's legal conclusions are reviewed *de novo*, a bankruptcy judge's factual findings may not be set aside unless clearly erroneous." *In re Plagakis*, No. 03 Civ. 0728 (SJ), 2004 WL 203090, at * 3 (E.D.N.Y. Jan. 27, 2004). Under the deferential "clearly erroneous" standard, an appellate court will not reverse unless "'on the entire evidence [the court] is left with the definite and firm conviction that a mistake has been committed.'" *Doe v. Menefee*, 391 F.3d 147, 164 (2d Cir. 2004) (quoting *Anderson*, 470 U.S. at 573.). If the lower court's "'account of the evidence is plausible in light of the record viewed in its entirety,'" then the appellate court must affirm. *Id.* Hence, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Traveller's Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1574-75 (2d Cir. 1994) (quoting *Banker v. Nighswander, Martin & Mitchell*, 37 F.3d 866, 870 (2d Cir. 1994)). That is so, even if the appellate court is "'convinced that [it] would have decided the case differently.'" *National Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 528 (2d Cir. 2004) (quoting *Anderson*, 470 U.S. at 573). The standard applies "both to credibility assessments and 'physical or documentary evidence or inferences from other facts.'" *Id.* (quoting *Anderson v. City of Bessamer City*, 470 U.S. 564, 573 (1985)).

**B.**     **The Bankruptcy Court's Finding that 360networks Was Not "Ready, Willing and Able" Was Not Clearly Erroneous**

*The Bankruptcy Court's Finding Was Supported by the Record*

A bankruptcy court's post-trial determination that a party was not "ready, willing and able" to perform is a factual finding that may not be set aside unless clearly erroneous. *See, e.g., Roberts v. Karimi*, 251 F.3d 404, 407-08 (2d Cir. 2001) (applying clearly erroneous standard to bankruptcy court's post-trial determination that a party was not ready, willing and able); *In re Randall's Island Family Golf Ctr.*, 272 B.R. at 524 (same); *accord William Raveis R.E., Inc. v. Stawski*, 31 Conn.App. 608, 611, 626 A.2d 797, 799 (Conn. App. 1993) ("The determination of whether a [party] is ready, willing and able is a question of fact, and will not be reversed unless the trial court's findings are clearly erroneous").

Here, the Bankruptcy Court's determination that 360networks was not ready, willing and able to perform is amply supported by the record. (*See* pp. 17-20 *supra*.) As the court found, while there was evidence that 360networks was financially and legally *able* to order the capacity before the March 30, 2003 deadline, there was no evidence that 360networks actually *intended* to place an order:

- "There was no proof" that 360networks took any of the preparatory steps under the contract for ordering capacity; *In re Asia Global III*, 379 B.R. at 500;

- "It never ordered capacity during the first 22 months of the 24-month window," and there was no plan to order it during the last two months; *id.*;

- By the time of Asia Global's anticipatory repudiation, 360networks had no reason to take down the capacity -- it had no use for the capacity itself, and, despite strenuous efforts, had been unsuccessful for the better part of two years trying to locate a customer for it; *id.*, 494-95, 500-01;

- As the court found, there were reasons for 360networks *not* to order the capacity -- the capacity was "not saleable, and declining in value"; *id.*, at 502;

- And ordering and inventorying it necessarily would have "divert[ed] [360networks'] sales efforts from its North American core business"; *id.*, at 502.

Moreover, contrary to 360networks' suggestion, the court's finding was based on a rejection of the credibility of 360networks' witnesses. The court dismissed the testimony of 360networks' witnesses that 360networks "would have" ordered the capacity as "pure speculation" and incredulous. *Id.*, at 501. And it implicitly rejected the testimony of 360networks' former chief operating officer and president, Jimmy Byrd, that the company valued the capacity at $100 million. Rather, the court found that 360networks' failure to make any mention whatsoever of the capacity -- as an asset or otherwise -- in its own bankruptcy case "implied that its value, if any, was immaterial" to the company. *Id.*, at 502. The court's words were thus carefully chosen, when it "concluded that 360networks had failed to adduce any *credible* evidence that Asia Global committed an anticipatory breach prior to January 29, 2003." *Id.*, at 496 (emphasis added). In sum, even if another court could have interpreted the evidence differently (and we respectfully submit none would have), it is clear that the Bankruptcy Court's account of the evidence was more than plausible. Its determination that 360networks was not ready, willing and able, therefore, was not clearly erroneous.

