WILLKIE FARR & GALLAGHER LLP
Attorneys for 360networks Corporation
Alan J. Lipkin, Esq.
Eilish M. Cahalan, Esq.
Adam S. Ross, Esq.
787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                          :
In re                                     :
                                          :  Chapter 7
ASIA GLOBAL CROSSING LTD., *et al.,*      :  Case Nos. 02-15749
                                          :  through 02-15750 (SMB)
            Debtors.                      :  (Substantively Consolidated)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

360NETWORKS CORPORATION,                  :
                                          :
                Appellant,                :  08 Civ. 03148-RJH
                                          :
v.                                        :
                                          :
ROBERT GELTZER, as Chapter 7 Trustee of   :
the Estate of Asia Global Crossing, Ltd., :
                                          :
                Appellee.                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


**REPLY BRIEF OF APPELLANT 360NETWORKS CORPORATION ON APPEAL
FROM BANKRUPTCY COURT'S ORDER EXPUNGING CLAIM NUMBER 5**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ..........................................................................................................................2

I.    THE BANKRUPTCY COURT INCORRECTLY HELD 360NETWORKS
      NEEDED TO SHOW IT WAS READY, WILLING, AND ABLE TO PERFORM..........2

      A.   Allowance Of 360networks' $100 Million Claim Is Mandated By The New
           York Down Payment Cases. ..................................................................................2

      B.   As 360networks Is Not Seeking Special Or Consequential Damages,
           360networks Does Not Need To Demonstrate It Was Ready, Willing And Able.........6

II.   THE BANKRUPTCY COURT ERRED WHEN CONCLUDING
      360NETWORKS WAS NOT READY AND WILLING TO ORDER CAPACITY
      AS OF JANUARY 29, 2003.........................................................................................7

      A.   Contrary To The Trustee's Position, The Standard Of Review Applicable To
           The Bankruptcy Court's Ready, Willing, And Able Determination Is De Novo
           Review. ..................................................................................................................7

      B.   The Trustee Also Misstates 360networks' Burden Of Proof.........................................9

      C.   The Bankruptcy Court Misapplied 360networks' Burden of Proof And Made
           Multiple Inferences That Were Both Factually Unwarranted And Legally
           Prohibited................................................................................................................11

      D.   360networks Appropriately Relies On Documents That Were Both Designated
           In The Record On Appeal And Filed In AGC's Bankruptcy Case.............................17

           1.   The Trustee Waived Any Argument That 360networks May Not Rely On
                The Documents Designated In The Record On Appeal.......................................18

           2.   All Evidence On Which 360networks Relies Was Part Of The Record In
                AGC's Bankruptcy Case...................................................................................19

           3.   Alternatively, This Court May Take Judicial Notice Of The Challenged
                Documents. ......................................................................................................19

III.  THE BANKRUPTCY COURT ERRED AS A MATTER OF LAW IN
      CONCLUDING AGC DID NOT REPUDIATE PRIOR TO JANUARY 29, 2003 .........20

      A.   360networks Was Entitled To Assert That AGC Anticipatorily Breached Its
           Guaranty Prior To January 29, 2003.........................................................................20

B.  Whether or Not the Rule 56(d) Findings Otherwise Could Have
    Been Appropriate, the Bankruptcy Court Erred By Not Finding
    AGC Anticipatorily Breached On November 17, 2002................................................22

C.  AGC Also Anticipatorily Breached In June 2002. ....................................................24

CONCLUSION...................................................................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Ames Department Stores, Inc.*,
  320 B.R. 518 (Bankr. S.D.N.Y. 2005) ..................................................................18

*In re Asia Global Crossing I*,
  326 B.R. at 256 ........................................................................................ *passim*

*In re Asia Global II*,
  332 B.R. 520 (Bankr. S.D.N.Y 2005) ...............................................................5, 20

*Bose Corp. v. Consumers Union of United States, Inc.*,
  466, U.S. 485, 501 (1984) ...............................................................................8, 9

*Doe v. Menafee*,
  391 F.3d at 164 ..............................................................................................8, 9

*In re Food Management Group, LLC*,
  372 B.R. 171 (Bankr. S.D.N.Y. 2007) ............................................................10, 13

*In re Indian Palms Associates, Ltd, B.C.*,
  61 F.3d 197 (3d Cir. 1995) .................................................................................19

*King World Products, Inc. v. Financial News Network, Inc*,
  660 F. Supp. 1381 (S.D.N.Y. 1987) ....................................................................10

*Leddy v. Standard Drywall, Inc.*,
  875 F.2d 383 (2d Cir. 1989) ...............................................................................21

*Lucente v. IBM*,
  146 F. Supp. 2d 298 (S.D.N.Y. 2001) ...............................................................5, 6

*Opinion ("In re Asia Global Crossing")*,
  379 B.R. at 490 ........................................................................................ *passim*

*Ornelas v. United States*,
  517 U.S. 690 (1996) ...........................................................................................8

*In re Randall's Island Family Golf Ctr.*,
  272 B.R. 521 (Bankr. S.D.N.Y 2002) ....................................................................8

*Roberts v. Karimi*,
  251 F.3d 404 (2d Cir. 2001) ..............................................................................7, 8

*Saewitz v. Epstein*,
    6 F. Supp. 2d 151 (N.D.N.Y. 1998).........................................................................5, 14

*Scholle v. Cuban - Venezuelan Oil Voting Trust*,
    285 F.2d 318 (2d Cir. 1960)................................................................................11

*Schwimmer v. Sony Corp. of America*,
    637 F.2d 41 (2d Cir. 1980)................................................................................21

*In re Tower Automotive, Inc.*,
    241 F.R.D. 162 (S.D.N.Y. 2006)

*Traveller's International A.G. v. Trans World Airlines, Inc.*,
    41 F.3d 1570 (2d Cir. 1994)...............................................................................8

### STATE CASES

*American List Corp. v. U.S. News and World Report, Inc.*,
    75 N.Y.2d 38, 549 N.E.2d 1161 (1989)................................................................6, 7

*Argonaut Partnership L.P. v. Sidek, S.A. de C.V.*,
    No. 96 Civ 1967, 1996 WL 617335 (S.D.N.Y. Oct. 25, 1996) ...............................24

*Cipriano v. Glen Cove Lodge*,
    769 N.Y.S.2d 168 (2003).....................................................................................4, 7

*Fridman v. Kucher*,
    34 A.D. 3d 726, 826 N.Y.S.2d 104 (App. Div. 2d Dept 2006) (citation omitted)...................8

*In re Prudential Lines, Inc.*,
    1994 WL 142017 (S.D.N.Y. Apr. 20, 1994)..........................................................18

*Jenkins v. Greyhound Lines, Inc.*,
    No. C-46141, 1971 WL 529 (N.D. Cal. May 4, 1971) ...........................................21

*Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*,
    92 N.Y.2d 458 (N.Y. 1998) ...............................................................................24

*Ross Bicycles, Inc. v. Citibank, N.A.*,
    613 N.Y.S.2d 538 (N.Y. Sup. Ct. 1994)................................................................14

*Scull v. Sicoli*,
    668 N.Y.S.2d 827 (App. Div. 4th Dept. 1998) ......................................................3, 4

*William Raveis R.E., Inc. v. Stawski*,
    31 Conn. App. 608, 626 A.2d 797 (Conn. App. 1993)............................................................8

## FEDERAL STATUTES

Fed. R. Civ. P. 56(d) ............................................................................................................21

Fed. R. Civ. P. 56(f) ............................................................................................................21

## PRELIMINARY STATEMENT

As to whether 360networks[1] must show it was ready, willing, and able to perform so as to prevail on its Claim, the Trustee now concedes that: (a) under New York case law, following a seller's anticipatory breach, the buyer may recover its down payment without showing it was ready, willing, and able; and (b) the New York Court of Appeals held such a showing also is unnecessary for a plaintiff to recover the general damages 360networks seeks as alternative relief.  Accordingly, the Trustee attempts to distinguish 360networks' $100 million prepayment from a down payment and argues the New York Court of Appeals' decisions should be ignored when determining the status of New York law.  The Trustee's contentions are meritless.

