UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re ASIA GLOBAL CROSSING, LTD.,

    Debtor.

---

360NETWORKS CORPORATION,

    Appellant,

- against -

ROBERT L. GELTZER, as Chapter 7 Trustee of the Estates of Asia Global Crossing Ltd.,

    Appellee.

1:08-cv-03148-RJH

**MEMORANDUM OPINION AND ORDER**

---

Richard J. Holwell, District Judge:

  The principal question in this bankruptcy appeal is whether a party confronted with an anticipatory repudiation of a contract must prove it was ready, willing, and able to perform in order to recover a downpayment or prepayment under the contract. The Court holds that the answer to that question is "no."

  Appellant-claimant 360Networks Corporation ("360") appeals from orders of the United States Bankruptcy Court for the Southern District of New York (Bernstein, C.J.) expunging its $100 million claim during the bankruptcy proceedings of Asia Global Crossing, Ltd. 360's claim originates in a transaction where 360 acquired an indefeasible right to use $150 million of bandwidth on Global Crossing's Asian networks, and Global Crossing acquired the right to use $200 million of bandwidth on 360's North American network. Commentators (and, apparently, the Bankruptcy Court) view such transactions

with skepticism, because they have been used to artificially inflate revenues reported on businesses' financial statements.

The Bankruptcy Court held that although Global Crossing repudiated its contractual obligations when it obtained the court's approval to sell substantially all its assets, 360 could not recover on its claim because it failed to show it was ready, willing, and able to takedown (i.e., order) capacity. This Court holds that because 360 is merely seeking to recover its $100 million prepayment, the Bankruptcy Court erred in requiring 360 to show it was ready, willing, and able to takedown capacity. The Court, however, remands for further findings as to whether the Global Crossing-360 transaction is a "hollow swap," and therefore unenforceable on public policy grounds.

**I.     BACKGROUND**

**A.     The Parties**

The parties to this appeal operate, or operated, in the once-lucrative field of fiber optic data communications. 360, whose business focuses on the North American market, provides telecommunications capacity to other companies and businesses. Debtors, including Asia Global Crossing Ltd. and Asia Global Crossing Development Co. (collectively, "Asia Global Crossing"), were indirect majority owned subsidiaries of Global Crossing, Ltd. Global Crossing Bandwidth Inc. ("GC Bandwidth") was a selling agent for various Global Crossing entities. For convenience, the Court refers to the Global Crossing entities collectively as "Global Crossing" except where more detail is necessary.

**B.     The Master Agreement and Guaranty**

In March 2001, Global Crossing and 360 entered into a swap transaction in which each party agreed to purchase bandwidth on the other's network. Global Crossing agreed

to purchase $200 million of capacity on 360's North American network and transatlantic cable.  360, for its part, agreed to purchase $150 million of capacity on Global Crossings' Asian networks.  (*See In re Asia Global Crossing, Ltd.*, 379 B.R. 490, 491-92, 502 & n.3 (Bankr. S.D.N.Y. 2007) ("*Asia Global Crossing III*").)  The parties netted their payment obligations, and Global Crossing paid $50 million to 360.  (*Id.* at 502; Trial Tr. 41, July 26, 2007.)

Members of Congress, Global Crossing shareholders, and the financial press have expressed concern that such transactions are nothing more than an accounting trick—a "hollow swap"—designed to artificially inflate the parties' revenues.  (*See, e.g.*, *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 326 (S.D.N.Y. 2004) (Lynch, J.) (describing shareholder allegations against Global Crossing and Arthur Andersen LLP); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436 (S.D.N.Y. 2004) (Lynch, J.) (approving settlement of claims against Global Crossing); Dennis K. Berman, Julia Angwin & Chip Cummins, *How Some Firms Booked Revenue that Was Bogus— Unraveling of Transactions in Highflying Industries Lowered the Boom on Era*, The Asian Wall St. J. (Dec. 24, 2002), at A1; Katherine Reynolds Lewis, *360networks in Scheme with Global Crossing: Allegations Made at Congressional Hearing*, Nat'l Post (Sept. 25, 2002), at FP12; Andrew Backover & Kevin Maney, *Once-Popular Capacity Swaps Now Tangle Telecoms*, USA Today (Feb. 28, 2002), at 1B.)  On October 1, 2002, the Oversight and Investigations Subcommittee of the House Energy and Commerce Committee held hearings on whether various swaps Global Crossing entered into were "sham transactions designed to boost revenues."  (*Capacity Swaps by Global Crossing and Qwest: Sham Transactions Designed To Boost Revenues?: Hearings Before the*