### *360networks' Arguments Are Meritless*

In taking exception to the Bankruptcy Court's determination that it was not ready, willing and able, 360networks either (i) resorts to facts that were not in the record or were rejected by the court, or (ii) quibbles with inferences drawn by the court.

Neither approach can succeed in reversing the Bankruptcy Court's factual finding of readiness, willingness and ability.

As set out above, the Court's review on this appeal "is limited to 'all documents and evidence bearing on the proceedings below and considered by the bankruptcy judge in reaching his decision.'" *In re Tower Automotive, Inc.*, 241 F.R.D. at 171 n.8 (quotation omitted). But many of the "undisputed facts" that 360networks contends "compelled the conclusion that 360networks was ready, willing and able to perform" were not even offered, let alone admitted, into evidence. (360 App. Br. at 24). Thus, at the trial, 360networks neither offered into evidence, nor asked the court to take judicial notice of the fact, that it "promptly pursued and obtained (unpaid) membership on [Asia Global's] official unsecured creditors' committee based upon and for the purpose of maximizing 360networks' $100 million claim" -- a fact that it now claims demonstrated its intent to "realize upon the rights" under the Master Agreement. (*Id.*, at 23). Likewise, 360networks did not offer or ask the court to take judicial notice of the "contemporaneous affidavits of [Asia Global's] chief financial officer and lead restructuring advisor in support of the ANC Sale Motion," which it cites on appeal as evidence of 360networks' readiness and willingness. (*Id.*, at 26.)

To the extent 360networks cites "facts" in the record that purportedly demonstrate its readiness and willingness to perform, such "facts" were squarely rejected by the Bankruptcy Court; and 360networks does not, and cannot, demonstrate that the court's rejection of those facts was clearly erroneous. Hence, 360networks contends that its "business practices showed it was ready and willing" to perform. (360 App. Br. at 24). But the court, having heard the testimony, found that 360networks had not shown

any such "business practice." *In re Asia Global III*, 379 B.R. at 501 n.13. Similarly, 360networks asserts that its "economic interests showed it was ready and willing" to perform, inasmuch as "360networks always placed significant value" on the capacity. (360 App. Br. at 35.) The court found, however, that the value, if any, that 360networks placed on the capacity was "immaterial." *In re Asia Global III*, 379 B.R. at 502. While 360networks disagrees with the court's findings, it does not even attempt to show that they were clearly erroneous.

In addition to citing to facts that either were rejected by the court or were not in the record, 360networks takes exception to the inferences that the Bankruptcy Court drew from the evidence. (*See* 360 App. Br. at 22, 27-35.) That 360networks views the import of the evidence differently from the Bankruptcy Court, however, provides no basis for reversal. (*See* p. 43 *supra*.) Accordingly, the Bankruptcy Court's post-trial finding that 360networks was not ready, willing and able to perform should not be disturbed, and the Post-Trial Decision and Expungement Order should be affirmed.

## C.    The Court Did Not Err in Applying the Burden of Proof

The Bankruptcy Court imposed the burden of proving readiness, willingness and ability on 360networks. *See In re Asia Global III*, 379 B.R. at 491. In so doing, the court acted properly. In a bankruptcy, "[i]t is ultimately 'for the claimant to prove his claim, not for the objector to disprove it,' and the claimant must prove his claim by a preponderance of the evidence." *In re G. Marine Diesel Corp.*, 155 B.R. 851, 853 (Bankr. E.D.N.Y. 1993)(quoting *In re Gorgeous Blouse Co.*, 106 F.Supp. 465 (S.D.N.Y. 1952)); *see also In re King*, 305 B.R. 152, 164-65 (Bankr. S.D.N.Y. 2004) (once the presumption of validity is overcome with respect to a proof of claim, "the claimant must

demonstrate by a preponderance of the evidence the validity and extent of its claim.").

Furthermore, even outside the bankruptcy context, it is black letter law that the burden of

establishing readiness, willingness and ability to perform is on the claimant. *See, e.g.,*

*Record Club of Am., Inc.,* 890 F.2d at 1275 (plaintiff "must . . . demonstrate that he had

the willingness and ability to perform"); *Penthouse Int'l Ltd. v. Dominion Fed. Svgs. &*

*Loan Ass'n,* 855 F.2d 963, 979 (2d Cir. 1988) (same).