Even, however, if 360networks needed to prove it was ready, willing, and able, 360networks did so.  Before addressing the Trustee's response, it is critical to note the Trustee's many concessions by omission, including the four key premises of 360networks' principal brief:

1.  360networks paid the full $100 million purchase price for the Asia Commitment (although the Trustee quibbles about how the price was paid).

2.  AGC anticipatorily breached its obligation to provide Asia Capacity to 360networks.

3.  Until AGC's repudiation, 360networks consistently sought to realize the value of the Asia Capacity.

4.  360networks always was able to order Asia Capacity (and when AGC repudiated, 360networks still had ample time to plan and order as well as a reminder system in place to avoid missing the ordering deadline).

Additionally, the Trustee does not challenge the numerous facts mandating the conclusion 360networks had a strong economic incentive to order, rather than forfeit, $100 million of Asia Capacity (at no cost).

--------------------------------------

[1]  Each capitalized term not otherwise defined herein shall have the meaning ascribed to it in 360networks' principal brief ("360 Br. at __") in this appeal.

By failing to respond, the Trustee also makes the following legal concessions:

      a.     Due to AGC's anticipatory breach, as a matter of law, 360networks' burden of proof concerning its readiness, willingness, and ability was limited (albeit the Trustee concedes this point only as it relates to 360networks' need to prove future conduct of third parties, rather than conduct of 360networks itself).

      b.     Due to AGC's anticipatory breach, as a matter of law all fact inferences regarding whether 360networks was ready and willing to order capacity must be made in favor of 360networks as the non-breaching party.

      c.     "Money talks", so a party is presumed to act in its own financial interest such that 360networks would have ordered rather than forfeited $100 million of Asia Capacity at no cost before the two year contract deadline.

      d.     If 360networks need not prove it was ready, willing, and able or if 360networks satisfied that burden, then, as a matter of law, 360networks is entitled to an allowed claim of $100 million plus costs of collection.

After conceding so much, the Trustee is forced to either ignore certain points and facts presented by 360networks or make hyper-technical arguments to exclude persuasive material and uncontested facts.  The Trustee merely summarizes the Bankruptcy Court's Opinion, which is based on misapplication of the burden of proof, improper inferences, and misuse of relevant law and facts.  Simply put, 360networks proved by a preponderance of evidence (including its economic incentives and consistent course of conduct) that it was ready and willing to order Asia Capacity; 360networks did not need to show it had taken every conceivable step to order well before the deadline to act.  Accordingly, the Bankruptcy Court's rulings should be reversed.

## **ARGUMENT**

I.     THE BANKRUPTCY COURT INCORRECTLY HELD 360NETWORKS NEEDED TO SHOW IT WAS READY, WILLING, AND ABLE TO PERFORM.

     A.     Allowance Of 360networks' $100 Million Claim Is Mandated By The New York Down Payment Cases.

The Trustee concedes that under New York caselaw, after an anticipatory breach, the nonbreaching party is entitled to recover its down payment without showing it was ready,

willing, and able to perform.[2]  Indeed, the Trustee fails to directly address the New York down payment cases, let alone provide contrary citations.  Further, the Trustee abandons the Bankruptcy Court's rationale for distinguishing those cases, that they are limited to a recovery of a "deposit" through "rescission".  See Opinion, 379 B.R. at 497.  Instead, the Trustee fabricates new meritless hurdles to application of the down payment cases to 360networks' Claim.

First, without citations (and for the first time), the Trustee now argues 360networks may not recover based on its $100 million prepayment because it "did not 'go out of pocket'".  Tr. Br. at 27.  In fact, 360networks paid the $100 million in cash pursuant to the Funding Agreement. GC Bandwidth simply directed that the $100 million be paid to 360networks' affiliates to satisfy other Global Crossing debts.  See Funding Agr. at 360N-000538, Ex. 16, Dkt. 967, App. 1. Regardless, nothing in the language or rationale of the New York cases required an "out of pocket" payment.  See Black's Law Dictionary (8th ed. 2004) ("Down payment" may be "paid in cash (or its equivalent)").  Moreover, the Bankruptcy Court repeatedly found 360networks had "prepaid" its $100 million obligation in full.[3]

Second, without legal support (and for the first time), the Trustee argues 360networks may assert a claim for damages, but not for a "payment obligation" guaranteed by AGC.  Tr. Br. at 27-28.  Yet, none of the New York cases refer to or required an express contractual obligation before ordering return of a down payment.  Moreover, the notion a claim might arise concerning the Master Agreement that was not guaranteed by AGC is nonsensical.  Under section 2.1 of the Guaranty, AGC expressly guaranteed GC Bandwidth's performance and "payment obligations"

---

[2]   See Tr. Br. at 27-31.  See, e.g., Scull v. Sicoli, 668 N.Y.S.2d 827, 828 (App. Div. 4th Dept. 1998) (Seller's "repudiating the contract therefore constitutes an anticipatory breach entitling the plaintiffs to recover their down payments without proof that they were ready, willing, and able to complete the transaction.").

[3]   See, e.g., 326 B.R. at 244 ("360networks had prepaid $100 million"); Opinion, 379 B.R. at 492 ("360networks prepaid the entire amount."; "360networks prepaid $100 million").

to 360networks, which arose due to AGC's repudiation and 360networks' prepayment. Further, AGC's Guaranty provides that "if GC Bandwidth went into bankruptcy, and 360networks could not demand payment or performance from GC Bandwidth, it could demand it directly from Asia Global." Opinion, 379 B.R. at 493 (citing Guaranty § 2.5). Hence, 360networks' right to recover based on AGC's repudiation is a "payment obligation" for which AGC is liable.

Nonetheless, the Trustee maintains 360networks could not be seeking $100 million due under the Master Agreement because 360networks only asserted a claim for "damages". See Tr. Br. at 28. Yet, 360networks sought "damages" as alternative relief to "restitution" and a claim based on its $100 million prepayment. See e.g., Proof of Claim, Ex. 252, Dkt. 969, App. 14; 360networks' Post-Trial Brief, Dkt. 910, App. 25; 360networks' Findings of Fact, Dkt. 911, App. 26. Indeed, 360networks' Claim always has been for exactly $100 million (plus costs of collection) and 360networks never sought special or consequential damages. Equally important, the Trustee cites to nothing in the down payment cases restricting their holdings to a refund. See, e.g., Scull v. Sicoli, 668 N.Y.S.2d at 828 (describing a claim for a return of down payments as an "action for damages"). Instead, the key to those cases is preventing a "windfall". See, e.g., Cipriano v. Glen Cove Lodge, 769 N.Y.S.2d 168, 174 (2003) (condemning a "windfall").

Third, the Trustee asserts 360networks' $100 million prepayment "bore no resemblance to a real estate buyer's down payment" and, therefore, is not covered by the down payment cases. Tr. Br. p. 29. Yet, nothing in those cases limits their holdings to the real estate context and the Trustee provides no basis for concluding otherwise. The Trustee also asserts three criteria to distinguish 360networks' prepayment, alleging a down payment is: (a) "a form of earnest money"; (b) "to indicate the intention and ability of the buyer to carry out the contract"; and (c) is "[n]ormally ... applied against the purchase price". Id. (citation omitted). Yet, the

Trustee's use of Black's Law Dictionary is totally misleading as "earnest money" is not a down payment.[4]  Regardless, 360networks' prepayment satisfied the Trustee's three criteria:

> a.      The Trustee's rationale, that a breaching seller "is no longer entitled to that 'earnest money' since his repudiation excuses the buyer from having to carry out the contract", applies with equal force to any retention of 360networks' $100 million prepayment.  Tr. Br. at 29.