*Subcomm. on Oversight and Investigations of the H. Comm. on Energy and Commerce*, 107th Cong. 1 (2002), *available at* http://www.gpoaccess.gov/chearings/107hcat1.html.) Patrick Joggerst, Global Crossing's former President of Carrier Sales, testified that Global Crossing and 360 entered into the transaction at issue in this case for the sole purpose of meeting Global Crossing's quarterly revenue projections. (*Id.* at 24.) Jim Gorton, Global Crossing's former General Counsel, testified that the transaction "presented too much of a risk to the company," and that "the legal risks associated with a 360 bankruptcy to me outweighed any business purpose that [Global Crossing] had for the transaction." (*Id.* at 533.)

As part of the swap transaction, two 360 subsidiaries entered into a contract, labeled the "Master Agreement," with GC Bandwidth on March 31, 2001. (*See* Pl.'s App., Item 1, at 4 (the "Master Agreement").) Under the Master Agreement, 360 acquired an indefeasible right to use (an "IRU," in industry parlance) $100 million of bandwidth on Global Crossing's Asian networks. (Master Agreement § 2(a); *see generally* Arun S. Subramanian, Note, *Assessing the Rights of IRU Holders in Uncertain Times*, 103 Colum. L. Rev. 2094, 2094-95 (2003).) In exchange, 360 agreed to pay Global Crossing $100 million. (Master Agreement § 2(a).)

Standing on its own, the Master Agreement did not give 360 the right to use any particular network facilities. Instead, 360 acquired the right to order or "takedown" Global Crossing capacity in the future at a rate specified in § 2(l) of the agreement. Section 2(l) provided that the amount of capacity 360 was entitled to would be determined by market prices at the time of delivery. 360 was entitled to $100 million of capacity at the lower of (i) the price listed in Exhibit C to the agreement or (ii) the lowest

price offered by Global Crossing or its affiliates to a non-affiliated third party. (*See* Master Agreement § 2(l).) To secure GC Bandwidth's performance, Asia Global Crossing delivered a guaranty to 360, which was dated March 30, 2001. (*See* Pl.'s App., Item 1, at 81 ("Guaranty").) In it, Asia Global Crossing guaranteed the full performance of GC Bandwidth's responsibility to provide bandwidth under the Master Agreement, as well as certain obligations related to the provision of collocation space. (Guaranty § 2.1.)

**C.     Subsequent Events**

Less than three months after the parties signed the Master Agreement, 360 filed for protection under Canada's bankruptcy statute, the Companies' Creditors Arrangement Act. (*Asia Global Crossing III*, 379 B.R. at 494.) Shortly thereafter, 360 abandoned its plans to develop trans-Pacific capacity and began efforts to sell the rights it acquired under the Master Agreement. (*Id.*) No buyers emerged. (*Id.*) Although 360 could have ordered capacity and "warehoused" it—i.e., left the capacity unused for resale to a future buyer—the Bankruptcy Court found that 360's general practice was to takedown capacity only when it located a buyer to whom it could resell the bandwidth. (*Id.*)

In June 2002, 360 began to consider the possibility of selling its rights under the Master Agreement back to Global Crossing. (*See id.* at 495.) The parties eventually agreed to a repurchase price of $12 million. (*Id.*) The sale was never completed, apparently due to objections by Global Crossing's bondholders. (*See id.*)