        In the face of this clear law, 360networks nevertheless contends that the

Bankruptcy Court "overstated" 360networks' burden of proof.  (360 App. Br. at 19.)

Based on 360networks' interpretation of two cases, it asserts that its burden of proof was

far more "limited" than that applied by the Bankruptcy Court, and "should have been

evaluated in the context of [Asia Global's] misconduct."  (360 App. Br. at 20.)

Furthermore, according to 360networks, "when evaluating the evidence . . . any

inferences should have been made based on the parties' economic interests and *against*

the breaching party." (360 App. Br. at 21.)  360networks grossly distorts these cases.

Neither of them altered a party's burden to prove readiness, willingness and ability.

        In fact, the principal case on which 360networks relies, *King World*

*Prods., Inc. v. Financial News Network, Inc.,* 660 F.Supp. 1381 (S.D.N.Y. 1987) (cited at

360 App. Br. at 20), entirely undermines 360networks' position, and supports the

Trustee's position, on this appeal. In that case, the court could not have been clearer that

the plaintiff bears the burden of proving readiness, willingness and ability.  It stated, in no

uncertain terms: "[Plaintiff] is required to prove it was ready, willing and able to perform

its part of the bargain" *Id.*, at 1387.

*King World* was an action by a plaintiff tenant against its subtenant, the defendant, for the subtenant's anticipatory repudiation of a sublease shortly after its execution -- before the subtenant took possession of the space and even before the landlord gave its required consent to the sublease.  While noting that the plaintiff carried the burden of proving that it was ready, willing and able to perform its obligations under the sublease in order to recover damages, the court found that such burden did not include having to prove that the landlord would have consented to the sublease:  because "[i]n order to establish the landlord would have approved the sublease, [plaintiff] would have had to continue pursuing the landlord's approval even after the landlord had been informed of [defendant's] repudiation of the contract[, which] would defy common sense."  *Id.,* at 1386.  *King World* thus stands for the proposition that where a plaintiff's ability to perform depends on the future actions of a third party, the plaintiff need not show what that third party would have done in order for the plaintiff to prove its readiness, willingness and ability to perform.

*In re Food Mgmt. Group, LLC*, 372 B.R. 171 (Bankr. S.D.N.Y. 2007) (cited at 360 App. Br. at 21), on which 360networks also relies, stands for the same proposition.    There, like in *King World*, the defendants, which had anticipatorily repudiated a contract, argued that the plaintiffs were not entitled to recovery, because the plaintiffs could not demonstrate that they were ready, willing and able to perform their end of the bargain, since their ability to perform depended, in part, on their obtaining certain lease extensions, which they had yet to obtain from third parties.  The court found that the plaintiffs did not need to show that they would have obtained those lease extensions, because "[defendant's] repudiation foreclosed the future and made it

impossible to know whether the debtors could have delivered all the lease extensions."
*Id.*, at 192.

These cases, in short, are of no assistance to 360networks. 360networks, unlike the plaintiffs in *King World* and *In re Food Mgmt.*, was not burdened with proving what a third party would have done in the future had Asia Global not repudiated. Rather, 360networks' burden was to prove th at *its* actions, *at the time of and prior to the anticipatory repudiation*, evidenced *its* intention to perform -- a burden that 360networks woefully failed to carry. Like each of its other arguments, 360networks' contention that the Bankruptcy Court's misapplied the burden of proof at trial is utterly meritless.

## CONCLUSION

For the foregoing reasons, the Summary Judgment Order, Reargument Order, Post-Trial Decision and Expungement Order of the Bankruptcy Court should be affirmed in all respects.

Dated: May 9, 2008
    New York, New York

Of counsel:
Jonathan L. Flaxer, Esq.
Stacy H. Schneider, Esq.
Pamela Zimmerman, Esq.

GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP


By: /s/ Adam C. Silverstein
      Adam C. Silverstein (AS 4876)

437 Madison Avenue
New York, New York 10022
(212) 907-7300
*Attorneys for Robert L. Geltzer, as chapter 7 trustee*

423484.2