> b.      360networks' "intention and ability" at the outset "to carry out" the Master Agreement were evidenced by the $100 million prepayment.

> c.      360networks' $100 million prepayment was "applied against the purchase price".  See Master Agreement § 2(a) - 360networks agrees to pay $100 million for the "aggregate purchase price", Ex. 14, Dkt. 967, App. 1.

Thus, the Trustee's alleged distinctions between a down payment and prepayment are illusory.

Equally flawed is the Trustee's next invented distinction, mischaracterizing the Master Agreement as an "option" rather than a sale agreement.  See Tr. Br. at 29-30.  This assertion is precluded by the Bankruptcy Court's holding, which was not appealed by and, therefore, is binding upon, the Trustee, that the contracts at issue here were "bilateral." In re Asia Global II, 332 B.R. 520, 529 (Bankr. S.D.N.Y 2005).  In contrast, the cases the Trustee cites each define an option as a "unilateral" contract.  Lucente v. IBM, 146 F. Supp. 2d 298, 312 (S.D.N.Y. 2001) (an option "is necessarily unilateral"); Saewitz v. Epstein, 6 F. Supp. 2d 151, 157 (N.D.N.Y. 1998) (same).  Other inconsistencies with an option, which typically involves a modest payment not applied against the purchase price, are 360networks' payment of the full $100 million purchase price and the application of that payment towards the purchase price.  Further, the contract

_____

[4]    Black's Dictionary's definition of "down payment" does not include "earnest money".  See 8th ed. 2004.  Rather, the Dictionary definition includes a "Cf." cross reference to "earnest money", which reference the Dictionary says "is used to refer to related but contrastable terms." Id.  Further, the term "earnest money", which typically is paid "in escrow", appears in none of the down payment cases.  See id. (definition of "earnest money").  Indeed, even the Trustee suggests only a "form of 'earnest money'" is required.  Tr. Br. at 29.

language here describes a consummated sale and never refers to an option.[5]  Instead, as

360networks purchased Asia Capacity and merely had to decide when to draw it down, the

Trustee's suggestion that the Master Agreement was an option is baseless.

Consequently, the New York down payment cases control here.

B.    As 360networks Is Not Seeking Special Or Consequential Damages,
      360networks Does Not Need To Demonstrate It Was Ready, Willing And Able.

An alternative basis for allowing 360networks' Claim without proof 360networks was

ready, willing, and able to perform is found in a New York Court of Appeals' decision,

American List Corp. v. U.S. News and World Report, Inc., 75 N.Y.2d 38, 43-44, 549 N.E.2d

1161 (1989).  Specifically, the Court of Appeals held that to recover general damages (i.e., a

"definite obligation" that the "defendant undertook to pay under the contract") based on the

defendants' "anticipatory breach", the plaintiff need not show it was ready, willing, and able to

perform.  Id. at 43-45.  In contrast, recovery of special damages (i.e., based on contingent lost

profits) required proof the plaintiff was ready, willing, and able to perform.  Id. at 45-46.

First, true to form, the Trustee asserts a hyper-technical hurdle, this time that

360networks' analysis of American List is foreclosed because it was not raised in the summary

judgment and reconsideration motions below.  See Tr. Br. at 32.  Yet, the ready, willing, and able

issue was not even mentioned in the summary judgment motions and arose only when the

Bankruptcy Court raised the issue sua sponte in its first opinion.  Further, in its reconsideration

motion and at trial 360networks argued that the ready, willing, and able requirement was

---

[5]    For example, AGC's Guaranty defines the Master Agreement as the "Purchase Agreement" and 360networks as
the "Purchaser".  Guaranty at 1, Ex. 15, Dkt. 967, App. 1.  Correspondingly, the Master Agreement provides
that "360 hereby unconditionally and irrevocably agrees to accept, purchase, pay for in full and receive an IRU
on the EAC and/or PC-1 systems for an aggregate purchase price equal to $100,000,000".  Id. § 2(a) (emphasis
added).  Moreover, utilization of phrases such as 360networks has paid "in full" and agreed "unconditionally
and irrevocably" to purchase are mutually inconsistent with the Trustee's concept of an option.  See Lucente v.
IBM, 146 F. Supp. 2d at 312 ("Until [an option] is exercised, it contains no elements of a sale.").

inapplicable here based in part on <u>American List</u>.[6]  Additionally, the Bankruptcy Court did not

find <u>American List</u> was wrongly decided until the December 2007 Opinion now on appeal.

Accordingly, 360networks is free to address <u>American List</u> on appeal.

 <u>Second</u>, the Trustee asserts <u>American List</u>'s discussion concerning anticipatory breaches

and the ready, willing, and able standard is <u>dicta</u>.  <u>See</u> Tr. Br. at 32.  Yet, as demonstrated above,

the distinction between general damages and special damages was critical to <u>American List</u>'s

holding as to when a plaintiff must show it had been ready, willing, and able to perform.  Indeed,

the Trustee's argument simply ignores <u>American List</u>'s special damages <u>holding</u>.

 <u>Third</u>, while the Trustee concedes <u>American List</u>'s language eliminates 360networks'

need to prove it was ready, willing, and able, the Trustee argues <u>American List</u> is contradicted by

Second Circuit decisions.  <u>See</u> Tr. Br. at 34.  Yet, the federal decisions merely attempt to

determine New York law.  The ultimate authority on New York law is its Court of Appeals,

particularly as <u>American List</u> is consistent with <u>Cipriano</u>, another New York Court of Appeals

decision.  Moreover, the few federal cases addressing <u>American List</u> did not consider its general

versus special damage distinction.  Thus, as one basis for 360networks' Claim is general

damages, proof 360networks was ready, willing, and able was not required under <u>American List</u>.

II. **THE BANKRUPTCY COURT ERRED WHEN CONCLUDING
360NETWORKS WAS NOT READY AND WILLING TO
ORDER CAPACITY AS OF JANUARY 29, 2003.**

 A. **Contrary To The Trustee's Position, The Standard Of
Review Applicable To The Bankruptcy Court's Ready,
Willing, And Able Determination Is De Novo Review.**

 The Trustee misinterprets <u>Roberts v. Karimi</u>, 251 F.3d 404 (2d Cir. 2001), to hold the

---

[6] <u>See e.g.</u>, 360networks' Memo of Law in Support of its Motion for Reconsideration at 16-17, Dkt. 664, App. 27;
Post-Trial Brief at 9, n.6, Dkt. 910, App. 25.)  Notably, the Trustee has felt free to raise multiple new arguments
on appeal that were not raised below.  <u>See, e.g.</u>, Argument I.A above.

clearly erroneous standard governs appellate review of the Bankruptcy Court's ready, willing, and able determination. See Tr. Br. at 44. In Roberts, however, the Second Circuit referred to the district court's determination that the plaintiff was not "ready, willing, and able" as a legal "conclusion" when stating that "[i]n support of this conclusion, the [district] court cited ample evidence that [plaintiff] refused to proceed with the sale on an 'as is' basis" as required by contract. 251 F.2d at 408 (emphasis added). Hence, the Second Circuit only held the district court's "as is" fact "finding" -- upon which that ready, willing, and able legal "conclusion" was based -- was subject to the clearly erroneous standard of review.[7] Id.