By October 2002, it became clear that the Global Crossing entities were headed toward bankruptcy. (*See In re Asia Global Crossing, Ltd.*, 326 B.R. 240, 246 (Bankr. S.D.N.Y. 2005) ("*Asia Global Crossing I*").) On October 21, 2002, several Global Crossing entities entered into a settlement agreement with 360. (*Id.*) In the agreement, GC Bandwidth and 360 exchanged mutual releases with respect to the Master

Agreement. (*Id.*) The releases, however, excluded Asia Global Crossing's obligations under the Guaranty. (*Asia Global Crossing III*, 379 B.R. at 496.) 360 paid Global Crossing $500,000 in connection with the settlement. (*Id.*)

On November 17, 2002, Asia Global Crossing filed for Chapter 11 protection. (*Asia Global Crossing I*, 326 B.R. at 247; *see* 11 U.S.C. § 1101 (2006).) Simultaneously, Asia Global Crossing filed a motion to sell substantially all its assets to Asia Netcom Corp. Ltd. (*Asia Global Crossing I*, 326 B.R. at 247.) If successful, the asset sale would have made it impossible for Asia Global Crossing to perform its obligations under the Guaranty. On January 29, 2003, the Bankruptcy Court approved the sale. (*Id.*)

**D.     Proceedings in the Bankruptcy Court**

On June 10, 2003, the Bankruptcy Court converted Asia Global Crossing's Chapter 11 case to Chapter 7. (*Id.* at 247; *see* 11 U.S.C. § 1112 (2006).) On February 20, 2003, 360 filed a $100 million proof of claim against the Asia Global Crossing estate based on the Guaranty. (*Asia Global Crossing I*, 326 B.R. at 247.) The trustee objected to the claim on the grounds that 360 never ordered any of the capacity available to it, and that 360 never took any of the preparatory steps it was required to perform under the Master Agreement. (*See* Def.'s Opp. Br. 6.) The parties filed cross-motions for summary judgment. (*See Asia Global Crossing I*, 326 B.R. at 247.)

**1. Summary Judgment Opinion and Order**

In a comprehensive opinion, the Bankruptcy Court held that while Asia Global repudiated its obligations under the Guaranty, 360 was required to show it was willing and able to takedown capacity to recover on its claim. The court began by noting that because 360 never ordered capacity under the Master Agreement, it could not recover unless its duty to perform that condition precedent was excused. (*See id.* at 248.) The

court then observed that the doctrine of anticipatory breach may excuse the nonoccurrence of such a condition. (*See id.* at 249.)[1] The Court noted, however, that while repudiation excuses the nonbreaching party's duty to *perform*, that party still must show "that he was ready, willing and able to perform his own obligations but for the repudiation." (*Id.* at 249-50.)

After noting the differences between an anticipatory breach and a party's right to demand assurance of future performances (*see* 326 B.R. at 251-52), the court turned to the question of when if ever Asia Global Crossing repudiated its obligations under the Guaranty, and held that Asia Global Crossing repudiated the Guaranty when the court approved the asset sale. (*Id.* at 256.) Thus, the court held that Asia Global Crossing repudiated the Guaranty as a matter of law on January 29, 2003. (*Id.*) The court then found that factual disputes prevented the entry of summary judgment on the question of whether 360 was ready, willing, and able to perform its obligations when Asia Global repudiated the contract. (*Id.* at 256-57.) In an opinion dated November 10, 2005, the court adhered to these rulings on reargument. (*See In re Asia Global Crossing*, *Ltd.*, 332 B.R. 520 (Bankr. S.D.N.Y. 2005).)

   **2. Trial**

   In July 2007, the Bankruptcy Court held a bench trial to determine whether 360 was ready, willing, and able to takedown capacity under the Master Agreement. After

---

[1] In its canonical form, this doctrine provides that "[w]here performances are to be exchanged under an exchange of promises, one party's repudiation of a duty to render performance discharges the other party's remaining duties to render performance." Restatement (Second) of Contracts § 253(2) (1979). A statement constitutes such a repudiation when it indicates "the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach;" a voluntary act does so if it "renders the obligor unable or apparently unable to perform without such a breach." *Id.* §§ 250(1) and (2).

hearing two days of testimony, the court found that although there were no financial or legal impediments to 360 taking down capacity under the Master Agreement, 360 failed to show that it was *willing* to do so but for Asia Global Crossing's breach. (*Asia Global Crossing III*, 379 B.R. at 491.)