At most, a determination of whether 360networks was ready, willing and able to perform is a mixed issue of law and fact, which determination is reviewed de novo. See Ornelas v. United States, 517 U.S. 690, 696-97 (1996) (determination of whether police officer had reasonable suspicion or probable cause is subject to de novo review because mixed question of law and fact requires resolving "whether the rule of law as applied to the established facts is or is not violated") (citation omitted); Bose Corp. v. Consumers Union of United States, Inc., 466, U.S. 485, 501 (1984) ("Rule 52(a) does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and a fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law.").[8] Review based on

---

[7]    The Trustee also misuses In re Randall's Island Family Golf Ctr., 272 B.R. 521, 524 (Bankr. S.D.N.Y 2002) (only applying clearly erroneous standard to fact issues such as whether the appellant had been on notice and whether the debtor had "demonstrated" willingness and ability), and William Raveis R.E., Inc. v. Stawski, 31 Conn. App. 608, 611, 626 A.2d 797, 799 (Conn. App. 1993) (inapplicable here as it involves Connecticut law and concerns the ready, willing, and able test in a different context). See Fridman v. Kucher, 34 A.D. 3d 726, 728, 826 N.Y.S.2d 104, 106 (App. Div. 2d Dept 2006) (without proof it had "funds necessary to purchase the property, [buyer] cannot prove, as a matter of law, that it was ready, willing, and able to close") (emphasis added) (citation omitted).

[8]    The Trustee's descriptions of cases addressing the general standard of review are flawed because the Trustee only quotes selected portions of the cited opinions. See Tr. Br. at 43. For example, when discussing Doe v. Menefee, the Trustee omits the Second Circuit's statement that: "we review the district court's ultimate [legal] finding . . . de novo" while "[w]e review the district court's underlying findings of fact under the more

standards of law is particularly appropriate here where witness credibility was not at issue (and only 360networks produced witnesses), the trial was short, and the challenged determination involved the ultimate issue, whether 360networks was ready, willing, and able. [9]  See id., 466 U.S. at 500-501, n.16.  Consequently, de novo review applies here. [10]

B.     The Trustee Also Misstates 360networks' Burden Of Proof.

The Trustee concedes the King World and Food Management cases cited by 360networks accurately reflect 360networks' burden of proof and cites no contrary authority.  See Tr. Br. at 49.  Moreover, the Trustee concedes that 360networks, as the nonbreaching party here, had a limited burden of proof.  Id.  Nonetheless, the Trustee argues that limitation only excused 360networks from "show[ing] what [a] third party would have done in order for the plaintiff to prove its readiness, willingness, and ability to perform."  Id.  Notably, even that concession is sufficient to mandate 360networks' success because a presumption that a third party telecommunication companies would have purchased Asia Capacity from 360networks makes it axiomatic 360networks was ready and willing to order Asia Capacity.

That conclusion is even easier to reach, however, because the Trustee overstates 360networks' burden of proof.  Nothing in King World's language limits its holding to the

---

deferential clearly erroneous standard."  391 F.3d 147, 163-64 (2d Cir. 2004) (emphasis added).  Correspondingly, when citing Traveller's Int'l A.G. v. Trans World Airlines, Inc., 41 F. 3d 1570, 1574-75 (2d Cir. 1994), the Trustee quotes the passage:  "[w]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous", but omits the next sentence in which the Second Circuit states:  "[h]owever, the district court's application of those facts to draw conclusions of law, including a finding of liability, is subject to de novo review."  Tr. Br. at 43; Traveller's, 41 F.3d at 1575 (emphasis added) (citation omitted).  Accordingly, under Second Circuit law, the Bankruptcy Court's legal conclusion regarding whether 360networks was ready and willing is subject to de novo review while the fact findings underlying that conclusion are reviewed for being clearly erroneous.

[9]  The Trustee's suggestion there were two credibility issues is rebutted below.  See page 13 and footnote 15.

[10]  Nevertheless, even under the clearly erroneous standard, examination of the Bankruptcy Court's readiness and willingness conclusion should leave this Court with "the definite and firm conviction that a mistake has been committed."  Doe v. Menafee, 391 F.3d at 164.

ability prong of the ready, willing, and able test or to "third party" conduct. Tr. Br. at 49.

Instead, <u>King World</u>'s elimination of the plaintiff's need to prove what the third party landlord

would have done is merely one example of the Court's broader holding, that the nonbreaching

plaintiff need not prove future conduct would have occurred if that conduct did not happen

"because [the nonbreaching plaintiff] refused to perform a futile act." <u>King World Prods, Inc. v.</u>

<u>Financial News Newtork, Inc</u>, 660 F. Supp. 1381, 1386 (S.D.N.Y. 1987). In effect, the

breaching party's repudiation rendered such future conduct "inherently speculative" and,

therefore, not subject to proof. <u>Id.</u> Here, such "speculative" conduct includes whether

360networks would have ordered and warehoused the Asia Capacity if AGC had not repudiated.

<u>See</u> <u>Opinion</u>, 379 B.R. at 501 (characterizing as "pure speculation" 360networks' witnesses'

testimony that "360networks would have ordered and warehoused the capacity.").

     The Trustee is equally mistaken when limiting <u>In re Food Management Group, LLC</u>, 372

B.R. 171 (Bankr. S.D.N.Y. 2007), to holding the nonbreaching debtor/seller has no burden to

show what a third party would have done in order to prove the debtor/seller's readiness,

willingness, and ability to close the sale. <u>See</u> Tr. Br. at 49-50. In <u>Food Management</u>, the

defendant/buyer argued the debtor/seller could not arrange lease extensions necessary to the sale.

The Court found, however, the debtor/seller might have utilized excess sales proceeds to

purchase the extensions. Hence, "[a]s a matter of law, the debtors were relieved of their

obligation to prove they had the ability to obtain these three lease extensions, because Matrix'

repudiation deprived the debtors of that ability." 372 B.R. at 200. Thus, the Court presumed the

debtor/seller was ready, willing, and able to use the excess sales proceeds based on the

debtor/seller's economic incentive to act and held the seller's repudiation relieved the

nonbreaching debtor/seller from proving that both <u>it</u> was ready and willing to utilize the excess

funds to buy-off the landlords and the landlords would have agreed to the extension.[11]

Consequently, in no sense is the reduction in the scope of 360networks' burden of proof limited to proving what a third party would have done to enable 360networks to perform. Rather, 360networks need not prove the occurrence of any post-repudiation conduct relevant to 360networks' readiness, willingness, and ability. That includes whether 360networks actually would have ordered Asia Capacity because when AGC repudiated, 360networks still had more than sufficient time to formulate a plan and order capacity, but never did so because such actions would have been "futile". Hence, 360networks satisfied its burden of proof as the Bankruptcy Court found 360networks was able (financially, legally, and otherwise) to order Asia Capacity, and 360networks had an economic incentive to order, rather than forfeit, Asia Capacity.

C.     The Bankruptcy Court Misapplied 360networks' Burden of
       Proof And Made Multiple Inferences That Were Both Factually
       Unwarranted And Legally Prohibited.[12]

Among the uncontested facts supporting the conclusion 360networks had a substantial economic incentive to order Asia Capacity in January 2003 are the following:

- Multiple 360networks witnesses testified that 360networks valued the Asia Capacity, would have ordered the Asia Capacity before the ordering period expired, and had ordered and warehoused other telecommunications capacity for future use in a similar situation. See Opinion at 501, n.13.

- Ordering Asia Capacity was cost free to and would have imposed minimal, if any, administrative burden on 360networks. See id. at 500.