Evidence supporting the court's conclusion included: (i) the absence of proof that 360 ever held the periodic planning meetings the Master Agreement called for (*id.* at 500); (ii) 360's failure to order capacity during the first twenty-two months of the Master Agreement (*id.*); (iii) 360's failure to find a buyer for the Global Crossing bandwidth (*id.*); (iv) the absence of proof that 360 developed a plan to takedown and warehouse unused capacity at the end of the Master Agreement's twenty-four month window (*id.* at 501); (v) the absence of proof that 360 had a general business practice of warehousing capacity it could not immediately resell (*id* at 501 & n.13); and (vi) the failure of 360 to disclose any plans to takedown Global Crossing capacity—or indeed, the existence of its rights under the Master Agreement—in its Canadian bankruptcy proceeding (*id.* at 501-02).

The only positive evidence that 360 was willing and able to perform came from three 360 executives, who testified that although 360 never reduced its plans to writing or held any meetings on the subject, 360 in fact had definite plans to takedown Global Crossing bandwidth during the last two months of the period specified in the Master Agreement. (*See id.* at 501.) The court found this testimony incredible: "One would think that if that was the plan, someone would have mentioned it or written about it during the twenty-two months that the Asia Commitment was open. No one did,

although they freely discussed other options. And if it was never planned or discussed, one wonders who would have executed the plan at the deadline." (*Id.*)

The Bankruptcy Court noted several explanations for why 360 did not develop plans to exercise its rights under the Master Agreement. 360, for example, had experienced significant difficulty selling the IRUs, which were declining in value. (*Id.* at 502.) And, 360 never went "out of pocket" to acquire Global Crossing capacity, as its rights under the Master Agreement were part of a larger swap transaction where it netted $50 million. (*Id.*) Ultimately, the Bankruptcy Court found that 360 had failed to sustain its burden of proof and accordingly expunged its claim. (*Id.* at 502.)

360 appealed. In this Court, 360 contends that: (i) it was not required to show that it was willing and able to takedown capacity; (ii) the Bankruptcy Court clearly erred in analyzing the trial evidence; and (iii) the Bankruptcy Court clearly erred in finding that Global Crossing did not repudiate its obligations prior to January 29, 2003.

## II. DISCUSSION

The only question this Court need consider is whether 360 was required to show it was ready, willing, and able to takedown capacity to recover on its claim. The Court holds that it was not.

### A. The Ready, Willing, and Able Requirement Does Not Apply Where a Party Merely Seeks to Recover a Downpayment or Prepayment

360 argues that although it would have been required to show intent to takedown capacity to recover expectation damages, no such showing is required here since it is merely seeking restitution of the $100 million it paid to Global Crossing. Specifically, 360 contends that under New York law, the plaintiff in a breach-of-contract action need

not establish her intent to perform where she is simply seeking to recover a downpayment or prepayment for services that were never rendered. (*See* Pl.'s Mem. 14-16.)

The Court agrees. The general rule is that following repudiation of a contract, the nonbreaching party may seek expectation damages *or* restitution for the benefits she conferred on the other party. Restatement (Second) of Contracts § 373(1) ("[O]n a breach by non-performance that gives rise to a claim for damages for total breach or on a repudiation, the injured party is entitled to restitution for any benefit that he has conferred on the other party by way of part performance or reliance."); 3 Dan B. Dobbs, *The Law of Remedies* § 12.7(1) (2d ed. 1993) ("The general principle is that upon the defendant's substantial breach or repudiation of an enforceable contract, the plaintiff is entitled to recover restitution of any benefits he has conferred in performance of the contract, for example, any part of the price which he has prepaid, or the reasonable value of any services rendered as contract performance." (footnotes omitted)) ("Dobbs"); 10 Joseph M. Perillo, *Corbin on Contracts* § 979 (rev. ed., supp. 2008) ("If a repudiation is recognized as a breach of contract, the injured party is given the alternative remedy of restitution on the same conditions as in other cases of total breach.") ("Corbin"). *See also Richard v. Credit Suisse*, 152 N.E. 110, 113 (N.Y. 1926) (Cardozo, J.) (where plaintiff contracted with defendant for sale of Polish marks and defendant failed to establish necessary credits, held, plaintiff entitled "to elect between restitution on the one hand and damages on the other").