---

[11] The same principle, that "[m]oney talks", so nonbreaching party will be presumed to act in its economic interest, applies here because 360networks had a strong economic incentive to order, rather than forfeit, the $100 million of Asia Capacity. See Scholle v. Cuban - Venezuelan Oil Voting Trust, 285 F.2d 318, 322 (2d Cir. 1960) (Second Circuit finds inference appropriate that illiquid buyer was ready, willing, and able to buy stock because stock price increase meant buyer had economic incentive to seek and obtain loan to finance purchase).

[12] The Bankruptcy Court's ruling should be reversed whether utilizing the burden of proof asserted by 360networks or the Trustee and whether reviewed de novo or under the clearly erroneous standard.

- Throughout more than the first year of the contract ordering period, 360networks actively sought to presell the Asia Capacity. See id. at 494.

- Thereafter, and until AGC's anticipatory breach, 360networks continued its sales efforts while focusing on a disposition of the Asia Commitment to Global Crossing or AGC. See id. at 495-96.

- In sworn affidavits by AGC's officers and financial advisors and other documents filed in January 2003, AGC repeatedly admitted that telecommunications companies similarly situated to 360networks then valued and would have ordered Asia Capacity by stating that the buyer's assumption of AGC's obligations to sell Asia Capacity to such companies was a material benefit to AGC from the ANC Sale. See 360 Br. at 26.

- ANC valued the Asia Capacity as demonstrated by ANC's November 2002 agreement to pay approximately $81 million plus assume substantial liabilities that could have exceeded $1 billion to acquire Asia Capacity from AGC as part of the ANC Sale. See Opinion, 379 B.R. at 496; ANC Sale Motion ¶¶ 20-22, 25, Dkt. 17, App. 9.

- AGC thought the Asia Capacity had value as shown in October 2002, when AGC increased its offer to $12 million to acquire 360networks' right to the Asia Capacity, which translated into the value of an allowed claim against AGC for $100 million of Asia Capacity in AGC's impending bankruptcy case. See Opinion, 379 B.R. at 495. Similarly, Global Crossing showed it valued the Asia Capacity by offering to purchase the Asia Commitment from 360networks, but was not "willing to pay [360networks] what [it] felt like the [Asia Commitment] was worth." July 27 Tr. 15-16, Dkt. 907, App. 3.

- 360networks had AGC's Guaranty of the Asia Commitment carved out of 360networks' settlement with Global Crossing. See id. at 496.

Incredibly, however, the Bankruptcy Court ignored virtually all those uncontested facts and never made the requisite inference that 360networks was incentivized (and therefore, ready and willing) to order capacity. Instead, the Bankruptcy Court erred by finding 360networks' "entire case rested on the strength of the inference that [360networks] would have ordered all the capacity because it didn't cost anything." 379 B.R. at 502 (emphasis added).

Compounding that error, the Bankruptcy Court refused to infer 360networks' readiness and willingness to order from facts showing that, as of January 2003, 360networks' attention was focused on realizing upon the Asia Commitment. Until October 2002, 360networks actively

negotiated with AGC and Global Crossing concerning the sale of the Asia Commitment.  Upon

AGC's chapter 11 filing in November 2002, 360networks successfully sought and obtained

membership on AGC's official creditors' committee based on 360networks' $100 million claim.

In February 2003, 360networks filed its $100 million proof of claim.  Id. at 496.  Meanwhile,

360networks had a system in place to ensure 360networks' personnel received sufficient advance

notice of the March 30, 2003 deadline for ordering Asia Capacity.  See July 27 Tr. at 23, 67.

Further, 360networks just had exited chapter 11, so customers no longer could have concern

about 360networks' (as opposed to AGC's) ability to perform.  Thus, 360networks was ready

and willing to order and it is inconceivable 360networks would not have timely ordered the Asia

Capacity absent an affirmative decision not to do so.

Yet, there was no evidence 360networks affirmatively chose not to order.  To the

contrary, beyond extensive evidence 360networks had a strong economic incentive to order and

had the Asia Capacity on its radar screen, 360networks' decision makers' consistent testimony

was "360networks would have ordered and warehoused the capacity."  Opinion, 379 B.R. at 501.

The Trustee incorrectly argues the Bankruptcy Court found such testimony not credible.  See Tr.

Br. at 45.  Instead, the Bankruptcy Court found such "testimony was pure speculation" and

excluded some of it.  See July 27 Tr. at 19, 379 B.R. at 501.  As shown above, that speculation is

exactly why, due to AGC's intervening repudiation, 360networks did not have the burden of

proving it would have ordered.[13]  Instead, 360networks only need prove it was ready and willing,

which was demonstrated by what 360networks said it would have done.  Indeed, whatever

_____

[13]    See In re Food Mgmt. & Group, LLC, 372 B.R. at 192 ("The consequence of that uncertainty [as to whether the
nonbreaching party would have performed] must fall on one side or the other, and as between the breaching
party and the counter-party whose ability to perform was foreclosed by the other[ ] [party's] breach, it is the
breaching party [who should] bear the consequence.").

360networks' burden, persuasive evidence of a plaintiff's readiness and willingness to act is the testimony of the plaintiff's principals. See, e.g., Saewitz vs. Epstein, 6 F. Supp. 2d at 157-58; Ross Bicycles, Inc. v. Citibank, N.A., 613 N.Y.S.2d 538, 539 (N.Y. Sup. Ct. 1994) ("Plaintiff clearly established that it [was ready and willing] through the testimony of its principal . . . .").

The Trustee fails to address all that evidence and simply recites the Bankruptcy Court's explanations for finding 360networks did not value Asia Capacity, which explanations were unsupported in the Record and, in any event, far outweighed by the factors listed above. For example, the Bankruptcy Court found nondisclosure of the Asia Commitment in 360networks' Canadian bankruptcy Information Circular signified 360networks did not view the Asia Commitment as a material asset. See Opinion, 379 B.R. at 501. 360networks has explained at length why that finding was unfounded and the Trustee failed to respond to, let alone rebut, those points. See 360 Br. pp. 33-35. Moreover, as there is no Canadian law governing the Information Circular's content (as acknowledged by the Bankruptcy Court, see 379 B.R. at 501), the Bankruptcy Court should have made the inference favoring 360networks, i.e., 360networks made no disclosure because it thought none was required, rather than an inference favoring the repudiating party, AGC, 360networks made no disclosure because it did not value the capacity.[14]

The Bankruptcy Court's only other findings concerning 360networks' valuation of the Asia Capacity were the Court's admitted (and inappropriate) "speculat[ion]" on why

_____

[14]    In reaching its conclusion, the Bankruptcy Court noted testimony of 360networks' former chief operating officer - - that in January 2003 360networks valued the Asia Capacity at $100 million - - and stated that if such testimony were true, then 360networks necessarily would have disclosed such a material asset. See 379 B.R. at 501. Yet, the COO's testimony has to be interpreted as referencing the value of $100 million of Asia Capacity in hand, which 360networks did not have. Instead, 360networks only had the Asia Commitment, which was the right to order $100 million of Asia Capacity from AGC. That right represented a $100 million claim worth far less than face. Indeed, in October 2002, 360networks had agreed to accept $12 million from AGC for the Asia Commitment because AGC was about to file for bankruptcy protection, reject 360networks' Guaranty, and sell AGC's remaining Asia Capacity. Moreover, by January 2003, AGC had filed for chapter 11 protection and was implementing the sale. Thus, the Bankruptcy Court's reliance on an unjustified understanding of the COO's testimony to find 360networks did not value the Asia Capacity was error.