These alternative remedies protect different interests that a party to a contract holds. Expectation damages, the traditional measure of a nonbreaching party's damages, aim to put the nonbreaching party in as good a position as she would have occupied had

there been full performance. Restitution, by contrast, aims to restore the nonbreaching party to as good a position as the one she occupied before the contract was made, without attempting to compensate her for consequential harms. *See* 11 Corbin § 55.6; 3 Dobbs § 12.7(1).

Where the nonbreaching party seeks damages (used here in the general sense of a monetary remedy for breach of contract) measured by her restitutionary interest, the ready, willing, and able requirement applied by the Bankruptcy Court is inapt. As the Bankruptcy Court recognized, that requirement prevents a nonbreaching plaintiff from claiming *profits* she would not otherwise have been entitled to but for the defendant's breach. *Asia Global Crossing I*, 326 B.R. at 250 ("This principle is merely the application of the general rule that the complaining party must demonstrate that the breach caused him injury; to do this he must prove that he intended to and was able to perform when his performance was due." (internal quotation marks and alterations omitted)). This risk of unjust enrichment, however, is nonexistent when a plaintiff seeks damages measured by her restitutionary interest. Since the plaintiff is only seeking to recover the benefit she conferred on the defendant, there is, logically, no possibility that an award of damages will confer benefits on the plaintiff to which she is not entitled.

A simple hypothetical illustrates the point. Suppose that *B* pays *S* $1,000 for an option to buy *S*'s house for $100,000 at any point within the next five years. Three years into the option term, *S* repudiates the option. *B* sues, seeking damages of $50,000, which is equal to the current market price of the house ($150,000) less *B*'s purchase price ($100,000). To recover, *B* must show she was ready, willing, and able to exercise the option when *B* repudiated. Otherwise, *B* would be awarded profits that she was not

certain to earn. If *B* was not ready, willing, and able to exercise the option, she would have earned nothing notwithstanding *S*'s repudiation. *See Kotcher v. Edelblute*, 164 N.E. 897, 899-900 (N.Y. 1928).

Suppose, however, that instead of purchasing an option to buy the house, *B* makes a $20,000 downpayment on the $100,000 purchase price, and the parties agree that *S* will turn over title when *B* pays the balance of the purchase price, which must occur within five years. Before *B* does so, *S* repudiates the contract by selling the house to *B2* for $200,000. *B* sues to recover her downpayment. Here the law does not require *B* to show she was ready, willing, and able to perform. *See Cipriano v. Glen Cove Lodge #1458, B.P.O.E.*, 801 N.E.2d 388, 394-95 (N.Y. 2003). As the Corbin treatise explains:

> If the plaintiff has made money payments to the defendant and there is later a failure of consideration therefore, involving a repudiation by the defendant or any other breach going to the essence of the contract, the plaintiff can maintain an action for restitution of the money so paid to the defendant, with interest. It makes no difference what was the performance promised by the defendant but not rendered by him; in various cases it has been failure to transfer land or goods or to render some agreed service. The cases so holding are so numerous as to make their citation both impossible and unnecessary.