360networks might not have ordered Asia Capacity. 379 B.R. at 502. Despite the requirement

that all inferences be made in 360networks' favor, the Bankruptcy Court "speculated" that

360networks would not have ordered Asia Capacity because:

- The capacity then was "not saleable, and declining in value", even though, at most, that merely meant that no immediate sale was likely, so the capacity might end up being worth less than $100 million over time, not that it lacked substantial value when held for sale over a 15 to 25 year period (and then would have been available for the booming Asia economies of today).

- 360networks might have been concerned about having to "pay a redesignation fee" to utilize "portability rights" to alter routes after ordering, even though that expense was modest ($15,000 per exercise, while 360networks then had approximately $90 million in cash, see Opinion, 379 B.R. at 493, 496) and any route redesignation was optional, so it only would have been made if necessary to fill a specific customer order for capacity.

- 360networks might have decided "not to divert its sales efforts from its North American core business", even though any such incremental efforts would have been: (a) optional on 360networks' part; (b) implemented by the same 360networks sales personnel handling North America (so no additional cost would have been incurred); and (c) pursued seamlessly with North American sales as the same international customers would have been targeted. See July 27 Tr. 13-14, 19-20, 71 Dkt. 907, App. 3.

Consequently, the controlling principle that "money talks" in determining whether a party was

ready and willing in a commercial setting mandates concluding 360networks was ready and

willing to act in its clear economic interest by ordering $100 million of cost free Asia Capacity.

The Trustee also relies on the Bankruptcy Court's incorrect inference from 360networks'

conduct that 360networks was not ready and willing to order capacity. See Tr. Br. at 44-46.

Specifically, the Bankruptcy Court noted the absence of formal planning meetings (although

360networks was in constant contact with AGC), 360networks' lack of a developed plan to take

down and warehouse Asia Capacity before the two year ordering period expired (although there

still remained more than sufficient time to formulate and implement such a plan), the fact

360networks had not formally ordered Asia Capacity by January 29, 2003, and 360networks'

general practice of seeking to have a buyer in hand before ordering capacity. See Opinion, 379 B.R. at 500-01. Yet, at most, these points merely explain why 360networks had not ordered capacity before AGC's January 2003 repudiation, as in a slow market with declining prices and no customer in hand, 360networks had a strong economic incentive to defer ordering until the end of the contract period. See 360 Br. at 32-33.

In contrast, at the end of the ordering period, the only proper inference from such facts is that 360networks would have continued to act in its economic interest by ordering and warehousing, rather than forfeiting, $100 million of Asia Capacity. 360networks' conduct throughout the ordering period (i.e., consistently seeking to sell the Asia Capacity to third parties and later to Global Crossing or AGC as well as preserving and enforcing its legal rights regarding the Asia Commitment) mandated the inference 360networks would have continued to seek to realize upon the Asia Commitment. Correspondingly, 360networks' ordering and warehousing Atlantic Hibernia capacity in a similar situation required the inference 360networks would have ordered and warehoused Asia Capacity.[15] See Opinion, 379 B.R. at 501, n.13.

Equally unfounded was the Bankruptcy Court's query whether 360networks' original acquisition of the Asia Commitment through a "swap" (i.e., in connection with selling other valuable capacity) might signify 360networks would not have "gone out of pocket to acquire the capacity." Id. at 502. First, 360networks did not have to go out of pocket to order Asia

---

[15]   The Bankruptcy Court acknowledged the Hibernia capacity acquisition, but inexplicably treated it as nonprobative and rejected the appropriate inference because the Court found no other examples to show 360networks had a "general business practice" of preserving valuable non-core assets. Id. Yet, a general business practice was not legally required to show 360networks was ready and willing. Instead, the critical point concerning Hibernia is that when the situation arose, 360networks acted opportunistically and in its economic interest to order and warehouse capacity. The fact such conduct may not have been 360networks' "general business practice" is irrelevant as it is unlikely any business is going to have a general practice concerning non-core assets, which by definition are not central to the business. The Bankruptcy Court wrongly suggested 360networks' loss of some Brazil assets might mean 360networks was willing to forfeit a valuable asset, but 360networks merely gave up worthless stock in a deeply insolvent subsidiary rather than forfeit valuable Asia Capacity owned directly by 360networks. See id.

Capacity.  Second, to the extent there might be future incidental expenses associated with selling capacity, they would be optional and be incurred only to respond to customer demand.  Third, 360networks had demonstrated a willingness to "go out of pocket" to monetize the Asia Commitment by incurring substantial costs of:  (a) negotiating and documenting the original complex Master Agreement; (b) extensive efforts to sell Asia Capacity throughout the ordering period; and (c) actively enforcing its rights in the Bankruptcy Court.

Consequently, only by ignoring the burden of proof and the overwhelming evidence, particularly regarding 360networks' economic incentives, and by making inappropriate inferences, did the Bankruptcy Court not find a preponderance of the evidence demonstrated 360networks was ready and willing to order Asia Capacity in January 2003.

D.      360networks Appropriately Relies On Documents That Were Both
         Designated In The Record On Appeal And Filed In AGC's Bankruptcy Case.

Raising another hyper-technical argument, the Trustee asserts certain Record items cited by 360networks should not be considered in this appeal.  See Tr. Br. at  46.  Specifically, the Trustee challenges the December 2, 2002 Appointment of AGC's official unsecured creditors' committee by the United States Trustee [Dkt. 62], which shows an example of 360networks actively enforcing its rights by obtaining membership on AGC's committee, and the January 28, 2003 affidavits of AGC's CFO and lead restructuring advisor [Dkt. 149], which demonstrate AGC admitted in January 2003, that a major benefit of the ANC Sale would be the buyer's assumption of "substantial claims for unactivated capacity" that otherwise would "be asserted against" AGC when its customers ordered the same Asia Capacity the Trustee insists 360networks was not equally ready and willing to order.  See Tr. Br. at 46.

The Trustee argues appellate review is limited to documents "bearing on the proceedings below and considered by the bankruptcy judge in reaching his decision."  Tr. Br. at 46 (citation

omitted). [16] As the Trustee cannot contend the challenged documents do not bear on the matter below, the Trustee's only argument concerns whether the Bankruptcy Court considered the documents. The Trustee's argument fails for the three reasons established below.

    1.    The Trustee Waived Any Argument That 360networks May Not Rely On The Documents Designated In The Record On Appeal.

The bankruptcy court "is the appropriate forum to resolve the objection" to any designation of the record on appeal. In re Ames Dep't Stores, Inc., 320 B.R. 518, 520 (Bankr. S.D.N.Y. 2005). Nevertheless, although 360networks' Record designation had been filed with the Bankruptcy Court for over two months prior to this appeal being docketed in this Court, the Trustee never filed a motion to strike in the Bankruptcy Court. Additionally, the Trustee designated at least nine items for the record on appeal on the same basis as 360networks, i.e., documents filed in AGC's bankruptcy case that were not formally admitted into evidence at trial. See Trustee's Counter-Designation [Dkt. 962] (designating Docket Nos. 87-90, 123, 156, 178, 230, and 277). Only now, long after the Record was transmitted, this appeal was docketed, and 360networks filed its principal brief, does the Trustee challenge certain designated items. [17]

As the Trustee's time to object has long past, he waived any objection. Also, the Trustee raises his objection in the wrong forum (District Court) and manner (appellate brief). Moreover,

---

[16]    The Trustee's argument relies on In re Tower Automotive, Inc., 241 F.R.D. 162, 171 n. 8 (S.D.N.Y. 2006) and In re Prudential Lines, Inc., 1994 WL 142017 at *2 (S.D.N.Y. Apr. 20, 1994). Both cases concern consideration on appeal of documents: (a) not designated in the appellate record; (b) not filed in the debtor's bankruptcy case; and (c) neither filed nor in existence when the bankruptcy court rendered the decision on appeal. As none of these factors apply to the documents the Trustee challenges, those cases are inapplicable here.