12 Corbin § 1108.

The Bankruptcy Court rejected the analogy to the second situation on the ground that restitution "is a form of rescission," which in turn was impossible because the Master Agreement and Guaranty were rejected or deemed rejected by operation of bankruptcy law. *Asia Global Crossing III, Ltd.*, 379 B.R. at 497 & n.10. However, the Bankruptcy Court's premise—that restitution requires rescission—was mistaken. While rescission of a contract may be accompanied by an order for restitution, the plaintiff in a breach-of-contract action may also elect to measure her damages by the value of the benefit the

defendant has unjustly retained. 12 Corbin § 1104 ("[A] judgment for . . . restitution is truly a remedy for a 'breach' as is a judgment for damages."); 1 Dobbs § 4.1 ("Restitution is often an appropriate remedy for breach of an enforceable contract, whether or not there is a 'rescission' of that contract."); *see also Abdul v. Subbiah*, 735 N.Y.S.2d 29, 30 (N.Y. App. Div. 2001) ("The trial court's award of damages is warranted by the record and serves to protect plaintiff's 'restitution interest'. Since the breach of contract by non-performance was a total breach, plaintiff was entitled to obtain restitution." (citations omitted)). This is what 360 has elected to pursue. It is not seeking to rescind the Master Agreement, but to recover as damages the value of the benefit Asia Global Crossing's estate has unjustly retained.

At oral argument, the trustee for Asia Global Crossing's estate suggested that 360 was not entitled to recover its downpayment because it had received substantially everything it bargained for in the Master Agreement. (*See* Tr. of Oral Arg. 32, Mar. 12, 2009 ("That right [to order capacity] was provided to 360networks at the moment the contract closed. So 360networks had the right to order the capacity from the moment the contract closed for a two-year period of time."); *id.* at 33 ("There was an anticipatory repudiation on the 22nd month of this two-year window for exercising its right and the court simply found that 360networks would not be injured unless it was going to order the capacity."). This view is also mistaken. Under any fair reading of the Master Agreement, 360 bargained for capacity on Global Crossing's Asian networks—not the empty right to order such capacity in the abstract.

In short, the Bankruptcy Court erred in requiring 360 to prove it was ready, willing, and able to takedown capacity to prevail on its claim. Because 360 only seeks to recover its prepayment, no such showing is necessary.

**B.  Remand Is Necessary To Determine if the Master Agreement Is Unenforceable on Public Policy Grounds**

Ordinarily, that would be the end of the matter. But here, the circumstances surrounding the Master Agreement raise an inference that Global Crossing and 360 may have entered into the agreement solely to inflate their reported revenues and not as part of a bona fide business transaction. Thus, the Bankruptcy Court noted the possibility that the transaction was "just a swap for accounting purposes." (Tr. 19.) And many of the factors cited by the court in support its finding that 360 was not ready, willing, and able to perform could be understood to support a finding that the Master Agreement was not part of a bona fide business transaction. As the court noted, neither party ordered capacity pursuant to the transaction; 360's executives struggled to identify a legitimate business purpose served by the transaction; 360 apparently valued the transaction at such a small figure that it did not reveal it in its Canadian bankruptcy proceeding; and 360 produced no documentary evidence of plans to takedown capacity.

In the Court's view, the possibility that the Master Agreement was not part of a bona fide transaction raises a question as to whether the agreement is unenforceable as a matter of public policy.[2] Under New York law, a contract that results from an illegal

---

[2] There is no requirement that a litigant raise the unenforceability of a contract on public policy grounds. Instead, because litigants generally will have few incentives to reveal the illegality of an agreement they are party to, a court may raise the unenforceability of a contract on public policy grounds sua sponte. Restatement (Second) of Contracts, cp. 8, at 5 (1979) ("Even if neither party's pleading or proof reveals the contravention [of public policy], the court may ordinarily inquire into it and decide the case on the basis of

agreement (such as an agreement to defraud) may fail to give rise to enforceable rights and obligations. In determining whether to enforce such a contract, New York courts consider, among other things, the character of the positive law that was violated, whether that law provides a complete remedial scheme, the extent of forfeiture that would result if the contract is held unenforceable, and whether enforcement of the contract is in the general public interest. *See Lloyd Capital Corp. v. Pat Henchar, Inc.*, 603 N.E.2d 246, 247-48 (N.Y. 1992) (citations omitted); *cf.* Restatement (Second) of Contracts §§ 178(2)–(3) (listing similar factors). "While some bargains are so offensive to society that courts will not entertain the action—essentially leaving the parties where they are—in other cases an illegal agreement is not so repugnant and may be enforced." *Denburg v. Parker Chapin Flattau & Klimpl*, 624 N.E.2d 995, 1001 (N.Y. 1993) (citations omitted). "It is all a matter of degree." *Id.*