[17]    The Trustee also should be equitably estopped from asserting 360networks may not rely on certain Record entries. Not only did the Trustee designate a record on appeal on the same basis as 360networks, but the Trustee's appeal brief refers to documents that were neither designated in the Record nor in existence when the Bankruptcy Court rendered its decision. See Tr. Br. at 23-24 (citing Docket numbers 952-953). Worse, the Trustee utilizes those references to mischaracterize the Bankruptcy Court's ruling on the Trustee's Fifth Interim Distribution Motion, which the Bankruptcy Court denied solely because it was a transparent and improper attempt to distribute the funds reserved for 360networks' Claim and thereby moot out this appeal.

excluding documents now would unfairly prejudice 360networks, which relied on the Record as designated in drafting its briefs.  As Bankruptcy Rule 8006, which governs designation of the record in a bankruptcy appeal, provides "[t]he record on appeal shall include the items so designated by the parties . . .",  this Court may consider all designated documents.

    2.    All Evidence On Which 360networks Relies Was
          Part Of The Record In AGC's Bankruptcy Case.

    360networks' Claim was litigated as a contested matter in AGC's bankruptcy case.  See In re Indian Palms Assocs., Ltd, B.C., 61 F.3d 197, 204, n. 11 (3d Cir. 1995) (contested matter is part of the main bankruptcy case).  Thus, all documents the Trustee challenges were docketed in the same case in which 360networks' Claim was litigated and had been considered by the Bankruptcy Court during that case.[18]  When designating the record on appeal in a contested matter in a bankruptcy case, parties may draw from the record of the entire bankruptcy case, not just documents referenced in the bankruptcy court's order.  See id. at 204-205  (holding the "contested matter [was] sufficiently associated with the general administration of the debtor's estate that the relevant record should include the case file as well as documents submitted in connection with the motion" on appeal).  Consequently, the challenged documents are properly part of the Record in this appeal.

    3.    Alternatively, This Court May Take Judicial
          Notice Of The Challenged Documents.

    "Federal Rule of Evidence 201 authorizes a court to take judicial notice of an adjudicative fact if that fact is 'not subject to reasonable dispute'".  In re Indian Palms Assocs., Ltd, B.C., 61 F.3d at 205 (holding party's designation of appellate record may be viewed as

---

[18]    Indeed, the ANC Sale was the climax of AGC's bankruptcy case.  Besides, at oral argument on the summary judgment motions, 360networks' counsel referred the Bankruptcy Court to documents concerning the ANC Sale motion that are "part of the record in this case" in addition to the documents included in the parties' declarations.  See 5/24/05 Tr. at 29, Dkt. 680, App. 28.

requesting district court to take judicial notice of portions of record in underlying bankruptcy case). As the appointment of AGC's creditors' committee and both affidavits in question were filed in AGC's bankruptcy case and neither 360networks' committee membership nor AGC's and its advisors' sworn statements is "subject to reasonable dispute", this Court may and, if necessary, should take judicial notice of those documents.

III.  **THE BANKRUPTCY COURT ERRED AS A MATTER OF LAW IN CONCLUDING AGC DID NOT REPUDIATE PRIOR TO JANUARY 29, 2003**

    A.  360networks Was Entitled To Assert That AGC Anticipatorily Breached Its Guaranty Prior To January 29, 2003.

The Bankruptcy Court erred in finding pursuant to Rule 56(d), but prior to any party having taken meaningful discovery, that AGC anticipatorily breached as of January 29, 2003, but not before then. Preliminarily, to the extent the Bankruptcy Court's "finding" that no prior anticipatory breaches occurred was a legal conclusion, that finding was error because Rule 56(d) only permits specifying "the facts that appear without substantial controversy." Regardless, the Trustee fails to address 360networks' argument that simply to defeat the Trustee's motion for summary judgment, which was based solely on the fact 360networks did not formally order Asia Capacity prior to the March 30, 2003 deadline, 360networks was not required to show every anticipatory breach by AGC, or even AGC's earliest breach. Instead, 360networks only needed to show one breach. Hence, contrary to the Trustee's argument, 360networks lacked "'the burden, access and motive' to lay bare [its] own proof on summary judgment" of all of AGC's potential repudiations. Tr. Br. at 36 (quoting In re Asia Global II, 332 B.R. at 532-33).

The Trustee also fails to rebut (or cite authority contrary to) 360networks' interpretation of Rule 56(d) beyond saying it is too "rigid." See Tr. Br. at 37-38. Yet, 360networks' interpretation is based on Rule 56(d)'s language, the most relevant source for interpreting Rule 56(d), particularly as few cases have been decided under the rule. Hence, a Rule 56(d) finding

was inappropriate prior to discovery as the Bankruptcy Court could not have fully "examined" the evidence and it was not yet "practical" to make fact findings.[19] The Trustee's argument that summary judgment <u>on a legal issue</u> may precede completion of discovery misses the mark because Rule 56(d) concerns <u>fact</u> findings.[20] <u>See</u> Tr. Br. at 38. Correspondingly, the Trustee's suggestion 360networks' motion for summary judgment signified "there were no genuine issues of material fact regarding Asia Global's anticipatory repudiation" is nonsensical as 360networks did not seek summary judgment on every potential repudiation and did not prevail on summary judgment concerning pre-January 29, 2003 breaches. <u>Id.</u> Instead, 360networks' motion just helped show AGC's other anticipatory breaches were in "substantial controversy", which also was demonstrated, <u>inter alia</u> by 360networks' counsel's statements.[21]

Moreover, as the Bankruptcy Court noted, and as the Trustee concedes, "an order under Rule 56(d) is not final . . . and may be revised at a later stage in the litigation". Tr. Br. at 37,

---

[19] <u>See</u> <u>Jenkins v. Greyhound Lines, Inc.</u>, No. C-46141, 1971 WL 529, at *3 (N.D. Cal. May 4, 1971) ("In view of the fact that discovery procedures are still pending, and for other reasons, the Court does not deem it 'practicable' to" make 56(d) findings of fact).

[20] The Trustee mistakenly asserts 360networks should have availed itself of Rule 56(f) to show discovery was required to establish prior anticipatory breach dates. Tr. Br. 38. Yet, Rule 56(f) only applies when a party opposing a motion for summary judgment cannot present "facts essential to justify its opposition." Fed. R. Civ. P. 56(f). Here, Rule 56(f) is inapposite as all 360networks needed to (and did) show to defeat the Trustee's summary judgment motion was one anticipatory breach by AGC. Nevertheless, while not filing a Rule 56(f) affidavit expressly requesting discovery in connection with the summary judgment motions, 360networks made clear to the Bankruptcy Court that the Trustee should not obtain any affirmative relief because "it is important to note that the Trustee's [summary judgment] motion should be evaluated with great skepticism because it is being made <u>before</u> any discovery in this matter . . . ." 360networks Reply Mem. of Law at 5, Dkt. 629, App. 29.

[21] Regarding Rule 56(d)'s requirement that the Bankruptcy Court "interrogat[e] attorneys", each time the Court inquired, 360networks' counsel maintained AGC had repudiated. Moreover, when 360networks' counsel stated there were "multiple anticipatory breaches," the Bankruptcy Court did not inquire further. (<u>See</u> 5/24/05 Tr. at 40, Dkt. 680, App. 28.) <u>See</u> <u>Leddy v. Standard Drywall, Inc.</u>, 875 F.2d 383, 386 (2d Cir. 1989) (explaining that "Rule 56(d) specifies [that] the court shall if practicable ascertain what material facts exist without <u>substantial controversy</u> . . . " (emphasis added)). The Trustee (and the Bankruptcy Court) cited <u>Schwimmer v. Sony Corp. of Am.</u>, 637 F.2d 41, 45 n.9 (2d Cir. 1980), to the effect that "statements of 360networks' attorneys" were not sufficient evidence of controversy. <u>See</u> Tr. Br. at 39 (citing <u>In re Asia Global I</u>, 326 B.R. at 252). Yet, <u>Schwimmer</u> involved summary judgment, <u>not</u> Rule 56(d), and granted summary judgment only <u>after</u> discovery had been taken.