This analysis is well illustrated by the Court of Appeals' interesting decision in *X.L.O. Concrete Corp. v. Rivergate Corp.*, 634 N.E.2d 158 (N.Y. 1994). Plaintiff, a concrete company, sued to recover unpaid sums due under a contract it obtained through an illegal conspiracy called "the Club," which controlled the market for high-value concrete contracts in New York City. *See id.* at 160. The Club selected the companies that would be awarded concrete contracts, exacted a two percent commission for "labor peace," and rigged bidding to ensure that the designated company would submit the lowest bid. *Id.* The Court of Appeals held that the illegal origins of the contract plaintiff sued under did not necessarily defeat its claim for contractual damages. Rather, "the critical question [was] whether the contract [was] so integrally related to the agreement,

---

it if it finds it just to do so, subject to any relevant rules of pleading or proof by which it is bound.").

arrangement or combination in restraint of competition that its enforcement would result in compelling performance of the precise conduct made unlawful by the antitrust laws." *Id.* at 161.

A similar analysis should be applied to the Master Agreement. If neither Global Crossing nor 360 entered into the agreement with a bona fide business purpose—if the agreement truly was a hollow swap—the agreement almost certainly would be "integrally related" to an agreement to defraud, and thus would not create enforceable rights and obligations. If 360 but not Global Crossing entered into the Master Agreement with a bona fide business purpose, the enforceability of the agreement would be a closer question. While 360 would have justified expectations in enforcement of the agreement, the public policy against fraud would cut against upholding 360's claim. Lastly, if both 360 and Global Crossing entered into the Master Agreement with a bona fide business purpose, there would be no basis for declining to enforce the agreement; here no public policy would argue against enforcing the contract as written.

The Bankruptcy Court, however, did not reach the questions of whether 360 and Global Crossing acted with a bona fide business purpose, whether the Master Agreement was a hollow swap, and whether the Master Agreement gave rise to enforceable rights and obligations.[3] Accordingly, remand is necessary so the Bankruptcy Court can address these questions in the first instance. *See Goldman v. Esso Virgin Islands, Inc. (In re Duplan Corp.)*, 212 F.3d 144, 157 (2d Cir. 2000) (remanding for further proceedings

---

[3] In a letter dated March 12, 2009, 360 suggested that the Bankruptcy Court ruled on these questions in the course of deciding that the Guaranty did not constitute a fraudulent transfer. *See In re Asia Global Crossing, Ltd.*, 344 B.R. 247 (Bankr. S.D.N.Y. 2006). The Court disagrees. The Bankruptcy Court only ruled that the Guaranty was supported by sufficient consideration to be enforceable as a matter of contract law, *id.* at 253; it did not rule on the enforceability of the Master Agreement and the Guaranty vel non.

where Bankruptcy Court did not make necessary factual findings); *In re Mazzeo*, 167 F.3d 139, 143 (2d Cir. 1999) (same). On remand, the Bankruptcy Court should determine whether and to what extent the Master Agreement is the product of a bona fide business transaction, then determine whether the agreement created enforceable contractual obligations under New York law. Given the Bankruptcy Court's long experience with this case and its skillful management of proceedings to date, the Court expresses no opinion as to whether further evidentiary hearings are necessary before the Court makes these determinations.

## III. CONCLUSION

The Bankruptcy Court's orders expunging 360's claim are reversed, and the case is remanded for further proceedings consistent with this opinion.

SO ORDERED.

Dated: New York, New York
April 29, 2009

Richard J. Holwell
United States District Judge