- On July 19, 2002, PCL filed for chapter 11 protection, ensuring AGC could not obtain the PC-1 portion of Asia Capacity without paying the full cash price to PCL, which AGC never would have done.

- In October 2002, AGC cancelled the $12 million buy-out deal negotiated with 360networks, signifying AGC (and its bondholders) believed AGC could do better in bankruptcy by rejecting its $100 million Guaranty obligation.

- Just before its November 17, 2002, chapter 11 filing, AGC:  (a) executed (and became legally bound to pursue) the ANC Sale agreement, which provided for the sale of AGC's assets, including its remaining Asia Capacity, without the buyer assuming AGC's Guaranty obligation to 360networks; (b) publicly announced the ANC Sale agreement; and (c) paid Lazard $1 million due upon such announcement.

- Immediately after its chapter 11 filing, AGC filed the ANC Sale and sales procedures motions seeking, inter alia, approval of the sale and a $16 million break-up fee for ANC.  The motions highlighted ANC's urgent need for an immediate sale due to AGC's inability to obtain financing.

See 360 Br. at 39-44[24].  The Trustee fails to contest such facts (just 360networks' interpretation of Mr. Millstein's statements) or that they demonstrate AGC unequivocally communicated its intent not to perform.  Instead, the Trustee and the Bankruptcy Court rely solely on the conclusion that "[t]he contingent nature of the [ANC Sale] agreement [and ANC sale motion] . . . did not constitute" an anticipatory repudiation because it was not "a definitive statement" absent court approval.  Tr. Br. 42; In re Asia Global Crossing I, 326 B.R. at 256.

The Trustee's and Bankruptcy Court's exclusive reliance on the court approval

_____

[24]    The Trustee asserts this Court should not consider certain documents cited by 360networks to help establish AGC's earlier repudiations.  See Tr. Br. at 40.  Specifically, the Trustee references:  (a) so-called "PCL bankruptcy filings" (actually, a filing by PCL in AGC's bankruptcy case), which helps show PCL would not automatically provide PC-1 Capacity to AGC to fulfill AGC's contractual obligations to provide such capacity to buyers; and (b) affidavits filed by AGC in support of the ANC Sale, which show AGC executed the ANC Sale agreement prepetition (which also is stated in the ANC Sale Motion), publicly announced the sale, and paid Lazard $1 million based on that announcement and, therefore, help demonstrate AGC's strong commitment to the sale.  All such documents may be considered on appeal as each was designated in the appellate Record and filed in AGC's bankruptcy case.  See infra Sec. II D.  Further, the Trustee does not contest any of the facts supported by these documents.  Moreover, the affidavits objected to were filed in support of the ANC Sale motion and the entire Bankruptcy Court record was considered by the Bankruptcy Court in determining the cross-motions for summary judgment.  See 5/24/05 Tr. at 29, Dkt. 680, App. 28.

contingency is unsustainable. First, every anticipatory breach based on a statement of intent not to perform is conditional because repudiation always may be retracted. See Argonaut P'ship L.P. v. Sidek, S.A. de C.V., No. 96 Civ 1967, 1996 WL 617335, at *6 (S.D.N.Y. Oct. 25, 1996) ("Once a party repudiates a contract, it may retract the repudiation before the other party changes its position in reliance on the repudiation"). Moreover, other conditions subsequent to a repudiation may exist, as shown by the Bankruptcy Court's determination that AGC repudiated upon court approval of the ANC Sale even though the sale order could have been reversed or reconsidered and the sale closing, which was subject to numerous conditions, remained more than one month away. See In re Asia Global I, 326 B.R. at 256-57.

Even if the requirement for court approval of the sale otherwise could be consequential, it was meaningless here because AGC made clear its only alternative to the sale was discontinuing operations due to lack of financing.[25] Thus, the Bankruptcy Court's and Trustee's reliance on the court approval "contingency" is unjustified. Instead, AGC's actions and statements on Nov. 17, 2002 constituted AGC's unequivocal "'statement . . . indicating that [AGC] will commit a breach that would of itself give [360networks] a claim for damages for total breach'". Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp., 92 N.Y.2d 458, 463 (N.Y. 1998).

C.    AGC Also Anticipatorily Breached In June 2002.

A similar analysis warrants concluding AGC repudiated the Guaranty with the June 2002 statements AGC's lead financial advisor, Jim Millstein, made to 360networks. (July 27 Tr. 98-100, 101-102, Dkt. 907, App. 3.) Millstein's clear message was that: (a) AGC intended and

_____

[25] See ANC Sale motion ¶ 29 ("it is unlikely that [AGC's] current cash resources and projected expenditure 'run rate' will permit it to maintain its business operations and its workforce beyond the first quarter of 2003 without a substantial infusion of fresh capital", which will not occur absent a sale due to "Global Crossing's refusal to honor its funding commitment [to AGC] and . . . the effective closing of the capital markets to the telecommunications industry generally"). Thus, a sale or liquidation was inevitable.

needed to sell all its assets promptly; (b) the Asia Commitment was an obstacle to that sale; and, therefore, (c) 360networks' only choices were:  (i) an out-of-court sale of the Asia Commitment to AGC; or (ii) AGC's rejection of the Guaranty and 360networks' pursuit of a rejection claim in AGC's bankruptcy case.  Performance by AGC was not an option.

The Trustee failed to cite contrary evidence.  See Tr. Br. at 41-42.  Instead, the Trustee relies on the Bankruptcy Court's determination 360networks misinterpreted Millstein's message. Even, however, if Millstein's statements were not crystal clear, the Bankruptcy Court again ignored the edict that all inferences must be made in 360networks' favor.[26]  Regardless, this Court may review Millstein's statements in light of the pre-June 2002 events listed above (which demonstrated AGC's need and intent to sell its assets).  The Court then should determine that Millstein, as AGC's agent, unequivocally communicated AGC's intent not to perform and, therefore, AGC repudiated the Guaranty in June 2002.

## CONCLUSION

For the reasons set forth above and in 360networks' principal brief, 360networks respectfully requests this Court to reverse the January 2 Order and award 360networks an allowed general unsecured claim of $100 million plus costs of collection.

Dated:  May 29, 2008

WILLKIE FARR & GALLAGHER LLP

By: _____
    Alan J. Lipkin (A Member of the Firm)
787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000
alipkin@willkie.com
Attorneys for 360networks Corporation

---

[26]  Millstein's statements were clear.  (See July 27 Tr. 163, Dkt. 907, App. 3 ("THE COURT: . . . Mr. Mueller testified . . . in words or substance that Millstein said we're not going to perform the contract, . . . ").

CERTIFICATE OF SERVICE

The undersigned, a member in good standing of the bar of this Court, hereby certifies that he caused to be served a copy of the Reply Brief of Appellant 360networks Corporation On Appeal From Bankruptcy Court's Order Expunging Claim Number 5 on the following person on May 19, 2008, by ECF and hand delivery:

Adam C. Silverstein, Esq.
Golenbock Eiseman Assor Bell & Peskoe LLP
437 Madison Avenue
New York, New York  10022-7302
Attorney for Appellee

Adam S. Ross, Esq.

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY  10019
(212) 728-8000

aross@willkie.com